# Exhibit A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **APRIL 2026**       **04329** |
| E-Filing Number: 2604071963 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION | STARBUCKS CORPORATION |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 100 ROSS ROAD SUITE 200 KING OF PRUSSIA PA 19406 | 2401 UTAH AVENUE SOUTH SEATTLE WA 98134 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 1 | [X] Complaint   [ ] Petition Action   [ ] Notice of Appeal <br> [ ] Writ of Summons   [ ] Transfer From Other Jurisdictions |

**AMOUNT IN CONTROVERSY**

[ ] $50,000.00 or less
[X] More than $50,000.00

**COURT PROGRAMS**

[ ] Arbitration    [ ] Mass Tort    [ ] Commerce    [ ] Settlement
[X] Jury    [ ] Savings Action    [ ] Minor Court Appeal    [ ] Minors
[ ] Non-Jury    [ ] Petition    [ ] Statutory Appeals    [ ] W/D/Survival
[ ] Other: _____

**CASE TYPE AND CODE**

4F - FRAUD

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY** <br> APR **29** 2026 <br> **L. BREWINGTON** | IS CASE SUBJECT TO COORDINATION ORDER? <br> YES     NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| JOE H. TUCKER JR | THE TUCKER LAW GROUP, LLC <br> TEN PENN CENTER <br> 1801 MARKET STREET, SUITE 2500 <br> PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)875-0609 | (215)559-6209 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 56617 | jtucker@tlgattorneys.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *JOE TUCKER JR* | Wednesday, April 29, 2026, 03:26 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**TUCKER LAW GROUP**
Joe H. Tucker, Jr., Esquire (56617)
Julian C. Williams, Esquire (324771)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 875-0609

*Filed and Attested by the Office of Judicial Records 29 APR 2026 03:26 pm L. BREWINGTON*

ATTORNEYS FOR PLAINTIFF
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

| | |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>STARBUCKS CORPORATION,<br><br>Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA<br><br>_____ Term, 2026<br><br>CASE NO.:<br><br>**JURY TRIAL DEMANDED** |

**<u>NOTICE TO DEFEND</u>**

Case ID: 260404329

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney, and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo Angie Y. Lugo partir dela fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus o objectiones a las demandas en contra de su persona. Sea a visado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sim previo a viso o notification. Ademas, la corte puede cumpla con todas las provisiones de esta demanda. Usted puede perer dinero o sus propiedades u otros derechos imporatantes para usted. |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help*. | *Lleva esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servico. Vaya en personal o llame por telefono Angie Y. Lugo la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistensia legal*. |
| Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>1101 Market Street-11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333 | Asociacion de Licenciados de Filadelphia<br>Servicio de Referencia e Informacion Legal<br>1101 Market Street-11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333 |

Case ID: 260404329

**CIVIL ACTION COMPLAINT**

Plaintiff Philadelphia Suburban Development Corporation ("PSDC"), by and through the undersigned counsel, hereby files this Complaint against Defendant Starbucks Corporation ("Starbucks"), and in support thereof alleges as follows:

**INTRODUCTION**

1.      PSDC brings this action against Starbucks for breach of a commercial lease (the "Lease") and fraud concerning a property located at 2628-32 N. Broad Street, Philadelphia, Pennsylvania 19132 (the "Property"). The Property sits at the intersection of Broad Street and Lehigh Avenue in North Philadelphia—a historically underserved, predominantly Black community.

2.      In April 2018, two Black men were arrested at a Starbucks in Philadelphia. They had been sitting at a table, waiting for a business associate. They had not ordered anything. A Starbucks employee called the police. The arrest was recorded, the video spread, and the nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

3.      Starbucks's CEO traveled to Philadelphia to apologize personally, calling the arrests "reprehensible." The company closed more than 8,000 stores for racial bias training. Starbucks publicly committed to investing in underserved communities—particularly in Philadelphia, the city it had embarrassed.

4.      Starbucks announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development in underserved neighborhoods. Philadelphia was one of twelve cities targeted for investment. Starbucks

Case ID: 260404329

committed to opening "Community Stores" in these neighborhoods—stores designed to partner with local nonprofits and create economic opportunity.

5.      PSDC—a Pennsylvania developer with fifty years of experience in Philadelphia focused on community development and social service—partnered with Starbucks to bring a Community Store to North Philadelphia.

6.      Starbucks's commitment was not limited to press releases.  Starbucks representatives actively participated in community meetings, including meetings of the Broad and Ridge Opportunities for Communities ("BROC"), making direct promises to North Philadelphia residents and community organizations about its plans to open and operate a Community Store.  The Community trusted and believed Starbucks would fulfill its promise.

7.      On October 27, 2021, PSDC and Starbucks executed the Lease.

8.      PSDC invested millions preparing the site, demolishing existing structures, performing construction work, and coordinating with local nonprofits.

9.      Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.

10.     PSDC's investment and concessions were premised on Starbucks's commitment to perform.

11.     The Starbucks store would catalyze broader community investment. PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community."  Economist Kevin C. Gillen, PhD estimates that the project would

Case ID: 260404329

generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.

12.    PSDC partnered with Starbucks in reliance on those commitments and promises, assuming substantial financial risk on the understanding that Starbucks would perform.

13.    Starbucks did not keep its promises.

14.    In fact, Starbucks delayed obtaining its building permits—its responsibility under the Lease—and then used those delays as a pretext to terminate.

15.    When its own conduct caused the project to become more expensive, Starbucks used that increased cost as further justification to exit.

16.    On November 19, 2025, Starbucks claimed it was "unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

17.    Starbucks's termination right had expired.  Its delays were self-created.  Its conduct over four years demonstrates bad faith.

18.    Starbucks betrayed the North Philadelphia community.

19.    PSDC brings this action to recover damages and to obtain a declaration that Starbucks's purported termination is invalid.

## PARTIES

20.    Plaintiff Philadelphia Suburban Development Corporation is a Pennsylvania corporation with its principal place of business at 100 Ross Road, Suite 200, King of Prussia, Pennsylvania 19406.

Case ID: 260404329

21.    Defendant Starbucks Corporation is a Washington corporation with its principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks is registered to do business in Pennsylvania and regularly conducts business in Philadelphia County.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 42 Pa. C.S. § 931.  The amount in controversy exceeds the jurisdictional limit of the Philadelphia Municipal Court.

23.    This Court has personal jurisdiction over Starbucks because Starbucks is registered to do business in Pennsylvania, regularly conducts business in Philadelphia County, and entered into the Lease at issue in this action in Philadelphia County.

24.    Venue is proper in Philadelphia County pursuant to Pa.R.Civ.P. 1006 because the Property at issue is located in Philadelphia County and a substantial part of the events giving rise to this action occurred in Philadelphia County.

## FACTUAL BACKGROUND

### A. The 2018 Starbucks Philadelphia Incident and Its Aftermath.

25.    On April 12, 2018, Rashon Nelson and Donte Robinson were arrested at a Starbucks in Philadelphia's Rittenhouse Square.  They had been sitting at a table waiting for a business associate.  They had not ordered anything.  A Starbucks employee called the police.

26.    The arrest was recorded.  The video spread.  The nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

Case ID: 260404329

27.     Starbucks's CEO, Kevin Johnson, traveled to Philadelphia to apologize, calling the arrests "reprehensible."

28.     Starbucks settled with Nelson and Robinson.  The City of Philadelphia settled for a symbolic $1 each, plus $200,000 for a program supporting young entrepreneurs in underserved communities.

29.     Starbucks closed more than 8,000 stores for an afternoon of racial bias training.

30.     In the wake of the incident, Starbucks publicly committed to investing in underserved communities.  The company announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development. Philadelphia was one of twelve cities targeted for investment.

31.     Starbucks committed to opening "Community Stores" in underserved neighborhoods—stores designed to partner with local nonprofits, hire from the community, and create economic opportunity.

32.     Bringing a Community Store to Philadelphia was a centerpiece of Starbucks's public response to the 2018 crisis.

33.     Unfortunately, Starbuck's public response was performative as it had no intention of following through on its promises.  Instead, Starbucks wanted to wait for the public furor to subside before it would renege.

**B. PSDC's History and Mission.**

34.     PSDC is a Pennsylvania developer with fifty years of experience in Philadelphia.  Its mission centers on community-oriented development—working with tenants, nonprofits, and community organizations to ensure development benefits residents rather than displacing them.

Case ID: 260404329

35.    PSDC has partnered with organizations across North Philadelphia to coordinate development that serves the community.

### C. Starbucks's Direct Commitments to North Philadelphia.

36.    Starbucks's commitment to North Philadelphia went beyond public announcements.  Starbucks representatives actively participated in community meetings and meetings of BROC—a community organization coordinating development along the Broad and Ridge corridor in North Philadelphia.

37.    At those meetings, Starbucks made direct promises to community residents and organizations to open a Community Store and invest in the neighborhood.  Those promises were specific, repeated, and relied upon.

38.    PSDC also relied on those promises.

39.    The Starbucks store would catalyze broader community investment. PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community."  Economist Kevin C. Gillen, PhD estimates that the project would generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.  PSDC's development vision for the Broad and Lehigh site, and Starbucks's role as anchor tenant and community partner, is set forth in the presentation attached hereto as Exhibit A.

40.    Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader $1 billion development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.  PSDC invested

Case ID: 260404329

millions with a modest expected return, premised on Starbucks's presence catalyzing broader community investment.

### D. The Lease.

41.    On October 27, 2021, PSDC and Starbucks executed the Lease for the Property.  A true and correct copy is attached hereto as Exhibit B.

42.    Under Section 2.2, PSDC agreed to lease the Property to Starbucks for twenty years, with three ten-year extension options—a potential fifty-year term.

43.    Under Section 3.1, Base Rent was $12,500 per month for Years 1-5, with scheduled increases thereafter.

44.    Under Section 4.1, PSDC agreed to complete certain work on the Property ("Landlord's Work"), including offsite improvements and obtaining permits and approvals required to operate the Premises.

45.    Under Section 4.4, PSDC agreed to provide Starbucks a $300,000 Tenant Improvement Allowance.

46.    Under Section 17, Starbucks had termination rights during a defined "Feasibility Period."   Section 17.2 provided that if Starbucks could not obtain its "Governmental Approvals"—building permits and certificate of occupancy—on satisfactory terms prior to expiration of the Feasibility Period, Starbucks could terminate the Lease.

47.    The Feasibility Period expired on February 24, 2022, nearly three years before Starbucks sent its November 2025 termination letter.

### E. PSDC Performs Its Obligations.

48.    PSDC fulfilled all its obligations under the Lease.

49.     PSDC invested millions preparing the Property, including demolition, site work, and construction.

50.     PSDC obtained all required zoning and platting approvals.

51.     PSDC coordinated with local nonprofits to integrate the Starbucks store into broader community development efforts.

52.     On September 12, 2022, PSDC sent Starbucks a letter, notifying Starbucks that the Premises would be delivered within 180 days.  A true and correct copy is attached hereto as Exhibit C.

53.     PSDC completed Landlord's Work and tendered timely delivery of the Premises.

**F.  <u>Starbucks Delays and Then Uses Its Own Delays as a Pretext.</u>**

54.     Starbucks failed to perform its obligations under the Lease.

55.     Obtaining Governmental Approvals—building permits and certificate of occupancy—was Starbucks's responsibility under Section 17.

56.     Starbucks failed to diligently pursue those approvals.  It delayed submitting permit applications.  It delayed responding to City inquiries.  It delayed taking the steps necessary to obtain its permits.  At every stage, Starbucks created the very delays it later cited as grounds for termination.

57.     Starbucks's conduct also drove up project costs.  Starbucks cannot invoke cost increases of its own making as justification to terminate.

58.     By April 2024—more than two years after the Feasibility Period had expired—the parties were in discussions regarding the Commencement Date and Rent Commencement Date.  On April 10, 2024, PSDC and Starbucks agreed by telephone

that the Rent Commencement Date would be March 5, 2024.  A true and correct copy of the email chain confirming that agreement is attached hereto as Exhibit D.

59.    PSDC prepared a Date Certificate reflecting those agreed terms, including a Commencement Date of March 11, 2023, and a Rent Commencement Date of March 5, 2024.  A true and correct copy is attached hereto as Exhibit E.  Starbucks never executed the Date Certificate.  Starbucks never paid rent.  Starbucks never opened.

60.    In fact, Starbucks obtained Commercial Building Permit No. CP-2023-003383 on February 4, 2025—nine months before it sent its termination letter.  The permit authorized new construction of a detached drive-through structure for use as a restaurant at 2628 N. Broad Street.  A true and correct copy is attached hereto as Exhibit F.  Starbucks's claim that it was "unable" to obtain Governmental Approvals was false: it had already obtained them.

## G. Starbucks's Purported Termination.

61.    On November 19, 2025, Starbucks sent a letter purporting to terminate the Lease.  A true and correct copy is attached hereto as Exhibit G.

62.    Starbucks claimed it was exercising its "option to terminate the Lease effective immediately" under Section 17.2 because it "has been unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

63.    Starbuck's purported termination was wrongful for four independent reasons.

64.    First, Starbucks's termination right had expired.  Section 17.2 permitted termination only during the Feasibility Period, which ended on February 24, 2022, nearly three years before Starbucks invoked it.

Case ID: 260404329

65.    Second, Starbucks caused the delays it relied upon.  It delayed permit applications, delayed responding to the City, and delayed at every step—then pointed to those delays as grounds to walk away.  A party may not create the condition that triggers its own termination right.

66.    Third, Starbucks acted in bad faith throughout.  Starbucks made promises to PSDC and to the North Philadelphia community, negotiated lease terms, agreed to a Rent Commencement Date, and watched PSDC invest millions.  Then Starbucks walked away, abandoning its obligations.

67.    Fourth, Starbucks's claimed inability to obtain Governmental Approvals is directly contradicted by the record.  Starbucks obtained its commercial building permit on February 4, 2025.  Nine months later it claimed inability.  That claim was false.

68.    Starbucks's purported termination is invalid.  The Lease remains in effect.

**H. <u>Damages.</u>**

69.    As a result of Starbucks's breach, PSDC has suffered substantial damages, including but not limited to:

a.    Costs incurred in performing Landlord's Work, including demolition, site work, and construction;

b.    Costs to relocate an existing tenant to make way for Starbucks;

c.    Zoning and platting approval costs;

d.    Broker commissions;

e.    The value of the land and the present value of the completed building as a capital asset;

f.    Lost rent and lost profits during the base twenty-year term;

Case ID: 260404329

g.  Lost lease value attributable to the three ten-year extension options; and

h.  Attorneys' fees and costs.

70.  PSDC reserves the right to prove the full extent of its damages at trial.

71.  Under Section 23.14 of the Lease, the prevailing party is entitled to reasonable attorneys' fees.

## COUNT I
## BREACH OF CONTRACT

72.  PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

73.  The Lease is a valid and enforceable contract.

74.  PSDC performed all its obligations under the Lease.

75.  Starbucks breached the Lease by:

a.  Failing to pay rent;

b.  Failing to execute the Date Certificate;

c.  Failing to diligently pursue its Governmental Approvals;

d.  Purporting to terminate after its termination right had expired; and

e.  Repudiating its obligations.

76.  As a direct result of Starbucks's breach, PSDC has suffered substantial damages in an amount to be determined at trial.

77.  PSDC is entitled to attorneys' fees as the prevailing party under Section 23.14.

Case ID: 260404329

## COUNT II
## FRAUD

78.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

79.    Starbucks made material misrepresentations to PSDC and the North Philadelphia community, including:

    a.    Starbucks publicly and directly represented to PSDC and to community members at BROC meetings and community gatherings that it was committed to opening a Community Store in North Philadelphia and investing in the neighborhood.

    b.    In October 2021, Starbucks executed the Lease, representing by that act its commitment to lease the property for twenty years, pay rent, and operate a Community Store; and

    c.    In April 2024, Starbucks agreed to and confirmed a Rent Commencement Date of March 5, 2024, representing its intent to honor its obligations under the Lease.

80.    Those representations were false.  Starbucks executed the Lease and made representations to PSDC and the community while failing to take the steps necessary to perform—delaying permit applications, failing to respond to City inquiries, and allowing the project to stall.  Starbucks obtained a commercial building permit in February 2025, demonstrating that performance was achievable, then claimed inability nine months later.  That pattern of conduct demonstrates that Starbucks's representations were knowingly false when made or were made with reckless disregard for their truth. Starbucks did not intend to fulfill its obligations.

Case ID: 260404329

81.    Starbucks made those representations intending that PSDC would rely on them and invest millions in the Property.

82.    PSDC justifiably relied on those representations by investing millions in the Property, obtaining zoning and platting approvals, coordinating with local nonprofits, accepting below-market rent, and assuming substantial financial risk.

83.    As a direct result of Starbucks's fraudulent misrepresentations, PSDC has suffered substantial damages in an amount to be determined at trial.  Because PSDC's claims sound in fraud, PSDC is entitled to recover all losses proximately caused by Starbucks's misrepresentations—including damages beyond the benefit of the bargain.

84.    Starbucks made public commitments to a historically underserved community in response to a national social injustice.  It induced PSDC to invest millions in reliance on those commitments.  It then walked away—abandoning its contractual obligations and the community it had promised to serve.  That conduct warrants punitive damages.

**COUNT III**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

85.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

86.    Every contract governed by Pennsylvania law contains an implied covenant of good faith and fair dealing.  That covenant requires each party to exercise its contractual discretion honestly and in a manner consistent with the reasonable expectations of the other party.

Case ID: 260404329

87.     Starbucks exercised its discretion under the Lease, including its discretion in pursuing Governmental Approvals, managing the construction timeline, and ultimately invoking Section 17.2 in bad faith and in a manner that frustrated PSDC's reasonable contractual expectations.  Specifically, Starbucks breached the implied covenant by:

   a.   Deliberately creating delays and then invoking them as a pretext to terminate;

   b.   Causing the project to become more expensive through its own conduct and then using those increased costs as a basis to exit;

   c.   Entering into and negotiating the Lease and allowing PSDC to invest millions while Starbucks delayed and failed to perform its obligations;

   d.   Obtaining a commercial building permit in February 2025 and then falsely claiming inability to obtain Governmental Approvals nine months later; and

   e.   Invoking a termination right that had expired years earlier.

88.     As a direct result of Starbucks's breach of the implied covenant, PSDC has suffered substantial damages in an amount to be determined at trial.

### COUNT IV
### DECLARATORY JUDGMENT

89.     PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

90.     An actual controversy exists between the parties regarding the validity of Starbucks's purported termination of the Lease.  PSDC is entitled to declaratory relief pursuant to the Declaratory Judgment Act, 42 Pa. C.S. § 7531 *et seq*.

91.     PSDC is entitled to a declaration that:

Case ID: 260404329

    a.    Starbucks's purported termination is invalid and of no legal effect;

    b.    The Lease remains in full force and effect; and

    c.    Starbucks owes rent and is obligated to perform under the Lease.

## COUNT V
## PROMISSORY ESTOPPEL
## (Alleged in the Alternative)

92.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

93.    This Count is pleaded in the alternative pursuant to Pa.R.Civ.P. 1020(c).

94.    Starbucks made clear and definite promises: to lease the Property for fifty years, to pay rent, to operate a Community Store, and to perform its obligations under the Lease.  Starbucks also made direct and repeated promises to North Philadelphia residents and organizations at BROC meetings and community gatherings about its commitment to the neighborhood.

95.    Starbucks made those promises with knowledge that PSDC and the community would rely on them.

96.    PSDC reasonably relied on those promises by investing millions in the Property, obtaining approvals, coordinating with nonprofits, accepting below-market rent, and taking on substantial financial risk.

97.    PSDC suffered substantial detriment as a result of that reliance.

98.    Injustice can be avoided only by enforcement of Starbucks's promises.

99.    PSDC is entitled to damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community.

Case ID: 260404329

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Philadelphia Suburban Development Corporation respectfully requests that this Court enter judgment in its favor and against Defendant Starbucks Corporation as follows:

A. On Count I, compensatory damages in an amount to be determined at trial, including lost rent, lost profits, and the value of PSDC's investments in the Property;

B. On Count II, all damages proximately caused by Starbucks's misrepresentations, including damages beyond the benefit of the bargain, plus punitive damages;

C. On Count III, compensatory damages in an amount to be determined at trial;

D. On Count IV, a declaration pursuant to 42 Pa. C.S. § 7531 *et seq.* that Starbucks's purported termination is invalid and of no legal effect, that the Lease remains in full force and effect, and that Starbucks owes rent and is obligated to perform;

E. On Count V, in the alternative, damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community;

F. Attorneys' fees and costs pursuant to Section 23.14 of the Lease;

G. Pre-judgment and post-judgment interest; and

H. Such other and further relief as the Court deems just and proper.

Case ID: 260404329

**JURY DEMAND**

PSDC demands a trial by jury on all issues so triable.


Respectfully Submitted,

**TUCKER LAW GROUP, LLC.**


Dated:April 29, 2026            BY: /s/ *Joe H. Tucker, Jr.*
                                Joe H. Tucker, Jr., Esquire
                                Julian C. Williams, Esquire

                                *Attorneys for Plaintiff,*
                                *Philadelphia Suburban Development*
                                *Corporation*

Case ID: 260404329

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania, Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.


**TUCKER LAW GROUP, LLC**


Date:  April 29, 2026

/s/ *Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,*
*Philadelphia Suburban Development*
*Corporation*

Case ID: 260404329

## VERIFICATION

I, **Mark R. Nicoletti, Sr.**, verify that I am the President and Co-CEO of the Philadelphia Suburban Development Corporation ("PSDC"), and as such I am authorized to take this Verification on behalf of Plaintiff, PSDC, that I have reviewed the foregoing *Complaint*, the factual averments in the *Complaint* are based upon information which has been gathered by counsel for PSDC in the preparation for the prosecution of this lawsuit. The language of the *Complaint* is that of counsel and not of signer. I verify that I have read the *Complaint,* and the statements therein are true and correct to the best of my knowledge, information and belief. To the extent that the contents of the *Complaint* are that of counsel, signer has relied upon counsel in taking this Verification. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities.

Date: 4/24/2026

DocuSigned by:

9A1E248401824BB...

Mark R. Nicoletti, Sr.



*Filed and Attested by the*
*Office of Judicial Records*
*29 APR 2026 03:26 pm*
*L. BREWINGTON*

# Exhibit A

Case ID: 260404329

Case ID: 260404329



# BROAD AND LEHIGH

A $1B transformational investment in North Philadelphia to benefit the people living and working in the community

P.S.D.C
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

RWG
RIVERWARDS GROUP

Kevin Gillen

Gensler

November 2023



# VISION

A welcoming, transit oriented, mixed-use project with 3,000+ units of affordable housing that will serve the local community and be a catalyst for economic development.



BROAD AND LEHIGH

Case ID: 260404329

P.S.D.C    RWG    Kevin Gillen    Gensler



# ECONOMIC + FISCAL IMPACT

**Kevin Gillen**

- Estimated to generate **$4.4B in total economic stimulus** to the City of Philadelphia

- Total of **9,570 jobs created** and/or supported during the construction phase

- Additional **571 jobs created** and supported during occupancy and operation with average wage projected to be $46,252

- With 25% minority participation, **2,535 jobs will be allocated to minorities**

- Over 12 years, the project is estimated to increase the current tax revenue of this location by **951%** with just over **$328M to the City of Philadelphia**

- Upon completion, **real estate and use and occupancy tax will increase by 951%** from the site's current use.

*November 2023 Economic and Fiscal Impact of the Proposed Board and Lehigh Affordable Housing, Mixed-Use and Social Services Real Estate Development Project in Philadelphia, PA Report by Kevin C. Gillen, Ph.D.*

Case ID: 260404329

P·S·D·C PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION | RWG | Kevin Gillen | **Gensler**



# AFFORDABLE HOUSING

Committed to delivering over 3,000 units of affordable housing that includes a mix of studio, one- and two-bedroom units to support a diverse range of household ages and sizes in the neighborhood.

Program includes:

• Naturally Occurring Affordable Housing (NOAH)

• Workforce/Affordable Housing

• Recovery Housing

• Affordable Senior Housing

Case ID: 260404329

BROAD AND LEHIGH

P·S·D·C  RWG  Kevin Gillen | Gensler

# HOUSING PROGRAM

| Type | Percent / Type | Unit Count |
|---|---|---|
| **Workforce / Affordable** | 60% unit/40% common | **1,215** |
| Studio | 15% | 378 |
| 1BR | 12% | 214 |
| 1BR - JR | 15% | 338 |
| 2BR | 18% | 285 |
| **Affordable: Recovery** | -- | **100** |
| **Affordable: Senior Housing** | 60% unit/40% common | **222** |
| Studio | 15% | 69 |
| 1BR | 12% | 39 |
| 1BR - JR | 15% | 61 |
| 2BR | 18% | 52 |
| **NOAH Units** | 60% unit/40% common | **987** |
| Studio | 15% | 307 |
| 1BR | 12% | 174 |
| 1BR - JR | 15% | 274 |
| 2BR | 18% | 232 |
| **NOAH Units** (by others) | 60% unit/40% common | **616** |
| Studio | 15% | 192 |
| 1BR | 12% | 108 |
| 1BR - JR | 15% | 171 |
| 2BR | 18% | 145 |

**3,140 Total Units**

- Workforce / Affordable Housing — 1,215 Units — 39%
- Recovery Housing — 100 Units — 3%
- Affordable Senior Housing — 222 Units — 7%
- Naturally Occurring Affordable Housing (NOAH) — 987 Units — 31%
- Naturally Occurring Affordable Housing (NOAH) (by others) — 616 Units — 20%



Case ID: 260404329

Kevin Gillen | RWG | P.S.D.C | Gensler

BROAD AND LEHIGH



# SOCIAL + HUMAN SERVICES

Leveraging and expanding a holistic set of social and human services to support existing residents and neighborhoods across North Philadelphia.

Program includes:
- Employment Training
- Senior Daycare
- Child Daycare
- Recovery/ Rehabilitation Services
- Heath and Wellness
- Food Access

Case ID: 260404329

P·S·D·C | RWG | Kevin Gillen | Gensler

# SERVICES PROGRAM

| Type | Area (GSF) | Unit Count |
|---|---|---|
| Social / Human Services | 162,200 | -- |
| Daycare | 9,500 | -- |
| Community Retail | 90,100 | -- |
| Full-Service Grocer | 41,900 | -- |

303,700 GSF

- 53% — Social / Human Services
- 3% — Daycare
- 30% — Retail
- 14% — Grocer



Community Retail & Social Services
Daycare
Community Retail
Existing Social / Human Services
Full-Service Grocer
Community Retail

Case ID: 260404329

P.S.D.C   RWG   Kevin Gillen   Gensler

BROAD AND LEHIGH



# PROGRAM RATIOS



# PROGRAM SUMMARY

| Type | | Area (GSF) | Unit Count |
|---|---|---|---|
| 🟡 | Workforce / Affordable | 1,100,000 | 1,215 |
| 🟡 | Affordable: Recovery | 211,800 | 100 |
| 🟤 | Affordable: Senior Housing | 196,000 | 222 |
| 🟡 | NOAH | 870,000 | 987 |
| 🟠 | NOAH (by others) | 544,300 | 616 |
| 🔵 | Social / Human Services | 162,200 | -- |
| 🟢 | Daycare | 9,500 | -- |
| 🔴 | Community Retail | 90,100 | -- |
| 🔴 | Full-Service Grocer | 41,900 | -- |
| | *Development Subtotal* | **3.23M** | **3,140** |
| | | | |
| 🟢 | Open Space (Public) | 125,100 *(2.87 ac)* | -- |
| 🟢 | Open Space (Private Amenity) | 162,400 *(3.73 ac)* | -- |
| | | | |
| 🟣 | Structured Parking | 553,200 | 1,382 spaces |
| 🟣 | Surface Parking | 76,200 | 234 spaces |
| 🔵 | Adjacent Street Parking | 36,800 | 147 spaces |
| | *Parking Subtotal* | **666,200** | **1,763 spaces** |

Program-Based Parking Demand — 1,477 spaces

*Note: Development team controls approximately 80% of the total square footage represented in the program summary above.*

Case ID: 260404329

BROAD AND LEHIGH

P·S·D·C  RWG  Kevin Gillen | Gensler



Septa Regional:
North Broad

Broad Street Line:
North Philadelphia

Broad Street

Lehigh Avenue

Amtrak Station:
North Philadelphia

# PROPERTY OWNERSHIP

PSDC has 55% site control within the vision focus area at Broad and Lehigh

| Transit Line Name | Acreage | Share of Ownership |
|---|---|---|
| ● PSDC-Controlled | 9.31 | 55% |
| Other Stakeholders | 7.52 | 45% |
| ● SEPTA | 1.60 | 10% |
| ● School Dist. of Philadelphia | 1.82 | 11% |
| ● Other (Private) Entities | 4.10 | 24% |



Case ID: 260404329

P·S·D·C PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION | RWG RITTENHOUSE WOODS GROUP | Kevin Gillen | Gensler



# ACCESS TO TRANSPORTATION

Focused investments that leverage existing transit networks and improve the user experience will enhance equitable access and mobility for residents and workers.

| Transit Line Name | Station(s) | Type | Authority |
|---|---|---|---|
| Keystone Service | N. Philadelphia | Regional Rail | Amtrak |
| Manayunk/Norristown Line | N. Philadelphia | Regional Rail | SEPTA |
| Lansdale/Doylestown Line | N. Philadelphia | Regional Rail | SEPTA |
| Trenton Line | N. Broad Street | Regional Rail | SEPTA |
| Chestnut Hill West Line | N. Broad Street | Regional Rail | SEPTA |
| Broad Street Line | N. Philadelphia | Local Rail | SEPTA |
| Route 54 - Lehigh Ave | Lehigh Ave | Local Bus | SEPTA |
| Route 16 - Cheltenham | Broad Street | Local Bus | SEPTA |
| Route 4 - Fern Rock Trans. Ctr. | Broad Street | Local Bus | SEPTA |
| Bike Route - Ridge Ave to Delaware River Waterfront | N/A | Bike Lane | Phila Streets |

BROAD AND LEHIGH

Case ID: 260404329

P·S·D·C PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION    RWG RIVERWARDS GROUP    Kevin Gillen | Gensler

# COMMUNITY IMPROVEMENTS

Enhance the comfort, safety, beauty, and walkability of neighborhood streets to further strengthen a sense of pride and identity in the community.



Landscape



Art + Architecture



Medians & Road Modifications



Street Furnishings

Case ID: 260404329

Kevin Gillen — RWG | Gensler

P.S.D.C

BROAD AND LEHIGH

Case ID: 260404329

# THANK YOU

P.S.D.C
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

RWG
RIVERWARDS GROUP

Kevin Gillen

Gensler

# Exhibit B

Case ID: 260404329

STARBUCKS

**GROUND LEASE**

**2628-32 N. Broad Street**
**Philadelphia, PA  19132**

**between**

**PHILADELPHIA-SUBURBAN DEVELOPMENT CORPORATION**

**and**

**STARBUCKS CORPORATION**

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)

STARBUCKS

Case ID: 260404329

**TABLE OF CONTENTS**

Page

1. PROPERTY .................................................................................................................. 1
2. LEASE; TERM. ........................................................................................................... 1
   2.1    Lease ............................................................................................................... 1
   2.2    Term................................................................................................................. 1
   2.3    Commencement Date....................................................................................... 2
   2.4    Lease Year ....................................................................................................... 2
   2.5    Extension ......................................................................................................... 2
3. RENT. ......................................................................................................................... 3
   3.1    Base Rent ........................................................................................................ 3
   3.2    Alternative Rent Period.................................................................................... 3
4. LANDLORD'S COVENANTS ...................................................................................... 4
   4.1    Landlord's Work and Delivery of Leased Premises.......................................... 4
   4.2    Zoning .............................................................................................................. 5
   4.3    Landlord's Documents...................................................................................... 5
   4.4    Tenant Improvement Allowance ...................................................................... 6
   4.5    Existing Tenant Termination and Renewal....................................................... 6
5. USE............................................................................................................................. 6
   5.1    Use................................................................................................................... 6
   5.2    Compliance with Law....................................................................................... 6
   5.3    Operations ....................................................................................................... 7
   5.4    Exclusivity ........................................................................................................ 7
6. TENANT'S CONSTRUCTION AND PROPERTY. ....................................................... 8
   6.1    Tenant's Improvements .................................................................................... 8
   6.2    Liens ................................................................................................................ 8
   6.3    Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings ............ 9
7. INSURANCE; INDEMNITY......................................................................................... 9
   7.1    Tenant's Insurance ........................................................................................... 9
   7.2    Landlord's Insurance ...................................................................................... 10
   7.3    Waiver of Subrogation ................................................................................... 10
   7.4    Indemnification by Tenant .............................................................................. 10
   7.5    Indemnification by Landlord............................................................................ 10
8. TITLE, SURVEY AND ENVIRONMENTAL CONDITIONS........................................ 11
   8.1    Title and Survey............................................................................................. 11
   8.2    Environmental................................................................................................ 12
   8.3    Tenant's Use of Any Hazardous Substance................................................... 14
9. DAMAGE OR DESTRUCTION. ................................................................................ 14
10. PROPERTY TAXES. ................................................................................................. 14
    10.1    Definition of "Real Property Taxes" ............................................................. 14
    10.2    Payment of Real Property Taxes.................................................................. 15
    10.3    Property Tax Protection................................................................................ 15
    10.4    U&O Tax ...................................................................................................... 15
    10.5    Tax Abatement ............................................................................................. 16
11. UTILITIES. ................................................................................................................ 16
    11.1    Utilities ......................................................................................................... 16
12. LANDLORD'S MAINTENANCE OF PROPERTY....................................................... 17
13. ASSIGNMENT AND SUBLETTING........................................................................... 17
14. DEFAULTS; REMEDIES. .......................................................................................... 18
    14.1    Tenant's Defaults.......................................................................................... 18
    14.2    Remedies in Default ..................................................................................... 18
    14.3    Landlord Defaults and Remedies ................................................................. 19
15. CONDEMNATION ..................................................................................................... 19
16. SIGNAGE .................................................................................................................. 20
17. TENANT'S CONTINGENCIES .................................................................................. 20

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)

i

STARBUCKS

Case ID: 260404329

|  | 17.1 | Feasibility | 20 |
|  | 17.2 | Permit Contingency | 21 |
| 18. | | OUTDOOR SEATING | 21 |
| 19. | | TENANT'S RIGHT OF EARLY TERMINATION | 21 |
| 20. | | TENANT'S USE OF COMMON AREAS | 22 |
| 21. | | OPTION TO PURCHASE AND RIGHT OF FIRST REFUSAL TO PURCHASE | 22 |
| 22. | | LEASEHOLD MORTGAGE | 24 |
| 23. | | GENERAL PROVISIONS. | 24 |
|  | 23.1 | Estoppel Certificate | 24 |
|  | 23.2 | Landlord's Interests | 25 |
|  | 23.3 | Authority | 25 |
|  | 23.4 | Severability | 25 |
|  | 23.5 | Time of Essence | 25 |
|  | 23.6 | Interpretation | 25 |
|  | 23.7 | Incorporation of Prior Agreements; Amendments | 26 |
|  | 23.8 | Waivers | 26 |
|  | 23.9 | Holding Over | 26 |
|  | 23.10 | Cumulative Remedies | 26 |
|  | 23.11 | Binding Effect; Choice of Law; Joint and Several | 26 |
|  | 23.12 | Subordination, Nondisturbance and Attornment | 26 |
|  | 23.13 | Only Landlord/Tenant Relationship | 27 |
|  | 23.14 | Attorneys' Fees | 27 |
|  | 23.15 | Force Majeure | 27 |
|  | 23.16 | Confidentiality of Lease | 27 |
|  | 23.17 | Brokers | 28 |
|  | 23.18 | Consents | 28 |
|  | 23.19 | Waiver of Jury Trial | 28 |
|  | 23.20 | Other Stores | 28 |
|  | 23.21 | Business Day | 28 |
|  | 23.22 | Memorandum of Lease; Release of Memorandum of Lease | 28 |
| 24. | | QUIET ENJOYMENT | 29 |
| 25. | | NOTICES | 29 |
| 26. | | LANDLORD LIABILITY | 30 |
| 27. | | EXHIBITS | 30 |

Case ID: 260404329

Project No. <u>91424-001</u>
Location:  <u>Philadelphia, PA (N. Broad & Lehigh Ave.)</u>

**GROUND LEASE**

THIS GROUND LEASE (this "Lease"), is made and entered into as of the *27th* day of *October*____, 2021 (the date of full execution as shown on the signature page shall be the "Execution Date"), by and between Philadelphia-Suburban Development Corporation, a Pennsylvania corporation, ("Landlord") and Starbucks Corporation, a Washington corporation ("Tenant").

1. PROPERTY.  Landlord is the owner of the parcel of land located at 2628-32 N. Broad Street, Philadelphia, PA 19132, containing approximately 33,000.6 square feet of land and legally described on <u>Exhibit A</u> attached hereto and by this reference incorporated herein (the "Property").  The Property adjacent to the certain real property owned by Landlord more fully described on <u>Exhibit B</u> attached and by this reference incorporated (the "Adjacent Property").  The Property and the Adjacent Property are shown on <u>Exhibit C</u> attached hereto and by this reference incorporated herein.

2. LEASE; TERM.

2.1 <u>Lease</u>.  In consideration of the mutual promises, covenants and conditions herein set forth, but subject to the conditions precedent for Tenant's benefit as set forth in the Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, the Property, together with all of Landlord's easement rights and appurtenances thereto, all buildings and improvements located on the Property and all easements and appurtenances in or to the Adjacent Property and/or Landlord's adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, necessary, desirable or reasonably required for the installation, maintenance, operation and service of sewer, water, gas, drainage, electricity and other utilities and for driveways and access ways to and from abutting highways and roadways, for the use and benefit of the Property (collectively, the "Leased Premises" or the "Premises") from and after the Commencement Date (as defined in <u>Section 2.3</u> below).  "Building" shall mean any building located upon the Leased Premises which Tenant has either improved or constructed at its expense. From and after the Execution Date until the Commencement Date, Landlord hereby grants to Tenant, subject to the terms and conditions of this Lease, a right of entry onto the Leased Premises for the sole purpose of performing any investigations, examinations, tests and studies with regard to the physical condition of the Leased Premises and examining the legal aspects with respect to the Leased Premises, including without limitation, satisfaction of Tenant's title, survey, soil and environmental contingencies set forth in this Lease (collectively referred to herein as the "Inspections") and this Lease shall be deemed a license for such purpose.

2.2 <u>Term</u>.  The "Initial Term" shall mean twenty (20) Lease Years (as defined in <u>Section 2.4</u> below), commencing on the Rent Commencement Date (as defined in <u>Section 3.1</u> below), and ending on the last day of the twentieth (20th) Lease Year, unless sooner terminated or extended as provided herein.  For purposes of this Lease, the word "Term" shall mean the Initial Term and any Extension Term(s) (as defined in <u>Section 2.5</u> below), as applicable, and the "Expiration Date" shall mean the last day of the last Lease Year of the Term. Promptly after the Rent Commencement Date, Landlord and Tenant shall execute a certificate in the form of <u>Exhibit F</u> stating the actual Commencement Date (as defined in <u>Section 2.3</u> below), Rent Commencement Date (as defined in <u>Section 3.1</u> below) and Expiration Date.  Landlord's failure or refusal to execute and deliver such certificate to Tenant within thirty (30) days after Landlord's receipt thereof shall constitute an acknowledgment by Landlord that the factual statements contained therein are true and correct, without exception, and may be relied upon by Tenant.

Case ID: 260404329

2.3    Commencement Date. The "Commencement Date" shall mean the date on which all of the following conditions have been satisfied or waived by Tenant in writing:

(a)    Landlord has delivered fully executed originals of this Lease, Memorandum of Lease, and SNDA(s) required pursuant to Section 23.12 of this Lease, if any, and the Initial Allowance Installment (as defined in Section 4.4) to Tenant;

(b)    Landlord's Work (as defined in Section 4.1) has been fully completed;

(c)    Tenant has satisfied all contingencies in Section 17 below and in any other applicable provisions of this Lease;

(d)    Landlord has delivered actual possession and control of the Leased Premises to Tenant in the condition required under this Lease;

(e)    Tenant has accepted possession of the Leased Premises tendered by Landlord as evidenced by written notice of delivery and acceptance of the Leased Premises in the form attached hereto as Exhibit E and Tenant agrees to use reasonable efforts to return such Exhibit E promptly after Landlord's written notice of delivery of such Exhibit E to Tenant, conditioned upon satisfaction of subsections 2.3(a), (b), (c), (d) and (f); and

(f)    Landlord has removed all Hazardous Substances from the Property as required under Section 8.2 and provided evidence thereof from the applicable government agency or certified environmental consultant; and

Landlord shall deliver the Premises to Tenant, in the condition called for in subsections (a) through (f) above on the Landlord's Delivery Deadline (the "Scheduled Delivery Date"). Tenant, in its sole discretion, may elect to accept delivery of the Leased Premises prior to the aforesaid date, but is not required to do so. Tenant's election to accept delivery of the Leased Premises prior to the Scheduled Delivery Date (or any other changes to the Scheduled Delivery Date) must be in writing and signed by a duly authorized signatory of Tenant in order to be effective.

2.4    Lease Year. For the purpose of this Lease, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12) consecutive calendar months during the Term; provided, however, that if the Term commences on a day other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding twelve (12) full calendar months shall constitute the first Lease Year of the Term. Notwithstanding the foregoing, if the last day of the first Lease Year falls between September 1 and January 31, then the first Lease Year shall be extended to end on the last day in February and each subsequent Lease Year shall begin on March 1.

2.5    Extension. Tenant shall have the option to extend the term of this Lease for three (3) consecutive ten (10) year period(s) (each an "Extension Term"), upon the same terms and conditions as contained in this Lease. The rent for each Extension Term shall be as set forth in Section 3 below. To exercise an extension option, Tenant shall give Landlord written notice at least one hundred eighty (180) days prior to the then-current Expiration Date of Tenant's intent to exercise any extension option ("Tenant's Extension Notice")

3.    RENT.

    3.1    Base Rent. Subject to the terms and conditions of this Lease, Tenant shall pay to Landlord at the address stated in Section 25 of this Lease, or to such other person or at such other place as Landlord may designate in writing, rent as follows ("Base Rent"):

Initial Term

| Lease Years | Monthly Installment | Lease Year Annual Rent |
|---|---|---|
| 1 – 5 | $12,500.00 | $150,000.00 |
| 6 – 10 | $13,500.00 | $162,000.00 |
| 11 – 15 | $12,083.33 | $145,000.00 |
| 16 – 20 | $13,310.00 | $159,720.00 |

Extension Term(s)

| Lease Years | Monthly Installment | Lease Year Annual Rent |
|---|---|---|
| Option 1 | | |
| 21 – 25 | $14,641.00 | $175,692.00 |
| 26 – 30 | $16,105.10 | $193,261.20 |
| Option 2 | | |
| 31 – 35 | $17,715.61 | $212,587.32 |
| 36 – 40 | $19,487.17 | $233,846.05 |
| Option 3 | | |
| 41 – 45 | $21,435.88 | $257,230.66 |
| 46 – 50 | $23,579.47 | $282,953.72 |

Tenant shall commence to pay Base Rent and all other charges hereunder on the date that is one hundred eighty (180) days after the earlier to occur of: (a) one hundred eighty (180) days after the Commencement Date, provided however that notwithstanding the satisfaction of the condition set forth in this sub-clause (a) the foregoing one hundred eighty (180) day period set forth in this sub-clause (a) will be extended on a day-for-day basis for each day that Tenant's construction of any initial improvements to be constructed by Tenant on the Property is delayed due to the occurrence of a Force Majeure Event, or (b) the date that Tenant opens for business on the Leased Premises to the public (the "Rent Commencement Date"). Tenant shall also pay to Landlord, Additional Rent as referenced in this Lease, together with the Fixed Rent, the "Rent". All Base Rent and Additional Rent shall be paid without notice, demand, setoff or counterclaim, except as otherwise expressly set forth in this Lease. Tenant shall have a thirty (30) day grace period to pay Base Rent and any other charges due for the initial month of the Term (or partial month as the case may be) in order to initialize its administrative procedures. During such grace period, no late fees, interest or penalties shall accrue, nor shall Tenant be deemed to be in default. Subject to the terms and conditions of this Lease, Tenant shall continue to pay Base Rent in monthly installments on or before the first day of every month thereafter during the Term. Base Rent for any period during the Term less than one calendar month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year. Notwithstanding the foregoing, Tenant shall not be required to pay Base Rent or any other charges hereunder until Tenant receives from Landlord a completed and executed Form W-9 taxpayer identification document in the form prescribed by the Internal Revenue Service, which is attached as Exhibit J, which Landlord agrees to deliver to Tenant fully executed concurrently with delivery of the executed Lease. Other than paying Base Rent and the other charges expressly provided elsewhere in this Lease, Tenant has no obligation to pay Landlord any other amounts. Landlord acknowledges and agrees that Tenant, at Tenant's option, shall have the right to pay amounts due under this Lease to Landlord via electronic funds transfer, and that Landlord shall cooperate with Tenant, if necessary, to establish that manner of payment by Tenant.

    3.2    Alternative Rent Period. In the event any Force Majeure Event, act by Landlord or act of any governmental authority having jurisdiction over Tenant's use of the Premises restricts or

Case ID: 260404329

otherwise limits Tenant's business operations in the Premises and (i) reduces by twenty five percent (25%) or more either (x) Tenant's gross sales for any month of the Term if 12 months of preceding sales are available or (y) the average of Tenant's gross sales for the preceding three (3) months if 12 months of preceding sales are unavailable, then Tenant shall pay fifty percent (50%) of the Monthly Base Rent in lieu of Base Rent each month until such restrictions or limitations are lifted, or (ii) as a result of a Force Majeure Event, act by Landlord or act of any governmental authority, as referenced above in this Section 3.2, Tenant ceases operations in the Premises, then Tenant shall pay no Base Rent, but shall continue to pay Annual Additional Rent. The "Alternative Rent Period" shall run from the date Tenant has notified Landlord that the restrictions or limitations were imposed until the date such restrictions or limitations are lifted.

Tenant shall provide Landlord notice of its election to apply the foregoing rent adjustments for the Alternative Rent Period. For a rent adjustment pursuant to clause (i) above, upon Landlord's written request, Tenant shall provide reasonable documentation of the decline in gross sales for the months covered by the Alternative Rent Period pursuant to Tenant's accounting principles consistently applied.

4.    LANDLORD'S COVENANTS

4.1    Landlord's Work and Delivery of Leased Premises.  On or before 110 days after receipt by Tenant of the Government Approvals ("Landlord's Work Deadline"), Landlord shall (a) complete all other work described in Exhibit H attached to this Lease; (b) complete any offsite improvements necessary for Tenant to obtain all of its permits or other approvals required to open and operate at the Leased Premises; and (c) Landlord shall ensure that site internet and voice systems, with minimum speed of 50x10 Mbps and from a service provider reasonably acceptable to Tenant are available for Tenant's use at the Premises and installed in accordance with the attached Exhibit H ("Landlord's Work").  Landlord shall provide at least one hundred eighty (180) day's prior written notice of the delivery date of the Premises to Tenant.  Landlord shall pay for all costs and expenses in connection with Landlord's Work.  Landlord understands that Landlord's Work Deadline impacts Tenant's intended construction start date for its improvements on the Property.  If any of Landlord's Work is not completed by Landlord's Work Deadline, then Tenant may, at its option, either (1) delay possession until the Leased Premises is in the condition required under this Section 4 and pursue its remedies below; or (2) accept possession of the Leased Premises and complete all work necessary to bring the Leased Premises into the required condition at Landlord's sole cost and expense.  If Tenant elects to delay acceptance of the Leased Premises under subsection (1) above, and if Landlord's Work is not completed within ninety (90) days after Landlord's Work Deadline, subject to extension day-for-day for each day of Force Majeure, but in no event shall the period be extended by more than one hundred eighty (180) days in the aggregate from the Landlord's Work Deadline, then Landlord shall pay to Tenant, as compensation in the form of liquidated damages and not as a penalty, the sum of five (5) days of free Base Rent for each day of delay accruing from the Scheduled Delivery Date to the actual Commencement Date (Landlord and Tenant hereby agree that the harm caused by Landlord's failure to complete Landlord's Work within the time period set forth above is impracticable or difficult to estimate and that the liquidated damages prescribed herein are a reasonable forecast of just and fair compensation to Tenant for such failure).  If Tenant elects to proceed under the foregoing subsection (2), then Landlord shall reimburse Tenant for the actual cost of such work, plus an administrative surcharge of five percent (5%) to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums.  Tenant's and its contractor's determination of the cost of such work shall be final and binding on Landlord and Landlord acknowledges that Landlord can control the cost by performing the work under this Section in a timely manner.  Landlord and Tenant agree that the foregoing free rent determination is a liquidated damages remedy to compensate Tenant based on Landlord and Tenant's best estimate of the daily damages, including but not limited to lost sales and business opportunity that Tenant will incur as a result of Landlord's failure to deliver the Property.  If Landlord does not reimburse Tenant as required by this Section 4.1 on or before the Rent Commencement Date, then Tenant may offset all unreimbursed amounts under this Section 4.1 against Base Rent and all other charges payable by Tenant hereunder until such unreimbursed amounts have been fully recouped.  If for any reason whatsoever, Force Majeure Event(s) notwithstanding, Landlord's Work is not completed within one hundred eighty (180) days after Landlord's Work Deadline, Tenant may, at its option, terminate this Lease upon written notice thereof

Case ID: 260404329

to Landlord, and, in such event, Landlord shall reimburse Tenant for all of Tenant's Investment (as defined in Section 14.2.1(a)) and other expenses incurred in connection with this Lease to the extent not included in Tenant's Investment, including, without limitation, site selection and lease negotiation and the drafting costs and expenses (including the allocated cost of in-house personnel). Landlord shall remit said reimbursement and return all monies previously deposited by Tenant, if any, within thirty (30) days of receipt of Tenant's notice of termination.

4.2    Zoning. If applicable, Landlord shall use its best efforts to obtain the approval of all public and governmental authorities as to all matters relating to zoning, subdivision, lot splits, lot ties, replats or similar requirements to create the Property as a separate legal parcel and for Tenant's intended use of the Leased Premises in accordance with all applicable federal, state, city, county and local laws, regulations and ordinances as well as in accordance with Tenant's plans and specifications and as necessary to permit Tenant to obtain all Government Approvals as described in Section 17.2 below ("P&Z Approval(s)"). Landlord shall pay all expenses of any such application, surveying and engineering and any other incidental costs relating to such approval or the recordation of a final parcel map or subdivision plat, as applicable, including, without limitation, all costs and expenses of site plans, surveys, preliminary plats, filing fees, impact fees, governmental or quasi-governmental fees, site costs and special assessments. Landlord shall also dedicate or grant any easements for public ways and diligently perform and pay for any improvements located off the Property as required for approval and recordation of a final parcel map or subdivision plat, as applicable. Copies of all evidence of zoning, subdivision and easements, as applicable, shall be provided to Tenant prior to Landlord's Work Deadline. As part of the P&Z Approvals, Landlord shall seek the necessary lot line adjustments from the City of Philadelphia to configure the Property into the separate legal parcel as described on Exhibit A. The portion of the P&Z Approvals applicable to subdivision, lot splits, lot ties, re-plats and similar requirements to create the Property as described on Exhibit A and for Tenant's intended use of the Leased Premises are sometimes referred to herein as the "Platting Approvals". The portion of the P&Z Approvals applicable to zoning or similar requirements for Tenant's intended use of the Leased Premises are sometimes referred to herein as the "Zoning Approvals". It is expressly acknowledged and agreed that Tenant's building permits and certificate of occupancy are not part of the P&Z Approvals that Landlord is required to obtain.

Landlord shall use diligent, commercially reasonable efforts to obtain the Zoning Approvals necessary for Tenant's use of the Leased Premises on or before the expiration of two hundred seventy (270) days from the Execution Date; provided, however, that Landlord shall have the right to extend such 270-day period by up to ninety (90) days solely as required to accommodate the City of Philadelphia's scheduling of agency or board hearings necessary for the Zoning Approvals. In the event Landlord is unable to obtain the Zoning Approvals within such 270-day period (as may be extended pursuant to the previous sentence), then Tenant may terminate this Lease.

Landlord shall use diligent, commercially reasonable efforts to obtain the Platting Approvals necessary for Tenant's intended use of the Leased Premises on or before sixty (60) days prior to the expiration of the Feasibility Period. In the event Landlord is unable to obtain the Platting Approvals necessary for Tenant's intended use of the Leased Premises on or before sixty (60) days prior to the expiration of the Feasibility Period, as defined in Section 17.1 of this Lease, then Tenant may terminate this Lease.

In the event Landlord has not used diligent, commercially reasonable efforts to timely obtain any of the P&Z Approvals, including without limitation the Platting Approvals and/or the Zoning Approvals, if Tenant terminates this Lease pursuant to its rights set forth on this Section 4.2, then Landlord shall, within thirty (30) days after such termination by Tenant, reimburse to Tenant all of Tenant's Investment (as defined in Section 14.2.1(a) of this Lease).

4.3    Landlord's Documents. Within five (5) business days after the Execution Date, Landlord shall deliver to Tenant copies of all title documents, surveys, soils reports, environmental reports, utility plans, covenants, conditions, restrictions and other written reports, studies and documents in

STARBUCKS

Case ID: 260404329

Landlord's possession or control relating to the Leased Premises ("Landlord's Documents"). In the event Landlord does not deliver Landlord's Documents in the time frame provided in this Section 4.3, then the Feasibility Period shall be extended one day for each day of Landlord's delay in delivering Landlord's Documents to Tenant.

4.4    Tenant Improvement Allowance.    Landlord shall provide Tenant with an improvement allowance in the amount of Three Hundred Thousand and 00/100 Dollars ($300,000.00) (the "Allowance"). The Allowance shall be disbursed to Tenant in two installments.  The first installment of the Allowance, in the amount of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) (the "Initial Allowance Installment"), will be paid to Tenant by Landlord concurrently with delivery of the Premises to Tenant under Section 4.1, and in no event later than the Scheduled Delivery Date, which payment of the Initial Allowance Installment will be an express condition to the occurrence of the Commencement Date and the Rent  Commencement Date.  The remainder of the Allowance in the amount of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00), shall be paid to Tenant by Landlord within thirty (30) days following the latest to occur of:  (i) the Rent Commencement Date; (ii) Tenant's payment of the first Base Rent payment required to be paid under this Lease; (iii) Tenant's opening for business in the Premises; (iv) Tenant providing Landlord with a copy of the certificate of occupancy for the Building, and (v) Tenant providing Landlord with a final lien waiver from its general contractor.

Notwithstanding the foregoing, without limitation of Tenant's rights and remedies otherwise set forth above or in this Lease, in the event Landlord fails to timely pay all or any portion of the Allowance as provided above, then Tenant shall have the right to offset, in full, Base Rent and all other monetary sums payable by Tenant hereunder (including without limitation Real Estate Taxes) next due until Tenant has recouped in full the total amount of the unpaid Allowance, together with interest thereon equal to the lesser of (i) ten percent (10%) per annum or (ii) the maximum rate allowed by law.

4.5    Existing Tenant Termination and Renewal.  In the event Landlord fails to cause all tenancy and occupancy rights of all occupants and tenants other than this Lease to be terminated and of no further force and effect, and the Premises to be free of all tenants and occupants, excepting only this Lease, on or prior to expiration of one hundred and twenty (120) days after the Execution Date, as may be extended up to sixty (60) additional days by written thereof notice from Landlord to Tenant (the "Required Vacancy Date"), then Tenant will have the ongoing right to terminate this Lease prior to Landlord causing all tenancy and occupancy rights of all occupants and tenants other than this Lease to be terminated and the Premises to be free of all tenants and occupants excepting only this Lease, and upon any such termination by Tenant Landlord will reimburse to Tenant the Recapture Price within thirty (30) days of such notice of termination by Tenant, which reimbursement obligation will survive termination of this Lease, and this Lease will be terminated and of no further force and effect excepting only those provisions which expressly survive termination.

5.    USE.

5.1    Use.  Tenant may use and occupy the Property for any lawful use, including, without limitation, the sale of beer and wine.

5.2    Compliance with Law.  During the Term, Tenant, at its expense, shall comply promptly with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Leased Premises pertaining to (a) the physical condition of any improvements constructed by Tenant on the Property; and (b) Tenant's specific business operations on the Property, except for the rights, duties, obligations, liabilities and indemnities of the parties specifically set forth in this Lease. If Tenant sells beer, wine or other alcoholic beverages the Property, then Tenant shall comply with all applicable laws, rules, and regulations of or enforced by the Pennsylvania Liquor Control Board or any successor agency or board with jurisdiction.  During the Term, Tenant, at its expense, shall comply promptly with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Leased Premises pertaining to (a) the physical condition of any improvements constructed by

Tenant on the Property; and (b) Tenant's specific business operations on the Property, except for the rights, duties, obligations, liabilities and indemnities of the parties specifically set forth in this Lease. Landlord shall, at its sole cost and expense and at all times during the Term of this Lease, comply with all other laws, rules, regulations, and ordinances made by any governmental authority affecting or relating to the Leased Premises, the Adjacent Property and the areas adjacent to the Property and the Adjacent Property.

     5.3    Operations. Tenant may operate its business in such manner and at such hours as Tenant considers proper in Tenant's sole business judgment. Tenant shall have no obligation to open for business or continuously operate a business on the Property. It is expressly understood and agreed that Tenant makes no covenant, representations or warranties, oral or written, as to the level of gross sales it may generate from the Property or the number of customers that it will bring to the Property. Tenant shall be responsible for removal of all trash from the Property and all snow and ice removal from the Property. Tenant shall be responsible to maintain all sidewalks located in front of the Building, but excepting any sidewalks located off of the Property or otherwise maintained by the City or another applicable authority.

     5.4    Exclusivity. Landlord and any Landlord Affiliate shall not use or allow any other person or entity (except Tenant) to use any portion of the Leased Premises or the Adjacent Property for or in support of the sale of (a) freshly ground and whole coffee beans; (b) espresso, espresso-based and coffee-based drinks; (c) tea or tea-based drinks; (d) gourmet brand-identified brewed coffee; and/or (e) blended beverages, including without limitation, those containing any of the following: ice, coffee, espresso, tea, milk, cream, juice and/or fruit. For purposes of this Lease, "gourmet" shall be defined as (a) beverages made using Arabica beans or (b) sourced from a gourmet coffee brand such as Coffee Bean & Tea Leaf, Intelligentsia, Peets, Caribou or other coffee purveyor. For purposes of this Lease "brand identified" shall mean beverages advertised or marketed within the applicable retail space using a brand name. If Landlord or an offending party contests Tenant's claim of such exclusive sales violation, Tenant shall be entitled, with Landlord's full assistance, to audit the alleged offender's sales records for a full accounting of any such violations in order to make a proper determination. In addition to all of Tenant's other rights and remedies contained in this Lease, Tenant shall be entitled to a fifty percent (50%) reduction of Base Rent and Annual Additional Rent for the entire time during which any such violation exists.

Full service, sit-down restaurants with a wait staff and table service serving a complete dinner menu may sell, in conjunction with a sale of a meal, blended beverages containing juice.

As used herein, the term "Affiliate" shall mean any person or entity in control of, controlled by or under common control with, the party to which such term refers. The restrictions stated in this Section 5.4 are hereinafter referred to as "Tenant's Exclusive Use Rights." Landlord acknowledges that the grant of Tenant's Exclusive Use Rights was a material inducement to Tenant entering into this Lease and agrees that Tenant shall have the right, in addition to any and all remedies at law, to enforce Tenant's Exclusive Use Rights by appropriate injunctive or other equitable relief and provided that the Landlord shall reimburse Tenant for all expenses incurred by Tenant in enforcing Tenant's Exclusive Use Rights, including reasonable attorney's fees. In the event that a violation of Tenant's Exclusive Use Rights continues for more than thirty (30) days after Tenant's written notice to Landlord, Base Rent and all other charges hereunder shall abate until such time as such violation(s) ceases. If such violation(s) continue for one hundred eighty (180) days after Tenant's notice to Landlord, then Tenant shall at any time thereafter be entitled to terminate this Lease by written notice to Landlord, whereupon Landlord shall pay to Tenant the Recapture Price (as defined in Section 14.2.1(a) of this Lease) within thirty (30) days after the date of Landlord's receipt of Tenant's notice of the Recapture Price, which Landlord's repayment obligation shall expressly survive a termination of this Lease. Upon Landlord's receipt of Tenant's notice of termination, this Lease shall be of no further force or effect and neither party shall have any further rights, duties or obligations hereunder other than those rights, duties and obligations that are expressly provided herein to survive a termination of this Lease.

     (a)    The "Recapture Price" shall be the greater of the then-existing unamortized balance of Tenant's Investment (as defined below) as reflected on Tenant's books and records

or the fair market value of Tenant's Property (the "Fair Market Value"). As used herein, the term "Tenant's Investment" shall mean the aggregate sums invested by Tenant, both hard and soft costs, in consummating the transaction concerning this Lease (including any sums paid to Landlord on account of any work performed by Landlord, site selection and lease negotiation costs and expenses, including the allocated cost of Tenant's in house personnel) and thereafter from time to time in making permanent improvements to the Property.

(b)    The determination of the Fair Market Value of Tenant's Property shall be determined by an appraisal prepared by an independent, third party appraiser (who shall not have been employed by either Tenant or Landlord within the past two calendar years) (the "Independent Appraiser"), as selected by Tenant, within thirty (30) days after receipt of Landlord's notice of exercise of its right to terminate this Lease. The Independent Appraiser shall be a member of the American Institute of Real Estate Appraisers (or any successor association or body of comparable standing if such institute is not then in existence), shall have at least ten (10) years' experience in the appraisal of real estate and shall be familiar with property values in the area in which the Property is located. Provided that the Independent Appraiser meets the foregoing qualifications, Landlord shall have no right to object to Tenant's selection of the Independent Appraiser. The fees and expenses of the Independent Appraiser shall be split equally between Landlord and Tenant. The decision of the Independent Appraiser shall be final, conclusive and binding on Landlord and Tenant.

6.    TENANT'S CONSTRUCTION AND PROPERTY.

6.1    Tenant's Improvements. From and after the Commencement Date, Tenant shall have the exclusive right, but not the obligation, to make any improvements, alterations and additions to the Leased Premises from time to time as Tenant desires. All such improvements, alterations and additions constructed by or at the direction of Tenant (including the Building) shall be and remain the property of Tenant at all times during the Term of this Lease. Landlord shall not have the right to place or permit liens or other encumbrances on any of the improvements on the Property or any other Tenant's Property (as described in Section 6.3 below), and Landlord hereby waives and releases any and all liens, whether statutory or under common law, with respect to Tenant's Property from time to time located in or about the Leased Premises. Landlord agrees to execute such commercially reasonable or otherwise customarily required documents, make such appearances and do such other things as Tenant may reasonably request so as to comply with the intent of this Section 6.1, at no material out-of-pocket expense to Landlord. Except as otherwise specifically set forth in this Lease, Tenant shall maintain the Property at Tenant's expense and Tenant shall have the right to remove any such improvements, alterations and additions at any time during the Term of this Lease, including any improvements existing on the Commencement Date. In addition, Landlord acknowledges and agrees that Tenant intends to seek certification of the Leased Premises through the then-current standards established by the United States Green Building Council (the "USGBC") for the certification of green buildings, commercial and retail interiors and other facilities ("LEED Certification"). Landlord acknowledges that LEED Certification may be awarded at various certification levels as determined by the USGBC. Accordingly, notwithstanding anything in this Lease to the contrary, Landlord agrees to cooperate, at no material out-of-pocket expense to Landlord, with Tenant in Tenant's efforts to achieve LEED certification (in a manner and at a level which shall be determined by Tenant in its sole discretion) and to take all reasonable steps requested by Tenant to achieve such certification. Further, Landlord agrees to reasonably assist Tenant in its efforts to maintain LEED Certification for the Leased Premises throughout the Term.

6.2    Liens. Tenant shall not permit any mechanics' or materialmen's liens to be levied against the Leased Premises for any labor or material furnished to Tenant or to its agents or contractors; provided, however, that Tenant shall not be required to pay or otherwise satisfy any claims or discharge such liens so long as Tenant, in good faith and at its own expense, contests the same or the validity thereof by appropriate proceedings and posts a bond or takes other steps reasonably acceptable to Landlord that remove such lien or stay enforcement thereof. If any mechanic's or materialmen's lien shall be filed against the Leased Premises due to actions of Tenant, and shall not be removed by Tenant within thirty (30) days

after notice given by Landlord to Tenant, then Landlord shall have the right to remove same by payment bond, or otherwise, and all reasonable sums (including reasonable attorney's fees and legal costs) expended by Landlord for such removal shall be paid by Tenant to Landlord upon written demand (including supporting documentation therefor), and shall be deemed to be Additional Rent due under this Lease.

6.3    Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings. "Tenant's Property" means all personal property, furnishings, machinery, trade fixtures, equipment, signage, the Building and other improvements (including, but not limited to, any alternative energy systems) which Tenant installs on the Leased Premises. At any time during the Term, or at the end of the Term, or at any earlier expiration of this Lease, Tenant may in its sole discretion remove all or any portion of Tenant's Property from the Leased Premises. Any of Tenant's Property not removed from the Leased Premises on the date this Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord, except Landlord shall not secure any rights to or interest in any trade dress, trademark(s), proprietary or intellectual property of Tenant. Tenant shall not be required to remove any improvements, alterations or additions from the Leased Premises. In the event Tenant does not remove any such improvements, alterations or additions, upon the expiration or earlier termination of this Lease, Tenant will be deemed to have abandoned the same and all such improvements, alterations and additions shall, at such time, be and become a part of the real estate with title vesting in the owner of the Property.

7.    INSURANCE; INDEMNITY.

7.1    Tenant's Insurance. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Property and shall be maintained with an insurance company with an A.M. Best Company ("Best's") rating of at least A- and a Best's financial performance rating of at least VII. Upon Landlord's request, Tenant will provide Landlord access to an Internet website that certifies Tenant's current insurance coverage in a Memorandum of Insurance.

7.1.1    Liability Insurance

(i)    Bodily injury, and personal injury (naming Landlord as an additional insured) and property damage insurance, against liability arising out of Tenant's use, occupancy, or maintenance of the Property, including liquor liability coverage in the event that Tenant elects to sell beer and wine from the Leased Premises. Such insurance shall include an "each occurrence" limit of not less than Two Million Dollars ($2,000,000) and a general aggregate limit of not less than Three Million Dollars ($3,000,000). Tenant's insurance shall be primary with respect to any claim arising out of Tenant's indemnity obligations.

(ii)    To the extent required by applicable law, Worker's Compensation insurance with statutory limits for all applicable federal or state regulations for the state where the Leased Premises is located and Employers Liability insurance with policy limits of not less than One Million Dollars ($1,000,000.00) per accident.

(iii)    In the event that alcoholic beverages are sold or consumed in the Leased Premises, Liquor Legal Liability insurance coverage either as part of Tenant's Commercial General Liability insurance program or as separate coverage, covering any claim for damages due to bodily injury (including death), personal injury, or property damage arising out of or in any way connected with the selling, serving, or distribution of alcohol. Such insurance shall provide minimum limits of not less than Five Million Dollars ($5,000,000.00), and Landlord and Landlord's agents, officers, directors, employees, and contractors shall be named as additional insureds.

(iv)    In the event Tenant brings any vehicle (owned, hired or leased by Tenant) on to the Property, Tenant shall maintain Commercial Auto Liability Insurance. Tenant shall maintain automobile liability with a limit of not less than $1,000.000.00 combined single limit.

STARBUCKS

Case ID: 260404329

7.2     Landlord's Insurance. During the Term, Landlord shall obtain and keep in full force and effect, the following insurance from an insurance company with a Best's rating of at least A- and a Best's financial performance rating of at least VII. The insurance required to be carried by Landlord under Section 7.2.1 shall be referred to as "Landlord's Insurance." Tenant shall be named as an additional insured under Landlord's liability insurance policies. Upon Tenant's request, Landlord will provide Tenant with a copy of the certificate(s) evidencing Landlord's insurance coverage required to be carried in this Section 7.2 and a premium bill for Landlord's Insurance.

7.2.1     Liability Insurance. Bodily injury, personal injury and property damage insurance (to include contractual liability) insuring against claims of bodily injury or death, personal injury or property damage arising out of or in connection with: (a) Landlord's and its agents', employees' or contractors' conduct upon, in or about the Leased Premises; and/or (b) the use or occupancy of the balance of the Adjacent Property, including (without limitation) the Common Areas, if any, with an each occurrence limit of not less than One Million Dollars ($1,000,000) and a general aggregate limit of not less than Two Million Dollars ($2,000,000). Notwithstanding the foregoing, Landlord's Insurance shall be primary with respect to any claim covered by Section 7.2.1(a).

7.3     Waiver of Subrogation. Notwithstanding any other provisions of this Lease to the contrary, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) for any loss or damage to any Building, structure or other tangible property, or any resulting loss of income and benefits (even though such loss or damage might have been occasioned by the negligence of such party its agents or employees) if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage, or which would have been covered by insurance required to be maintained pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a waiver of subrogation provision in their respective policies in order to implement the provisions of this Section 7.3.

7.4     Indemnification by Tenant. Subject to Section 7.3 and provided that Landlord notifies Tenant in writing of any such third party claims within thirty (30) days after Landlord becomes aware of such claim, Tenant shall defend, protect, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless from and against any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) arising in connection with any and all third party claims arising out of: (a) any intentional conduct or negligence of Tenant or Tenant's agents, employees, or contractors; (b) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; or (c) the failure of any representation or warranty made by Tenant herein to be materially true when made. This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur during the Term. Notwithstanding any provision of this Lease to the contrary, the provisions of this Section 7.4 and Tenant's covenants to provide insurance as provided in this Lease shall in no event extend to Landlord's independent liability.

7.5     Indemnification by Landlord. Subject to Section 7.3, Landlord shall defend, protect, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless from and against any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of: (a) injuries occurring in the Adjacent Property outside the Leased Premises; (b) any intentional conduct or negligence of Landlord or Landlord's agents, employees, or independent contractors; (c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Landlord herein to be materially true when made. This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees.

Case ID: 260404329

8.      TITLE, SURVEY AND ENVIRONMENTAL CONDITIONS.

        8.1     Title and Survey.  During the Feasibility Period (as described in Section 17.1), Tenant shall have the right, at Tenant's expense, to order a commitment for leasehold title insurance, including extended coverage, from a title insurance company of Tenant's choosing (the "Title Company") showing Landlord as the record owner of the Property, and the Leased Premises and the Adjacent Property. Tenant shall have the right, at Tenant's expense, to order a current ALTA survey of the Property during the Feasibility Period.  Landlord agrees to provide to Tenant and the Title Company within thirty (30) days from request for same all documents required by the Title Company to issue Tenant's Title Policy (defined below) including without limitation, all authority documents, a commercially reasonable or customary owner's affidavit, a commercially reasonable or customary lien affidavit, and a commercially reasonable or customary parties in possession affidavit.  If the report on title, title binder, commitment, survey or other evidence disclose any conditions, restrictions, liens, encroachments, encumbrances, easements or covenants which, in Tenant's sole and absolute discretion, would affect Tenant's proposed use and enjoyment of the Leased Premises and appurtenant easements (the "Title Encumbrances"), Landlord shall have thirty (30) days from the date Tenant notifies Landlord of such defects to cure such Title Encumbrances and to furnish an updated title report, binder or commitment and revised survey showing such Title Encumbrances cured or removed, and the Feasibility Period will be automatically extended until such Title Encumbrances have been either cured or removed from the updated title report, binder or commitment and revised survey or waived in writing by Tenant.  If such defects in title are not so cured or removed within such thirty (30) day period, Tenant will have the ongoing right, at its option, either: (i) accept title to the Property subject to such defects or matters; (ii) remove such objectionable matters and offset the cost of such removal against Base Rent or other charges payable hereunder; or (iii) terminate this Lease.  In the event of any such termination, this Lease shall be of no further force or effect and neither party hereto shall have any further rights, duties or obligations hereunder other than those that expressly survive a termination of this Lease.  Landlord shall promptly deliver to the Title Company, if so requested and to the extent in Landlord's possession, Landlord's prior title evidence, including, but not limited to, title policies, commitments, current abstract(s) and attorneys' opinions, and all documents required by the Title Company to issue Tenant's Title Policy (defined below) including without limitation, all authority documents, a commercially reasonable or customary owner's affidavit, a commercially reasonable or customary lien affidavit, and a commercially reasonable or customary parties in possession affidavit.  The title policy shall be issued strictly in accordance with the title commitment as approved by Tenant covering the date of recording of the Memorandum of Lease and containing a coverage amount of not less than the value of the Tenant's leasehold estate and proposed leasehold improvements (the "Title Policy").

        Landlord covenants and agrees that, from and after the Execution Date and continuing throughout the Term, Landlord shall not create or allow any leases, agreements, contracts, easements, covenants, encumbrances, liens, or any other rights, restrictions, or obligations affecting or recorded against Property (collectively, "Prohibited Encumbrances") without Tenant's prior written consent except (i) as may be required by law provided Landlord agrees to diligently and in good faith, contest any such governmental requirement or (ii) subject to Section 23.12 below a mortgage provided an SNDA is provided therefore.  If any such Prohibited Encumbrances are created without Tenant's prior written consent, then Landlord shall, at Landlord's sole cost and expense, promptly terminate and/or remove said Prohibited Encumbrances upon Tenant's request.

        Tenant acknowledges that the Property is situated on Broad Street under which runs a multi-track municipal subway line operated as of the Execution Date by SEPTA (the "Broad Street Subway Line"). Landlord represents and warrants to Tenant that (x) the location of the Broad Street Subway Line, with respect to the Property, is at a depth so as not to interfere with Tenant's construction of its Building and related improvements; (y) the Broad Street Subway Line will not affect the structural integrity of the Property, Tenant's improvements thereto, or Tenant's use and occupancy thereof; and (z) the Broad Street Subway Line does not impose any rights or obligations with respect to the surface of the Property.

STARBUCKS

Case ID: 260404329

8.2    Environmental. Within five (5) business days after the Execution Date, Landlord shall deliver to Tenant a copy of all environmental and soil reports and any other documents in Landlord's possession or control relating to Hazardous Substance(s) (as defined in Section 8.2.2) on, in or under the Leased Premises and any property immediately adjacent to the Leased Premises (the "Environmental Reports"). In the event any Environmental Reports are dated effective more than six (6) months prior to the date of Tenant's receipt thereof, Landlord shall, at its sole cost and expense, deliver an updated Environmental Report reasonably acceptable to Tenant covering the Leased Premises dated no more than six (6) months prior to the date of Tenant's receipt thereof. Additionally, Tenant shall have the right, but not the obligation, to conduct any soil tests, including invasive or non-invasive analyses for the presence of any Hazardous Substances in, on or under the Leased Premises, at Tenant's sole direction and at Tenant's sole cost and expense ("Tenant's Environmental Investigation"). Landlord expressly consents to Tenant, its agents, employees and/or representatives entering upon the Leased Premises for purposes of conducting Tenant's Environmental Investigation. Tenant shall be under no obligation whatsoever with respect to any Hazardous Substances discovered in connection with Tenant's Environmental Investigation (except for Hazardous Substances introduced by Tenant or parties claiming under Tenant). If the Environmental Reports or Tenant's Environmental Investigation or any other environmental testing conducted by or at the direction of Tenant disclose any site characteristics that indicate the possible or actual presence of above or below ground Hazardous Substances which may impact the Leased Premises, then Landlord, at Landlord's expense, shall, in a manner that complies with all applicable Environmental Laws (as defined in Section 8.2.1 below) investigate, monitor, remove, remediate, transport and dispose of such Hazardous Substances and perform all investigation, monitoring, remediation and clean up necessary or advisable to remediate Hazardous Substances on, in or under the Leased Premises to the extent necessary to obtain a closure letter or its equivalent from the applicable governmental authority that any file opened by such governmental authority is closed and that "no further action" is necessary or required to remediate the Leased Premises (a "Closure Letter"). If Landlord has not fully completed all such removal and remediation and delivered to Tenant a true and correct copy of the Closure Letter prior to expiration of the Feasibility Period (as defined in Section 17.1), then the Feasibility Period shall be automatically extended until ten (10) business days after Landlord has notified Tenant in writing and provided Tenant with a true and correct copy of the Closure Letter prior to the expiration of Landlord's Work Deadline, or such other written documentation, satisfactory to Tenant in its sole and absolute discretion, evidencing that all such removal and remediation has been completed in accordance with applicable Environmental Laws.

Landlord represents and warrants to Tenant that to Landlord's knowledge there are not, nor have there ever been, any underground storage tanks or any other Hazardous Substances on, in or under the Leased Premises or the Adjacent Property except as disclosed in the Environmental Reports. Landlord further represents and warrants to Tenant that, to Landlord's knowledge (i) Landlord, and the Leased Premises and the Adjacent Property are not subject to any existing, pending or threatened investigation by any governmental authority under any Environmental Laws; (ii) any handling, transportation, storage, treatment or use of Hazardous Substances that has occurred on the Leased Premises and/or the Adjacent Property to date has been in compliance with all Environmental Laws and all other applicable federal, state and local laws, regulations and ordinances; and (iii) no leak, spill, release, discharge, emission or disposal of Hazardous Substances has occurred on or adjacent to the Leased Premises and/or the Adjacent Property to date.

8.2.1    Environmental Law. The term "Environmental Law" means any federal, state, or local law, statute, ordinance, regulation or order and all amendments thereto, as now or hereafter may be amended or promulgated from time to time, pertaining to health, industrial hygiene, environmental conditions, soil, groundwater, air and water quality, the handling, transportation, storage, treatment, usage or disposal of Hazardous Substances.

8.2.2    Hazardous Substance(s). The term "Hazardous Substance(s)," for purposes of this Lease, shall be interpreted broadly to include, but not be limited to, any material or substance that is defined, regulated or classified under any Environmental Law or other applicable federal, state or local laws and the regulations promulgated thereunder as (i) a "hazardous substance" pursuant to

STARBUCKS

Case ID: 260404329

section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601(14), as now or hereafter amended; (ii) a "hazardous substance" pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1321(14), as now or hereafter amended; (iii) a "hazardous waste" pursuant to section 1004 or section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. §§6903(5), 6921, as now or hereafter amended; (iv) toxic pollutant under section 307(a)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §1317(a)(1), as now or hereafter amended; (v) a "hazardous air pollutant" under section 112 of the Clean Air Act, 42 U.S.C. §7412(a)(6), as now or hereafter amended; (vi) a "hazardous material" under the Hazardous Materials Transportation Uniform Safety Act of 1990, 49 U.S.C. §5102(2), as now or hereafter amended; (vii) toxic or hazardous pursuant to regulations promulgated now or hereafter under the aforementioned laws or any state or local counterpart to any of the aforementioned laws; or (viii) any substance that is actually or allegedly harmful to human, animal or vegetable life or any other portion of the environment, including any substance that after release into the environment or upon exposure, ingestion, inhalation or assimilation, either directly from the environment or directly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavior abnormalities, cancer or genetic abnormalities, specifically including, but not limited to chlorinated solvents, polychlorinated biphenyls ("PCBs"), radioactive materials, including radon and naturally occurring radio nuclides, natural gas, natural gas liquids, liquefied natural gas, synthetic gas, oil and other petroleum products or by-products, asbestos and urea formaldehyde.

8.2.3    Tenant shall protect, defend, indemnify, and hold harmless Landlord and Landlord's employees, agents, parents, and subsidiaries from and against any and all loss, damages costs, claims, damage, expense, or liability, including, without limitation, attorneys' or other professional fees, and the costs of repairs and improvements necessary to obtain a Closure Letter from the proper, applicable governmental authority (collectively, "Claims") arising out of or attributable to Tenant's or Tenant's agents', contractors', or employees' use, manufacture, storage, release, or disposal of a Hazardous Substance on the Property. This indemnity shall survive the termination of this Lease.

8.2.4    Landlord shall protect, defend, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any Claims directly or indirectly related to: (a) a violation of or responsibility under Environmental Laws except that if such Claims are directly related to Tenant's, or Tenant's agents, contractors or employees use, manufacture, storage, release or disposal of a Hazardous Substance on the Property or the Adjacent Property; or (b) a breach of any representation, warranty, covenant or agreement contained in this Section 8. This indemnity shall survive the termination of this Lease.

8.2.5    Subject to Tenant's obligations set forth in Section 8.4.1, if any Hazardous Substance is deposited, released, stored, disposed, discovered or present in or on the Leased Premises or the Adjacent Property, Landlord, at Landlord's expense, shall promptly and diligently, to the extent required by any applicable law, including (without limitation) any Environmental Laws, rules, regulations and policies of any governmental entity with jurisdiction over the same, and in compliance with such laws, remove, transport and dispose of such Hazardous Substance. Landlord, at Landlord's expense, shall promptly and diligently investigate any reasonable claim from Tenant concerning the presence or suspected presence of a Hazardous Substance on or in the Leased Premises, including (without limitation) the sampling, monitoring and analysis of soil (both surface and subsurface), groundwater and air quality (both indoor and outdoor). Such investigation shall be performed by environmental contractors reasonably acceptable to Tenant, and Tenant agrees to reasonably cooperate promptly in connection with such approval. Landlord shall use its best efforts to minimize direct and indirect impact on Tenant, including its operations in the Leased Premises and effective use of the Premises, if any, during all activities related to remediation. Without limiting the foregoing, prior to the Commencement Date, Landlord shall, at its sole cost and expense, remove all asbestos and asbestos-containing material from the Leased Premises. Tenant will be responsible for ordinary and customary maintenance of the drive aisles and parking areas located on the Premises relating to minor amounts of oil and gasoline, which do not exceed amounts permitted under Environmental Law, deposited on the drive aisles and parking areas by vehicles in the ordinary course of Tenant's business operations on the Premises. In the event that there shall now or in

the future exist any Hazardous Substances in, on, under or about the Leased Premises or the Adjacent Property (not caused by Tenant) that materially and adversely affect Tenant's use of or operations from the Leased Premises, access to or visibility of the Leased Premises, Tenant's construction of its improvements (collectively "Interference"), then: (i) Base Rent and all other charges payable under this Lease shall be equitably abated in proportion to the effect of the Interference on Tenant's operations; (ii) if Tenant, in its sole discretion, decides to cease operating in the Leased Premises, then: (a) all Base Rent and all other charges payable under this Lease shall abate until the date on which Tenant is reasonably able to reopen for business from the Leased Premises without any Interference and (b) in the event such Hazardous Substances were used, manufactured, stored, released, or disposed of by Landlord or its agents, employees or contractors, then for each day of closure, Landlord shall pay to Tenant, as liquidated damages and not as a penalty, the sum of Five Hundred Dollars ($500.00) per day of Tenant's closure of Tenant's business at the Leased Premises; (iii) if such Interference occurs prior to the Rent Commencement Date, then the Rent Commencement Date shall be delayed for one (1) day for each day of Interference (notwithstanding anything in Section 3.1 of this Lease to the contrary); and (iv) if such Interference continues for more than one hundred eighty (180) days, Tenant may terminate this Lease, in which event Landlord shall pay to Tenant within twenty (20) days of the date  Tenant vacates the Leased Premises an amount equal to the unamortized portion (based on a straight-line amortization over the Initial Term) of Tenant's store development costs incurred in connection with the Leased Premises, including (without limitation) attorneys' fees, design fees, consultant fees (whether the foregoing fees are incurred by outside or in-house personnel), permitting fees, site selection costs, and construction costs, plus all other costs and expenses incurred by Tenant in connection with this Lease and the Leased Premises.

8.3     Tenant's Use of Any Hazardous Substance. The only Hazardous Substances Tenant may use in its operations are cleaning solutions and other substances as are customarily used in Tenant's business.  Tenant will manage such use in accordance with the Environmental Laws.

9.      DAMAGE OR DESTRUCTION.

9.1     If the Building and other improvements, or any portion thereof, on the Leased Premises are damaged or destroyed by fire or other casualty, unless Tenant elects to terminate this Lease as provided below in this Section 9.1, Tenant may raze, demolish, alter, repair, restore or replace the damaged or destroyed Building or improvements as Tenant may elect in its sole and absolute discretion. In the event Tenant chooses not to elect to terminate this Lease, Base Rent and Real Property Taxes shall not abate.  If the cost to repair, restore or replace such damaged or destroyed improvements exceeds thirty-five percent (35%) of the then replacement value of the Building, and if the damage or destruction occurs within the last three (3) Lease Years of the Initial Term or during any Extension Term, Tenant may, to be evidenced by written notice to Landlord within sixty (60) days after the occurrence of such damage or destruction, elect to terminate this Lease effective as of the date of the damage or destruction.  Tenant shall be entitled to all proceeds of insurance on policies covering such damage or destruction.  If Tenant elects to terminate this Lease pursuant to this Section 9.1, Tenant shall, at its expense up to the amount of the insurance proceeds, either leave the remaining undamaged portion of the Building as is on the Property or demolish such remaining undamaged portion of the Building and remove all debris thereof from the Property, and the parties shall thereafter be released from any further liability under this Lease; provided, however, any and all Base Rent or other charges paid by Tenant for the period after the date of the occurrence of such damage or destruction, shall be promptly refunded to Tenant by Landlord.

10.     PROPERTY TAXES.

10.1    Definition of "Real Property Taxes". For purposes of this Lease, the phrase "Real Property Taxes" shall include general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest of Landlord in the Property; provided, however, that assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Property Taxes for any Lease Year.  Notwithstanding the foregoing, Real Property Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any income taxes

Case ID: 260404329

arising out of or related to ownership and operation of income-producing real estate; (c) any excise or other taxes imposed upon Landlord based upon gross or net rentals, gross receipts, revenues or other income received by Landlord or otherwise attributable to Landlord's ownership or use of the Property; (d) any rollback, greenbelt or similar deferred taxes that are assessed after the Rent Commencement Date, but relate to time periods prior to the Rent Commencement Date by reason of a change in zoning, use or ownership; (e) any assessments or other impositions or other charges imposed, assessed or charged by any governmental authority relating to the initial development or subsequent redevelopment of the Adjacent Property; (f) any fees or other sums paid to a governmental authority in consideration of obtaining any of the Government Approvals (as defined in Section 17.2 below) or utility service, including, but not limited to, impact, loophole and proffer fees; or (g) assessments accruing against the Property prior to the Rent Commencement Date or after the date of termination of this Lease. Landlord shall be responsible for paying, without contribution from Tenant, all taxes and impositions described in clauses (a) through (g) prior to delinquency.

10.2    Payment of Real Property Taxes. As of the Rent Commencement Date, Landlord represents and warrants that (a) the Property is a separate legal parcel with its own parcel identification number, which is accurately and completely set forth on Exhibit A; (b) the Property is separately assessed for the purpose of paying all Real Property Taxes, (c) Landlord has paid in full all Real Property Taxes due as of the Rent Commencement Date, and (d) Landlord shall pay when due all future Real Property Taxes which accrue for the period of time prior to the Rent Commencement Date. For each year during the Term, Landlord shall provide Tenant with a copy of the most currently available tax statement and Tenant shall pay the Real Property Taxes for the Property directly to the taxing authority prior to delinquency, provided that the invoice or statement is received by Tenant at least forty-five (45) days prior to such date. If Real Property Taxes assessed against the Property for periods of time during the Term are billed by the applicable taxing authorities following the expiration or earlier termination of the Term, the parties agree that the Real Property Taxes for such period during the Term shall be calculated based on the Real Property Taxes billed by the applicable taxing authorities for the immediately preceding period during the Term, in full satisfaction of such reimbursement obligation to Landlord. In the event the taxing authority offers a discounted tax rate or a penalty rate based on the date of payment, Tenant's property tax shall be calculated at the lowest possible discounted amount regardless of the date of Landlord's payment to the taxing authority. Tenant shall pay Real Property Taxes only as such taxes become due and payable during the Term (as defined in Section 2.2), prorated for the first and last years of the Term. Tenant shall have the right to challenge, at its sole expense, the Real Property Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require. Upon the request of Tenant, and if required to preserve the right to challenge such taxes, Landlord will pay all Real Property Taxes under protest or in such other manner as will preserve the right to challenge such taxes. Tenant may challenge Real Property Taxes if Tenant pays any protested amount to Landlord. Landlord will reimburse Tenant for any refund of Real Property Taxes received as a result of any tax contest.

10.3    Property Tax Protection. Notwithstanding anything contained herein to the contrary, if Landlord sells or transfers the Property, or if a change of ownership occurs and as a direct result of such sale or transfer there shall be a reassessment of the Property and the Real Property Taxes increase, Tenant shall not be obligated to pay any portion of such increase becoming due during the Term as a direct result of such sale, transfer or change of ownership. All increases in Real Property Taxes due to such reassessment shall instead be paid by Landlord in the year of such reassessment and all subsequent years during the Term.

10.4    U&O Tax. The City of Philadelphia, Pennsylvania (the "City") imposes the Business Use and Occupancy Tax ("U&O Tax") on the commercial use and occupancy of real estate located in Philadelphia. Pursuant to U&O Tax regulations, Landlord is required to attempt to collect this tax from Tenant and remit to the City. If Tenant fails to pay the U&O Tax required to be paid by law to Landlord as required by this Lease within the later to occur of: (i) forty-five (45) days after written request for same, accompanied by the governmental invoice or other reasonable evidence thereof, or ten (10) days prior to the due date thereof, Landlord may report this non-payment on the U&O Tax return at which point Tenant

is directly responsible to the City for payment of the U&O Tax required to be paid by law and any interest, penalties, or other charges in connection therewith. Tenant acknowledges that the amount of U&O Tax payable by Tenant may change during the Term due to, inter alia, a change in the applicable U&O Tax rate or the assessment of the Property.

10.5    Tax Abatement.    Tenant acknowledges and agrees that Tenant shall bear responsibility for compliance with any tax abatement program offered by the City of Philadelphia for the construction of new improvements, to the extent such program is available to Tenant, and that, except as expressly provided below, Landlord shall not be responsible for any compliance with such program nor for increases in the tax assessment on account of Tenant's failure to apply for such program. Tenant shall, promptly after filing and written request therefore, provide Landlord with copies of all tax abatement applications filed with the City of Philadelphia. Notwithstanding the foregoing, Landlord agrees to promptly and timely reasonably cooperate with Tenant and its contractors and vendors in connection with such above referenced compliance and submission, including without limitation, executing any required applications or appeals related thereto, and Landlord will be liable for any failure to so promptly and timely reasonably cooperate.

11.    UTILITIES.

11.1    Utilities.    From and after the Commencement Date, Tenant shall pay directly to the applicable utility companies or governmental agencies charges for all utility services consumed by Tenant on the Property during the Term.    Landlord covenants and agrees to pay any and all such utility charges and expenses occurring prior to the Commencement Date, including, without limitation, such charges and fees accruing as a result of Landlord's Work. At Landlord's sole cost and expense, Landlord shall ensure data communications infrastructure in the form of broadband cable or broadband fiber is located on the Property and available for Tenant's use.   Landlord shall be responsible for all water connection, sewer connection, traffic impact and other extraordinary fees associated with such use, except as otherwise specifically provided herein.  Landlord will provide for separately metered utilities for Tenant at Landlord's sole cost and expense.  Upon Tenant's request, Landlord shall dedicate or grant any easements on the Leased Premises, Adjacent Property and adjacent properties owned by Landlord as necessary for the extension, maintenance and use of utility lines and services needed by Tenant for its proposed use of the Property.  Landlord shall not take or permit any person claiming under Landlord to take any action that shall interrupt or interfere with any utility service to the Property, except for such time as is reasonably required to repair any such utilities.  In the event that any such interruption or interference occurs and is caused by Landlord or its agents, employees or contractors and continues for longer than 24 hours after written notice thereof which notice, notwithstanding anything to the contrary, may be given solely via email correspondence pursuant to the email address designated under Section 25, Base Rent shall be fully abated for each additional day that such interruption or interference continues.   Tenant will have no obligation to pay or reimburse Landlord for any utility charges that were incurred or billed before the date that the then-current Landlord purchased the Property from the previous landlord.  Tenant shall be entitled to the exclusive use of any electricity generated by an alternative energy system at the Leased Premises and is solely entitled to the proceeds from the sale of any unused alternative energy system electricity that is generated at the Leased Premises.

11.1.1    Alternative Energy System  Notwithstanding anything contained in Section 11.1 or elsewhere in this Lease, Tenant (in its sole discretion) or its solar contractors, suppliers or other alternative energy agents ("AE Agent") shall have the right to, at Tenant's cost and expense, install, utilize, maintain and remove a solar photovoltaic or similar solar energy system including all related equipment, appurtenances, wiring and meters or any other form of alternative energy system (collectively referred to as "AE System") on the roof of the Building for use at the Leased Premises.  The installation will include the right to make necessary penetrations through the roof and/or walls of the Building for such use.  Tenant and/or its AE Agent shall be entitled to remove at Tenant's or its AE Agent's cost the AE System at end of the Term, or at any time during the Term in its sole discretion, without Landlord's consent, provided Tenant repairs any damage caused by such removal.  Tenant shall be entitled to the exclusive use of the electricity

generated by the AE System at the Leased Premises, even if it is purchased from its AE Agent. Tenant and/or its AE Agent are solely entitled the proceeds from the sale of any unused AE System electricity generated at the Leased Premises.

11.1.2   Easement. If requested by Tenant, Landlord shall execute and record an easement consistent with the rights and obligations of the parties to this Lease at no additional rental charge.

11.1.3   Financing. Landlord agrees that in the event Tenant's and/or the AE Agent's lender(s) or an AE System lessor (collectively "AE Lender") provides financing or a rental arrangement for AE System, the AE System (regardless how it is attached to or incorporated in the Building and the Leased Premises) shall remain the property of Tenant, the AE Agent and/or the AE Lender. Any collateral securing such financing would create a first priority security interest ("Security Interest") in the AE System in favor of the AE Lender to be perfected by the filing of a Financing Statement (Form UCC-1) under the Uniform Commercial Code as personal property only, and not as a fixture upon the Building or the Property. Landlord acknowledges and accepts the existence of such Security Interest and agrees that the AE System shall at all times remain the personal property of Tenant, AE Agent and/or AE Lender for which Landlord disclaims and releases any lien of Landlord in or to the AE System as a fixture or otherwise. Landlord, to the best of its knowledge, represents and warrants that the installation of the AE System and the granting of the Security Interest will not violate any covenant, restriction, lien, financing agreement or security agreement to which Landlord is a party. Upon the request of Tenant or AE Agent, Landlord shall execute and deliver an acknowledgement, in a form reasonably satisfactory to AE Lender, confirming the provisions of this Section 11.1.3. Landlord disclaims and waives any right to receive any and all savings, subsidies, credits, renewable energy credits, allowances, rebates, tax incentives or other incentives based upon the installation and maintenance of the System, all of which shall be for the exclusive benefit of Tenant, AE Agent and/or AE Lender (as the case may be).

12.     LANDLORD'S MAINTENANCE OF PROPERTY. Landlord hereby warrants Landlord's Work, and agrees to correct any defects in Landlord's Work, for a period of one year from the Commencement Date, which Landlord's Work will be performed in good and workmanlike condition. Landlord agrees to cause the Adjacent Property to be maintained in a safe, well lit, free of debris and abandonment condition, and to cause to be promptly demolished any improvements damaged by casualty and all debris removed, in the event such damaged improvements are not being restored. Because the Property is "self-contained, and Tenant is maintaining the Property at its own expense, Tenant shall not be obligated to pay any common area expenses or other costs in connection with Landlord's maintenance of the Adjacent Property or the Property.

13.     ASSIGNMENT AND SUBLETTING. Tenant may, without Landlord's consent, sublet all or any portion of the Premises or assign its interest in this Lease to: (a) a parent, subsidiary, affiliate, division or other entity controlling, controlled by or under common control with Tenant; (b) a successor entity related to Tenant by merger, consolidation, reorganization or government action; or (c) an entity that acquires not less than ten (10) of Tenant's locations, operating under the trade name "Starbucks" or any other trade name then used by Tenant (each a "Permitted Transfer"). For the purpose of this Lease, any sale or transfer of Tenant's capital stock, redemption, or issuance of additional stock of any class shall not be deemed an assignment, subletting, or any other transfer of this Lease or the Premises. Landlord shall not be entitled to any consideration in connection with any assignment or sublet. Except in the case of a Permitted Transfer, prior to any assignment or sublet, Tenant shall first notify Landlord of its intent to market the Premises for assignment or sublet. Upon receipt of such notice, Landlord shall have thirty (30) days to elect to terminate this Lease by notice to Tenant conditioned upon payment of the Recapture Price. Such termination shall be effective ninety (90) days after Tenant's receipt of such notice and receipt from Landlord of the Recapture Price. If Landlord does not elect to terminate this Lease within such thirty (30) days, Tenant shall have the right to sublet all or any portion of the Premises or assign this Lease without Landlord's consent. Tenant shall be released of all Lease obligations and future liability following any assignment or sublease.

STARBUCKS

Case ID: 260404329

14.    DEFAULTS; REMEDIES.

14.1    Tenant's Defaults. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

(a)    The failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of twenty (20) days after Tenant's receipt of Landlord's notice in writing of such failure; or

(b)    The failure by Tenant to observe or perform any of the material covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after Tenant's receipt of Landlord's written notice thereof; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

14.2    Remedies in Default. In the event of any such default which remains uncured after the expiration of the applicable notice and cure period(s) specified above, Landlord may, as its sole and exclusive remedy, in accordance with procedures required by law, subsequent to the giving of notice and expiration of any applicable cure period, pursue one of the following mutually exclusive remedies:

14.2.1    In the event of a material default, Landlord may elect to terminate Tenant's right to possession of the Leased Premises by judicial process, upon written notice, in which case this Lease shall terminate and Tenant shall surrender possession of the Leased Premises to Landlord within thirty (30) days after such written notice to Tenant. Landlord shall not be entitled to terminate this Lease during any time that the parties are involved in a good faith dispute regarding the existence of an alleged material default. In the event Landlord shall elect to terminate this Lease, all rights and obligations of Tenant shall cease and terminate except that Tenant shall pay Landlord any accrued but unpaid Base Rent up to the date of termination. Notwithstanding anything to the contrary set forth herein, except with respect termination rights expressly set forth in this Lease, Landlord waives any rights existing under law or in equity to terminate this Lease or terminate Tenant's right to possession under this Lease. Notwithstanding anything in this Lease to the contrary, in no event shall Tenant be liable for (i) any consequential damages or (ii) lost Base Rent in excess of two (2) years of Base Rent.

14.2.2    Notwithstanding the limitation of recovery of lost Base Rent in excess of three (3) years as set forth above in Section 14.2.1 or below in Section 14.2.3. Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in full force and effect whether or not Tenant shall have abandoned the Property. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, except for Landlord's right to terminate this Lease for the same default pursuant to Section 14.2.1 above, but including the right to recover the Base Rent as and when it becomes due hereunder.

14.2.3    Notwithstanding the foregoing, with respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to promptly obtain another tenant for the Leased Premises, at a fair market rental for the land and any improvements, and to otherwise mitigate its damages. In the event Landlord is awarded the right in a lawful procedure to terminate this Lease and accelerate rent as damages for Tenant's uncured default, Landlord shall only be entitled to the net present value (calculated using a discount rate of eight percent (8%) per annum) of the amount of fair market Base Rent reasonably determined to compensate Landlord for the time and cost that it would take to lease the Leased Premises to another tenant, but in no event shall such time period exceed the fair market value for the following three (3) Lease Years.

STARBUCKS

Case ID: 260404329

14.3    Landlord Defaults and Remedies.    The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord:  (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion); or (b) the failure of any representation or warranty to be true when deemed given hereunder.  Notwithstanding the foregoing, in the event Landlord's breach creates an emergency situation, or is of such a nature that it impairs Tenant's ability to operate at the Leased Premises (which shall include, by way of illustration and not limitation, obstructions or disruptions to: drive through facility, parking, access to the Leased Premises, visibility, utilities, health and safety and quiet enjoyment), then Landlord shall be required to remedy such breach as soon as commercially reasonable and in any event without delay.  In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein:  (i) to remedy such default or breach; (ii) to pursue the remedy of specific performance; (iii) to seek money damages for loss arising from Landlord's failure to discharge its obligations under the Lease; and (iv) to terminate this Lease whereupon in the event such default arose from the intentional or malicious acts or omissions of Landlord or its agents, employees or contractors, then Landlord shall pay to Tenant the Recapture Price within thirty (30) days of notice of such termination from Tenant.  Tenant shall also have the right to recover its costs and expenses (including attorney's fees) in pursuing the remedies herein and shall have the option to offset or deduct said costs, expenses and awards to which it is entitled pursuant to this Section from the installments of Base Rent and other payments required of Tenant next falling due under this Lease.  Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section 14.3 be construed to obligate Tenant to perform Landlord's repair obligations.

15.    CONDEMNATION.  If the whole or any part of the Leased Premises is taken or condemned by any competent authority for any public use or purpose during the Term, including any Extension Term, Tenant shall have the right to an award for damages, including the right to claim and prosecute its claim in all appropriate courts and agencies ("Tenant's Proceeds") for such taking based upon Tenant's ownership of Tenant's Property, together with Tenant's reasonable moving and relocation expenses and the value of Tenant's leasehold interest, including without limitation the difference (if any), between the existing rental under this Lease and the current market rate for rent for like properties of the type of property constituting the Leased Premises.  Such award shall be allocated between Landlord and Tenant in accordance with their respective interest.  Notwithstanding the foregoing, any award attributable or applicable to Tenant's Proceeds, shall belong to Tenant, Landlord hereby irrevocably assigns and conveys to Tenant any portion of any compensation awarded to Landlord to the extent of or allocable to Tenant's Proceeds.

If a part of the Leased Premises shall be taken or condemned which, in the sole judgment of Tenant, is sufficient to render the remaining portion unsuitable for its continued use or occupancy, including, without limitation, (a) a taking of a portion of the access roads to the Property that, in Tenant's reasonable judgment, impedes or interferes with access to the Property or affects the conduct of Tenant's business as theretofore conducted on the Property, (b) the reduction of the parking serving the Property or the Adjacent Property to below the amount required by applicable ordinance without variance, or (c) the closing of any entrance or exit to the Property, or (d) a material effect on Tenant's ability to operate its business, then, in any such event or events, Tenant may, at any time, either prior to or within a period of sixty (60) days after the date when possession of the Leased Premises shall be required by the condemning authority, elect to terminate this Lease, or, if an option to purchase the Property is conferred upon Tenant by any other provision of this Lease, may as an alternative to such termination of this Lease, elect to purchase the Property in accordance with such purchase option, except that there shall be deducted from the purchase price to be paid for the Leased Premises all of Landlord's award from the condemnation proceeding.  In the event of any termination of this Lease by Tenant, this Lease shall terminate as of the date of such taking, subject to the right of Tenant, at its election, to continue to occupy the Property, subject to the terms and conditions of

this Lease, for all or such part, as Tenant may determine, of the period between the date of such taking and the date when possession of the Property shall be taken by or conveyed to the appropriating authority. In the event of any such termination, this Lease shall be of no further force or effect and neither party shall have any further rights, duties or obligations hereunder other than those rights, duties and obligations that are expressly provided herein to survive a termination of this Lease.

If Tenant does not exercise any option to terminate this Lease or to purchase the Property, then this Lease shall continue in full force and effect with respect to the portion of the Leased Premises not so taken, except that the annual Base Rent payable shall be reduced by a fraction, the numerator of which shall be the number of square feet taken or condemned, and the denominator of which shall be the square footage of the Property prior to the taking or condemnation. In the event that Tenant shall not exercise any option to terminate this Lease or to purchase the Property, Landlord shall have the obligation to provide the proceeds received by Landlord to Tenant in an amount sufficient to repair or restore the Leased Premises. Upon Tenant's receipt of such proceeds, Tenant will, with all due diligence, to the extent but only to the extent provided by such proceeds, repair and restore the Property or what may remain of it, and until the completion of such work, the obligation of Tenant to pay Base Rent and Real Property Taxes hereunder shall abate. This Section 15, however, shall not be construed to require Tenant to restore or repair any of Tenant's Property. Landlord must, with all due diligence and at its own cost and expense, repair and restore the portions of the Leased Premises outside of the Property or what may remain of it to its former condition as soon as reasonably practicable following the date of taking.

16.    SIGNAGE. Tenant shall have the exclusive right to install and place signs, awnings and other advertising materials in, on and about the Property and Tenant's Building thereon, including all directional signs, menu boards, and other signage associated with the drive-through facility, to the maximum extent permitted by law. Landlord hereby consents to, and Tenant shall be permitted to install, Tenant's then-current trademarked name(s), colors, letters, font and logo in any of Tenant's signage. Tenant will have the exclusive right at no Additional Rent but at Tenant's sole cost and expense, to install a sign panel or panels on both sides of the pylon sign(s) currently located on the Property (the "Existing Pylon"). Landlord shall not vary or change the location, size or position of Tenant's signage, including but not limited to the position of Tenant's pylon signage or directional signage. If Tenant desires to replace or relocate the Existing Pylon, Tenant may do so all at Tenant's sole cost and expense but upon prior written notice to Landlord and subject to all legal requirements.

17.    TENANT'S CONTINGENCIES. This Lease and Tenant's obligations hereunder accruing as of the Commencement Date are subject to the following conditions precedent for Tenant's benefit (collectively with the title, survey and environmental contingencies set forth in Section 8, "Tenant's Contingencies") in accordance with Section 2.1 hereof:

17.1    Feasibility. As used herein, the "Feasibility Period" shall mean the period of time beginning on the Execution Date and ending on the later to occur of: (i) one hundred twenty (120) days after the Execution Date, or (ii) sixty (60) days from Landlord's receipt and delivery to Tenant of a copy of such final Platting Approvals filed of record in the real property records of Philadelphia County, Pennsylvania; provided notwithstanding the foregoing the Feasibility Period will be extended on a day for day basis for every day after forty-five (45) days from the Execution Date, that Landlord has failed to cause to be terminated in writing the existing tenancy on the Property and provided a copy of such written termination to Tenant (the "Existing Tenant Termination Date"). During the Feasibility Period, Tenant may perform any investigations, examinations and studies with regard to the physical condition of the Leased Premises, legal aspects with respect to the Leased Premises and the overall feasibility of Tenant's proposed leasing and use of the Leased Premises, including satisfaction of Tenant's contingencies for title, survey and environmental conditions set forth in Section 8 (but subject to extension as set forth in Section 8.2). Tenant shall have full and complete access to the Leased Premises and the Adjacent Property from and after the Execution Date for purposes of performing its Inspections on the Leased Premises, including, without limitation, soils tests, environmental tests and surveys. Excepting with respect to geotechnical testing, Tenant agrees to provide written notice to Landlord in the event that Tenant is going to perform

invasive testing relating to Hazardous Substances (other than asbestos or asbestos containing matters) on the Property, and will provide Landlord with a copy of the scope of such testing, and will provide Landlord with the reasonable opportunity to be present for such testing, provided if a Landlord representative is not reasonably available during such testing then Tenant will not be obligated to postpone or not pursue such invasive testing.

Tenant's insurance under Section 7.1.1(i) will apply to Tenant's Inspections.

Tenant shall, and shall cause Tenant's agents, employees and contractors to, comply with all applicable laws and governmental rules, regulations and standards imposed by any quasi-governmental authority having jurisdiction over the Leased Premises, in conducting Inspections on the Leased Premises, provided Tenant will have no liability with regards to discovery of any existing conditions or with regards to any Hazardous Substances discovered on the Property or Adjacent Property.  Tenant shall obtain all governmental licenses or permits, if any, necessary for conducting its activities, prior to undertaking such activities.

17.2    Permit Contingency.  Tenant's obligations under this Lease are conditioned upon and Tenant shall have a contingency to obtain all permits and/or licenses (including but not limited to conditional use permits, building permits, variances and other governmental approvals) (collectively, "Government Approvals") that are required by applicable laws to enable Tenant legally develop and use the Property for its intended purpose, including but not limited to, the rights (a) to construct Tenant's Building and other improvements on the Property in accordance with Tenant's plans therefor; (b) to install Tenant's signage on the Property; (c) to conduct its business from the Property, (d) to provide and operate outdoor seating for the Property and (e) to construct and operate a drive-through facility as specified on Exhibit I attached hereto.  Tenant shall, at Tenant's sole cost and expense, initiate and diligently pursue each Government Approval.  Subject to Force Majeure Events and delays caused by Landlord, Tenant agrees to initially submit for its Government Approvals within ninety (90) days from receipt by Landlord of the P&Z Approvals and delivery to Tenant of a copy of the P&Z Approvals.  Landlord shall execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such Government Approvals.  If Tenant does not obtain all Government Approvals on terms satisfactory to Tenant or if a Government Approval is not renewed or is revoked during the Term of this Lease due to Landlord's conduct, or if drive-through permits are not renewed or are revoked, then Tenant shall have the right to terminate this Lease.  After termination hereunder, neither party shall have any rights or liabilities under this Lease, except for such matters which expressly survive such termination, and Landlord shall return any deposits and prepaid amounts to Tenant, if any; provided, if such termination is based on Landlord conduct, Tenant shall be entitled to pursue such other rights and remedies as may be available at law or in equity.  Tenant shall vacate the Leased Premises within thirty (30) days after exercising the option to terminate as herein provided.  Notwithstanding Section 25, e-mail notification will be effective for purposes of this Section 17.2 relating to extensions and termination.

Notices regarding Tenant's Contingencies may be given via facsimile if also sent concurrently and in accordance with Section 25 herein.  Such facsimile notices shall only be valid as notice concerning Tenant's Contingencies as provided in this Section 17 and shall be deemed given on the business day receipt is confirmed, either electronically or otherwise, when also delivered in accordance with Section 25. Tenant's notice to Landlord of the failure of any or all of Tenant's Contingencies shall terminate the rights and obligations contained herein, whereupon Tenant's possession of the Leased Premises, the Commencement Date and this Lease shall be deemed not to have become effective.

18.    OUTDOOR SEATING.  If such seating is permitted by the local authorities, Tenant may provide outdoor seating for its customers on the Leased Premises pursuant to Tenant's plans therefor.

19.    TENANT'S RIGHT OF EARLY TERMINATION.  Notwithstanding anything contained herein to the contrary, Tenant, in its sole discretion, shall have the right to terminate this Lease as of the Early Termination Date. The "Early Termination Date" shall be any date on or after the last day of the sixtieth

Case ID: 260404329

(60th) full calendar month of the Term. In order to exercise this early termination right, Tenant must give Landlord written notice at least sixty (60) days before the Early Termination Date (the "Termination Notice"). Upon the date Tenant specifies for the termination and conditioned upon receipt of confirmation of the amount thereof, Tenant agrees to pay Landlord the Termination Payment. On the Early Termination Date, upon termination by Tenant in accordance with the requirement thereof, the rights and obligations shall be the same as if the Lease had naturally expired on the Termination Date, and for avoidance of ambiguity, Landlord shall take ownership of all improvements on the Property (including but not limited to the Building). For purposes hereof, the term "Termination Payment" shall mean the sum of (i) the remaining unamortized portions of the sums paid to Broker by Landlord amortized on a straight line basis over the initial Term of the Lease, and (ii) the remaining unamortized prorated amount of any installment of the Allowance amortized over the initial Term of the Lease, attributable to after the Early Termination Date. Landlord and Tenant acknowledge and agree that the Allowance is being amortized on a straight line basis over the first ten (10) years of the Initial Term.

20.    TENANT'S USE OF COMMON AREAS. Landlord hereby grants to Tenant the benefit of all easements, licenses, rights of way and privileges created under any reciprocal easement agreements or similar instrument ("REA"), to the extent such exist, that inure to the benefit of Landlord and/or the Property, including without limitation, ingress and egress to streets, driveways and public rights-of-way. Landlord shall enforce all provisions of the REA as reasonably necessary to give Tenant the benefits to which it is entitled under this Lease. Landlord shall not, without the prior written consent of Tenant, modify, amend or terminate the REA, nor waive any of its rights thereunder. In addition, Tenant shall have the right to use any and all other appurtenances and easements benefiting the Leased Premises and/or the Adjacent Property. In no event shall Landlord, except with the prior written consent of Tenant, vary or permit to be varied the existing means of ingress and egress to the Property. Landlord shall not reduce or permit to be reduced the number of parking spaces in the Leased Premises below that which is required by applicable ordinance without variance. Any changes, additions or alterations to the Adjacent Property shall not (a) impair access to the Leased Premises; (b) materially affect the conduct of Tenant's customary business thereon; or (c) detract from Tenant's signage, create confusion regarding the business conducted in the Leased Premises. In the event of any such interference or other violation of this Section 20 by Landlord, in addition to Tenant's other rights and remedies under applicable law and this Lease, the Base Rent and other charges due from Tenant hereunder shall be equitably abated based on the degree of interference with Tenant's business.

21.    OPTION TO PURCHASE AND RIGHT OF FIRST REFUSAL TO PURCHASE

(a)    Tenant is hereby given the option to purchase the Property, provided Tenant shall give Landlord notice in writing of its election to exercise this option to purchase at any time during the Term or any Extension of this Lease (the "Purchase Election Notice"). The Purchase Election Notice shall contain Tenant's determination of the Fair Market Value. The term "Fair Market Value" means the value a willing buyer would pay and a willing seller would accept for the Property subject to this Lease with Tenant, taking into account all the relevant factors, whether favorable to Landlord or Tenant.

Within thirty (30) days after receipt of the Purchase Election Notice, Landlord shall send written notice to Tenant of Landlord's determination of the Fair Market Value ("Landlord's Determination"). If Tenant does not reject Landlord's Determination by giving written notice of such rejection within thirty (30) days after receipt of Landlord's Determination, time being of the essence, then Landlord's determination shall be deemed accepted by Tenant. If Tenant rejects Landlord's determination of the Fair Market Value, the parties shall have a period of thirty (30) days from and after the date on which Tenant shall have rejected Landlord's Determination (the "Negotiation Period") to negotiate and agree on the Fair Market Value. The parties shall be obligated to conduct such negotiations of Fair Market Value in good faith. If the parties agree on the Fair Market Value, they shall promptly proceed to execute such purchase as set forth in this Section 21(a). If the parties are unable to agree on the Fair Market Value as aforesaid, then the parties shall proceed to arbitration in accordance with paragraph directly below.

If the parties cannot agree upon Fair Market Value, then the parties, in good faith, shall jointly select a single arbitrator, who must be a licensed real estate broker with at least ten (10) years' experience with sales of retail pad sites in the Philadelphia area. Landlord and Tenant shall evenly split the costs of such arbitrator. In the event of the failure of Landlord and Tenant to designate an arbitrator within ninety (90) days after Tenant exercises any option, either party shall have the right to apply to the Philadelphia Court of Common Pleas (or other court having original jurisdiction in Philadelphia County) to designate an arbitrator meeting the criteria set forth in this Section 21(a).

The arbitrator shall determine which of the two (2) rent determinations submitted in accordance with this Section more closely represents the Fair Market Value of the Property. The arbitrator may not select any other Fair Market Value of the Property other than one submitted by Landlord or Tenant. The determination of the arbitrator shall be binding upon Landlord and Tenant and shall serve as the basis for the determination of the Fair Market Value, and Landlord and Tenant shall promptly proceed to execute such purchase as set forth in this Section 21(a).

This option to purchase shall be independent of the right of first refusal to purchase granted below and any notice or action taken under the right of first refusal shall not terminate or affect this option in any way. If Tenant exercises its option or right of first refusal to purchase the Property under this Section 21 and the Property is not yet a separate legal parcel, Landlord shall, at its sole expense, promptly take such necessary action as is legally required to create the Property as a separate legal parcel before conveyance thereof to Tenant.

(b)    It is further agreed that should Landlord or Landlord's heirs, executors, successors or assigns, at any time during the Term of this Lease or any Extension, receive an offer to purchase the Property or any part of the Property (which may be in the form of a final letter of intent containing all material terms of the offer to purchase), and Landlord desires to accept such offer; or should Landlord during any such time make an offer to sell the Property or any part of the Property or transfer the beneficial interest in any land trust in which the Property or any part of the Property is held, Landlord shall give Tenant forty-five (45) days' notice in writing of such offer setting forth the name and address of the proposed purchaser or new beneficiary, with executed copies of all relevant documents, the amount of the proposed purchase price and all other terms and conditions of such offer. Tenant shall then have the first option to purchase the Property or the beneficial interests which are the subject of the offer by giving written notice to Landlord of its intention to purchase within such forty-five (45) day period at the same price (excluding the value of Tenant's Property included in the purchase price) and on the same terms as any such offer, except as otherwise specifically provided herein. It is understood that in the event Tenant does not give notice of its intention to exercise the option to purchase within such period, this Lease and all of its terms and conditions shall nevertheless remain in full force and effect and Landlord and any purchaser or purchasers of the Property shall be bound by the terms of this Lease, including without limitation, terms of this Section 21. For the purposes of this provision, an offer to sell shall include any assignment of beneficial interest if the Property is held in a trust. Whether or not the Property set forth in the offer are sold or the beneficial interest is transferred, Tenant shall have, upon the same conditions and notice, the continuing first option to purchase the Property or beneficial interest or any part of the Property upon the terms of any subsequent offer or offers to purchase throughout the Term of this Lease.

If any of the foregoing options are exercised, Landlord shall convey marketable, indefeasible and insurable title to the real estate in fee simple or convey the beneficial interest in a land trust by good and sufficient stamped special warranty deed or assignment of beneficial interest, as the case may be, with release of dower, homestead, courtesy and other rights of the respective spouses, if any, and free from all encumbrances whatsoever. In addition, in the exercise of such options, all monies shall be placed with a third-party escrowee of Tenant's designation, and the settlement of the purchase price and the conveyance to Tenant shall take place in escrow. At closing, customary closing charges in Philadelphia shall apply, it being agreed that Tenant would be responsible for all title insurance premiums and Landlord and Tenant would evenly split all realty transfer taxes. Settlement of the purchase price and conveyance to Tenant shall be made within ninety (90) days from the date of exercise in the case of the right of first refusal,

provided such 90 day period will be reasonably extended if the parties are engaged in diligent, commercially reasonable efforts to negotiate the purchase agreement, and ninety (90) days after the parties' mutual agreement or the determination of the arbitrator. Taxes, utilities, rents and other current expenses shall be adjusted as of the date of the closing date, if necessary.

In the event there are any conflicts between the terms in this Lease concerning the right of first refusal and the terms contained in the offer which Tenant must accept if Tenant desires to purchase the Property, then the terms of this Lease shall control and supersede those contained in such offer.

22.    LEASEHOLD MORTGAGE.  If Tenant mortgages its leasehold estate and the mortgagee or holders of the indebtedness secured by the leasehold mortgage or trust deed shall notify Landlord, in the manner provided herein for the giving of notice, of the execution of such mortgage or trust deed and name the place for service of notice upon such mortgagee or holder of indebtedness, then, in such event, Landlord agrees for the benefit of such mortgagees or holders of indebtedness from time to time:

(a)    That Landlord will give to any such mortgagee or holder of indebtedness simultaneously with service on Tenant, a duplicate of any and all notices or demands given by Landlord to Tenant.  Such notices shall be given in the manner and be subject to the terms of the notice provisions of this Lease.

(b)    That such mortgagee or holder of indebtedness shall have the privilege of performing any of Tenant's covenants under this Lease, of curing any default of Tenant or of exercising any election, option or privilege conferred upon Tenant by the terms of this Lease.

(c)    That Landlord shall not terminate this Lease or Tenant's right of possession for any default of Tenant if, within a period of twenty (20) days after the expiration of the period of time within which Tenant might cure such default under the provisions of this Lease, such mortgagee or holder of indebtedness commences to eliminate the cause of such default and proceeds diligently and with reasonable dispatch as provided.

(d)    That, except for the rights to terminate contained in this Lease, no rights, privilege or option to cancel or terminate this Lease, available to Tenant, shall be deemed to have been exercised effectively unless joined in by any such mortgagee or holder of the indebtedness.

(e)    That no liability for the payment of rental or the performance of any of Tenant's covenants and agreements shall attach to or be imposed upon any mortgagee, trustee under any trust deed or holder of any indebtedness secured by any mortgage or trust deed upon the leasehold estate, unless such mortgagee, trustee or holder of indebtedness forecloses its interest and becomes the Tenant under this Lease.

23.    GENERAL PROVISIONS.

23.1    Estoppel Certificate.  Tenant shall, no more than twice in any Lease Year and upon not less than thirty (30) days prior written notice from Landlord, execute, acknowledge and deliver to any prospective purchaser or mortgagee, or to Landlord on such party's behalf a statement in writing on Tenant's standard form or on such other form as is acceptable to Tenant, (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect); (b) stating the date to which the Base Rent and other charges are paid and the amount of any security deposit held by Landlord, if any; and (c) acknowledging that there are not, to the actual knowledge of the person executing such certificate, any uncured defaults on the part of Landlord hereunder, or specifying such defaults, if any, which are claimed.

Case ID: 260404329

Any such statement may be conclusively relied upon by said prospective purchaser or mortgagee of the Leased Premises. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord. Landlord shall similarly provide an estoppel certificate to Tenant upon the same terms as above.

23.2    Landlord's Interests. Landlord represents, warrants and covenants to Tenant that as of the Execution Date and throughout the Term, as applicable, (a) Landlord owns and holds fee title in and to the Property and the Adjacent Property enabling Landlord to enter into an enforceable lease with Tenant on the terms and conditions contained herein (no additional signatories or consents are required to make the Lease binding and fully enforceable), and Landlord will defend the title and indemnify Tenant against any damage and expense which Tenant may suffer by reason of any claim against title or defect in the title or description of the Property; (b) the real property identified on Exhibit A contains the Property described in Section 1; (c) there are no encumbrances, liens, agreements, covenants or restrictions other than those expressly approved by Tenant, and Landlord further covenants, represents and warrants that it will not enter into any encumbrances, liens, agreements, covenants or restrictions without Tenant's prior written consent (except for mortgages in accordance with Section 23.12 below for which an SNDA has been provided; (d) to Landlord's knowledge, there are no impending condemnation plans, proposed assessments or other adverse conditions relating to the Leased Premises; (e) as of the Existing Tenant Termination Date (defined in Section 17.1 above), all written tenancies, other than this Lease, in the Property will be terminated in writing, and as of the Required Vacancy Date (defined in Section 4.5 above), the Property will be free all of any tenants and occupants thereof, and Tenant shall have sole and actual possession and control of the Property from and after the Commencement Date; (f) there are no claims, causes of action or other litigation or proceedings pending or, to the best of Landlord's knowledge, threatened with respect to the ownership, operation or environmental condition of the Leased Premises or any part of it; (g) there are no disputes with neighboring property owners or tenants regarding any aspect of the Leased Premises; and (h) the Property has free and unobstructed access to the public street which is closest in proximity to the Property and Landlord will not take any action or enter into any agreement during the Term hereof which would reduce or hinder such access. Landlord will indemnify and hold Tenant harmless if any of the foregoing representations and warranties prove to be untrue. The term "Landlord" as used herein shall mean only the owner or owners, at the time in question, of the fee title (or a tenant's interest in a ground lease) of the Property. In the event of an assignment or transfer of this Lease by Landlord for other than security purposes, Landlord shall cause its assignee or transferee to assume the provisions of this Lease and Landlord shall deliver notice of such assignment or transfer and a copy of the effective instrument of transfer to Tenant within fifteen (15) days after the date of transfer. Tenant shall be entitled to continue to pay rent and give all notices to Landlord until Tenant has received the foregoing from Landlord. Landlord shall deliver all funds in which Tenant has an interest, including but not limited to Tenant's security deposit, if any, to Landlord's purchaser or assignee. From and after a sale of the Property, Landlord shall be released from all liability toward Tenant arising from this Lease because of any act, occurrence or omission of Landlord's successors occurring after the transfer of Landlord's interest in this Lease, provided Landlord's purchaser or assignee expressly assumes Landlord's duties and covenants under this Lease. Nothing herein shall be deemed to relieve Landlord of any liability for its acts, omissions or obligations occurring or accruing up to and including the date of such transfer.

23.3    Authority. Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

23.4    Severability. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

23.5    Time of Essence. Time is of the essence to the parties executing this Lease.

23.6    Interpretation. Section and subsection headings are not a part hereof and shall not be used to interpret the meaning of this Lease. This Lease shall be interpreted in accordance with the fair meaning of its words and both parties certify they either have been or have had the opportunity to be

represented by their own counsel and that they are familiar with the provisions of this Lease, which provisions have been fully negotiated, and agree that the provisions hereof are not to be construed either for or against either party as the drafting party.

        23.7    Incorporation of Prior Agreements; Amendments.  This Lease contains all agreements of the parties as of the date hereof with respect to any matter mentioned herein. No prior agreement, correspondence or understanding pertaining to any such matter shall be effective to interpret or modify the terms hereof. Oral commitments or promises are not enforceable and shall not be binding or made part of this Lease. Any revisions or modifications to this Lease must be in writing and mutually accepted by persons with full and complete authority to bind the party, as designated by this Lease. Landlord waives the right to claim or assert the existence of any other modifications to this Lease. This Lease may be modified only in writing, signed by the parties in interest, at the time of the modification. Landlord specifically acknowledges that Tenant's employees at the business located on the Leased Premises do not have authority to modify this Lease or to waive Tenant's rights hereunder.

        23.8    Waivers. No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord of the same or any other provision. A party's consent to or approval of any act shall not be deemed to render unnecessary obtaining such party's consent to or approval of any subsequent act. No waiver shall be effective unless it is in writing, executed on behalf of Landlord or Tenant by the person to whom notices are to be addressed.

        23.9    Holding Over. If Tenant remains in possession of the Leased Premises or any part thereof after the expiration of the Term, with or without the consent of Landlord, such occupancy shall be a tenancy from month-to-month at a rental in the amount of the Base Rent payable in the last month of the Term for the first two (2) months of holdover and then a rental in the amount of one hundred twenty-five percent (125%) of the Base Rent payable in the last month of the Term, plus all other charges payable hereunder, and upon the terms hereof applicable to month-to-month tenancies.

        23.10    Cumulative Remedies. Except where otherwise expressly provided in this Lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

        23.11    Binding Effect; Choice of Law; Joint and Several. This Lease shall be binding upon and benefit the parties, their respective heirs, personal representatives, successors and assigns. This Lease shall be governed by the laws of the state where the Leased Premises are located. All of the terms, covenants and conditions contained in this Lease to be performed by Landlord and/or the duties, obligations and liabilities of Landlord pursuant to this Lease, if Landlord shall consist of more than one person or organization, shall be deemed to be joint and several.

        23.12    Subordination, Nondisturbance and Attornment. This Lease shall be subordinate to all existing mortgages and/or deeds of trust affecting the Leased Premises as of the Execution Date of this Lease, provided that, as a condition precedent to the effectiveness of this Lease, Tenant may require that Tenant, Landlord and Landlord's lender execute and record a Subordination, Nondisturbance and Attornment Agreement ("SNDA") in recordable form and substantially similar to the form attached hereto as Exhibit G (with any changes to such form being subject to Tenant's reasonable approval), it being understood that any such mortgage or deed of trust shall be deemed an objectionable title matter by Tenant under Section 8.1 of this Lease. Landlord agrees to use its best efforts to obtain such SNDA prior to expiration of the Feasibility Period as set forth in Section 17.1. In addition, Landlord shall not allow any new mortgage or deed of trust lien to be recorded against the Property after the Execution Date and prior to recordation of the Memorandum of Lease, unless Tenant, Landlord and Landlord's lender (under the new mortgage/deed of trust) first execute and record an SNDA in substantially the form attached hereto as Exhibit G, with any changes to such form being subject to Tenant's reasonable approval. If requested by Landlord, Tenant agrees to subordinate this Lease to the lien of any mortgage or deed of trust subsequently placed on the Property after the Memorandum of Lease is recorded and to attorn to Landlord's successor

STARBUCKS

Case ID: 260404329

following any foreclosure, sale or transfer in lieu thereof; provided, however, that the mortgagee, transferee, purchaser, lessor or beneficiary ("Landlord's Successor") agrees in an SNDA in form and substance satisfactory to Tenant substantially similar to the form attached to this Lease as Exhibit G that Tenant's use or possession of the Property shall not be disturbed, nor shall its obligations be enlarged or its rights be modified by reason of any such transaction. Notwithstanding any foreclosure or sale under any mortgage or deed of trust (or transfer by deed in lieu thereof), this Lease shall remain in full force and effect.

23.13    Only Landlord/Tenant Relationship. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant. Landlord and Tenant expressly agree that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

23.14    Attorneys' Fees. If either party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, proceeding, trial or appeal, shall be entitled to its reasonable attorneys' fees to be paid by the losing party as fixed by the court.

23.15    Force Majeure. In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party (a "Required Act"), and such delay or hindrance is due to causes entirely beyond its control such as sabotage, riots, insurrections, martial law, civil commotion, war, fire, extreme flooding, earthquake, hurricane, tornado or other casualty or acts of God (a "Force Majeure Event"), then the performance of such Required Act shall be excused for the period of delay, and the time period for performance of the Required Act shall be extended by the same number of days in the period of delay. For purposes of this Lease, the financial inability of Landlord or Tenant to perform any Required Act, including (without limitation) failure to obtain adequate or other financing or Landlord's failure to become the fee simple owner of the Property, shall not be deemed to constitute a Force Majeure Event. A Force Majeure Event shall not be deemed to commence until the date on which the party who asserts some right, defense or remedy arising from or based upon such Force Majeure Event gives written notice thereof to the other party hereto. No extension of time for or excuse for a delay in the performance of a Required Act will be granted for rain, snow, wind, cold temperatures, flood or other natural phenomena of normal intensity for the locality where the Leased Premises are located. If abnormal adverse weather conditions are the basis for a claim for an extension of time due to a Force Majeure Event, the written notice shall be accompanied by data substantiating (i) that the weather conditions were abnormal for the time and could not have been reasonably anticipated; and (ii) that the weather conditions complained of had a significant adverse effect on the performance of a Required Act. To establish the extent of any delay to the performance of a Required Act due to abnormal adverse weather, a comparison will be made of the weather for the time of performance of the Required Act with the average of the preceding ten (10) years climatic range based on the National Weather Service statistics for the nearest weather reporting station to the Leased Premises.

23.16    Confidentiality of Lease. From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Leased Premises (including, without limitation, architectural plans, specifications, site plans and drawings) or Tenant's business (collectively, "Confidential Information"), to any person including, without limitation, any brokers, any other tenants in the Adjacent Property or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify,

Case ID: 260404329

defend, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision, including the recordation of this Lease without Tenant's express written consent. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants, current or potential mortgagees, lenders or purchasers of the Property who have a reasonable need for such Confidential Information and who agree to be bound by the terms of this Section and Tenant may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants and current or potential lenders, assigns or subtenants who agree to be so bound. Either party may also disclose the terms of this Lease (i) when such information is subpoenaed or otherwise required by law or a court order; (ii) in connection with any litigation concerning the rights and obligations of the parties to this Lease with jurisdiction; and (iii) as may be required by any governmental or quasi-governmental agency.

23.17   Brokers. Landlord agrees to pay a brokerage commission to Equity Retail Brokers, Inc. for services provided in connection with this Lease in accordance with the terms of a separate commission agreement. Except as specifically identified in this Section, Landlord and Tenant each represent to the other that they have not dealt, directly or indirectly, in connection with the leasing of the Leased Premises, with any other broker or person entitled to claim a commission or leasing fees. In no event may this Lease be construed to create any express or implied obligation on the part of Tenant to perform this Lease on behalf of any broker (or any person claiming a commission or leasing fee) as primary obligee or as a third party beneficiary. Landlord and Tenant each shall indemnify and hold each other harmless from any loss, liability, damage, or expense (including without limitation reasonable attorneys' fees) arising from any claim for a commission or leasing fee arising out of this transaction made by any unidentified broker or other person with whom such party has dealt.

23.18   Consents. Whenever the right of approval or consent is given to a party pursuant to this Lease, that party shall not unreasonably withhold, condition or delay its consent unless this Lease expressly provides otherwise.

23.19   Waiver of Jury Trial. With respect to any litigation arising out of or in connection with this Lease, Landlord and Tenant hereby expressly waive the right to a trial by jury.

23.20   Other Stores. Notwithstanding anything in this Lease to the contrary, under no circumstances do the parties to this Lease intend to limit or otherwise affect in any way the ability or right of Tenant and Tenant's Affiliates to open, operate, merchandise or close any stores anywhere, regardless of the proximity to the Leased Premises or the potential or actual effect of the opening, operation, merchandising or closing of such stores, and further regardless of any obligations or rights based on the sales generated at the Leased Premises expressly set forth in this Lease. Without limiting the generality of the foregoing, the parties confirm that neither Tenant nor its affiliates are subject to a so-called "opening covenant", "continuous operations clause", "operating covenant", "radius restriction" or similar limitation in favor of Landlord or its affiliates or other tenants of the Adjacent Property.

23.21   Business Day. "Business Day" or "business day" shall mean a day other than a Saturday, Sunday or legal holiday. If the date upon which deadline or time period provided for in this Lease is or ends on a Saturday, Sunday or legal holiday, then such date shall automatically be extended until 5:00 p.m. Pacific Standard Time of the next business day.

23.22   Memorandum of Lease; Release of Memorandum of Lease. Either party shall have the right to record the Memorandum of Lease referenced in Section 2.2 at any time at the requesting party's expense, substantially in the form attached to this Lease as Exhibit D. The party requesting recordation of the Memorandum of Lease shall be responsible for all recording costs therefor; provided, notwithstanding the foregoing, in the event Tenant elects to file the Memorandum of Lease of record, Landlord and Tenant will share the transfer taxes equally (50% to be paid by Tenant and 50% to be paid by Landlord). At Landlord or Tenant's request, the parties shall execute a memorandum of lease in

recordable form giving notice of such non-monetary terms as Tenant may reasonably request, including Tenant's exclusivity and option rights. At Landlord's request and at Landlord's sole cost and expense, Tenant shall remove any such Memorandum of Lease from the title records following the expiration or earlier termination of this Lease. Landlord agrees to execute and deliver documents as requested by Tenant and otherwise cooperate with Tenant in order to effectuate such removal; however, Tenant shall have no obligation to remove such Memorandum of Lease if Landlord fails to so cooperate. Notwithstanding anything herein to the contrary, Tenant shall not be liable for any damages or liability as a result of its failure to remove the Memorandum of Lease from the title records.

24.    QUIET ENJOYMENT. Without limiting any rights Tenant may have by statute or common law, Landlord covenants and agrees that, so long as this Lease is in full force and effect, Tenant shall lawfully, quietly and exclusively hold, occupy and enjoy the Leased Premises during the Term of this Lease without disturbance by Landlord or by any person having title paramount to Landlord's title or by any person claiming through or under Landlord.

25.    NOTICES. Whenever a provision is made under this Lease for any notice, consent, approval, election, submission, request, declaration or demand, whether required or permitted to be given under this Lease or pursuant to any law or governmental regulation of any kind ("Notice"), or where it is deemed desirable or necessary by either party to give or serve any such Notice to the other party, it shall be in writing and served either personally or sent by United States mail, certified, postage prepaid, return receipt requested, or by pre-paid nationally recognized overnight courier service providing proof of receipt (such as FedEx or UPS), addressed at the addresses set forth below or at such address in the United States as either party may advise the other in writing from time to time. In the event a party refuses to accept delivery of a properly issued Notice, the date of rejection shall be deemed the date notice has been received. Any such Notice which does not comply with the requirements herein shall be ineffective for purposes of this Lease.

|  |  |
|---|---|
| To Landlord at: | Philadelphia-Suburban Development Corporation<br>100 Ross Road, Suite 200<br>King of Prussia, PA  19406<br>Attn.:  Co-CEO<br>Email:  mn@psdc.com |
| With a copy to: | Philadelphia-Suburban Development Corporation<br>100 Ross Road, Suite 200<br>King of Prussia, PA  19406<br>Attn.:  General Counsel<br>Email:  lperuto@psdc1962.com |
| To Tenant at: | Starbucks Corporation<br>Attn:  Financial Lease Admin. RE-3<br>RE: Starbucks Coffee Company Store # 68730 |
| by mail at: | P.O. Box 35126<br>Seattle, WA  98124-5126 |
| by overnight delivery to: | 2401 Utah Avenue South, Suite 800<br>Seattle, WA  98134<br>Phone: (206) 318-4440<br>Email:  FinancialLeaseAdmi@Starbucks.com |

Landlord shall send a duplicate copy of any notice given under Section 14 to the attention of the Law and Corporate Affairs Department at the same address, Mailstop S-LA1.

Case ID: 260404329

Such Notice shall be deemed to have been given on the date of personal delivery (or the first business day thereafter if delivered on a day that is not a business day) on the date of receipt or refusal of certified mailing, return receipt requested, or the next business day after being sent by overnight courier.

26.     LANDLORD LIABILITY.  If, at any time after delivery of the Premises in the condition required hereunder, Landlord shall fail to perform any covenant, term, condition or obligation of this Lease upon Landlord's part to be performed, recovery may be satisfied only from Landlord's interest in the Leased Premises and the Adjacent Property, including without limitation, (i) the proceeds of sale of any right, title and interest of Landlord in the Premises and the Adjacent Property, (ii) the rents, issues, profits and/or other income from such property receivable by Landlord from all or any portion of the Premises and the Adjacent Property , (iii) the consideration received by Landlord from the sale or other disposition of, or the proceeds received by Landlord from the financing or refinancing of, all or any part of Landlord's right, title and interest in the Premises and the Adjacent Property, (iii) out of the insurance proceeds or condemnation award, as the case may be, payable to Landlord as a result of any damage, destruction, taking or transfer in lieu; and in no event shall any partner, shareholder, officer, director, member or employee in Landlord be liable for any deficiency or other money judgment; provided, however, that the provisions of this paragraph shall not be deemed to deny to Tenant, or limit its rights to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability or other property of Landlord or Landlord's partners, agents, shareholders, officers, directors, principals or affiliates) which may be accorded Tenant by law or under the terms of this Lease by reason of Landlord's failure to perform its obligations hereunder, nor shall the provisions of this paragraph be deemed to limit or prejudice the rights of Tenant to proceed against same with respect (i) to Landlord's obligations under the Lease with respect to any Hazardous Substances, and (ii) to recovery of damages for fraud, embezzlement or breach of trust (which shall include, without limitation, the failure to use any monies paid by Tenant to Landlord hereunder for their intended purposes).  In the event that Landlord's interest in the Property, Leased Premises and the Adjacent Property, together with any monies collected pursuant to this Section is insufficient to provide Tenant with a full recovery, then Tenant may offset Rent and any other charges or amounts due by Tenant under the Lease, including without limitation, any interest due thereon, and may extend the Term, or any extension terms, as applicable, as necessary for Tenant to make a full recovery of its rights and remedies under this Lease.

27.     EXHIBITS.  The following exhibits are attached to this Lease and by this reference are incorporated herein:

Exhibit A - Legal Description of Property
Exhibit B - Legal Description of Adjacent Property
Exhibit C - Site Plan of Property and Adjacent Property
Exhibit D - Memorandum of Lease
Exhibit E - Delivery of Possession Letter
Exhibit F - Date Certificate
Exhibit G - Subordination, Non-Disturbance and Attornment Agreement
Exhibit H - Landlord's Work Letter
Exhibit I - Tenant's Drive Through Facility
Exhibit J – Form W-9

STARBUCKS

Case ID: 260404329

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:                                          TENANT:

PHILADELPHIA-SUBURBAN    DEVELOPMENT        STARBUCKS CORPORATION, a Washington
CORPORATION,                                       corporation
a Pennsylvania corporation

By: _____                      By: _____
Its: President, Mark Nicoletti                       Its: vice president, Ray Silverstein
Date Signed: 21 October 2021                         Date Signed: 21 October 2021

Landlord's Federal Tax Identification Number:
23-1640157

STARBUCKS

Case ID: 260404329

STARBUCKS

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

[SEE ATTACHED]

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    A-1

STARBUCKS

Case ID: 260404329



Shaheed A. Smith Geospatial, LLC
1432 Easton Road, Suite 5F
Warrington, PA 18976
Office  215-343-5989
www.sasgeospatial.com

A Certified MBE/DBE/SBE Firm

### SURVEYOR'S  DESCRIPTION OF PROPOSED PARCEL NEW LOT 1
### 16TH WARD, PHILADELPHIA,
### CITY AND COUNTY OF PHILADELPHIA, PA

ALL THAT CERTAIN TRACT OR PARCEL OF LAND SITUATE IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, PA, AS DESCRIBED IN A PLAN ENTITLED "LOT LINE ADJUSTMENT", PREPARED BY SHAHEED A. SMITH GEOSPATIAL, LLC, FOR KIMLEY-HORN AND ASSOCIATES, INC., DATED 02/26/21, MORE PARTICULARLY DESCRIBED AS FOLLOWS AND TO WIT:

BEGINNING AT A POINT IN THE WESTERLY RIGHT OF WAY LINE OF NORTH BROAD STREET (113 FEET WIDE ON CITY PLAN, LEGALLY OPEN), MEASURED NORTHERLY A DISTANCE OF 270.000 FEET FROM THE NORTHERLY LINE OF HUNTINGDON STREET (50 FEET WIDE ON CITY PLAN, LEGALLY OPEN); THENCE;

1. FROM SAID POINT OF BEGINNING, LEAVING THE RIGHT OF WAY LINE OF NORTH BROAD STREET, NORTH 78° 39' 00" WEST A DISTANCE OF 245.667 FEET TO A POINT, THENCE;

2. NORTH 11° 21' 00" EAST A DISTANCE OF 90.000 FEET TO A POINT, THENCE;

3. NORTH 78° 39' 00" WEST, A DISTANCE OF 150.000 FEET TO A POINT IN THE EASTERLY RIGHT OF WAY OF 15TH STREET (50 FEET WIDE, LEGALLY OPEN ON CITY PLAN), THENCE;

4. NORTHERLY ALONG SAID RIGHT OF WAY, NORTH 11° 21' 00" EAST, A DISTANCE OF 20.000 FEET TO A POINT, THENCE;

5. LEAVING SAID RIGHT OF WAY LINE, SOUTH  78° 39' 00" EAST A DISTANCE OF 150.000 FEET TO A POINT, THENCE;

6. NORTH 11° 21' 00" EAST A DISTANCE OF 28.843 FEET TO A POINT, THENCE;

7. ALONG A NEW LINE OF LOT 1, SOUTH 78° 39' 00" EAST, A DISTANCE OF 80.212 FEET TO A POINT, THENCE;

Boundary ▪ Topographic ▪ ALTA ▪ Subdivisions ▪ As-Built ▪ Right-of-Way ▪ Existing Conditions ▪ Property



Shaheed A. Smith Geospatial, LLC
1432 Easton Road, Suite 5F
Warrington, PA 18976
Office  215-343-5989
www.sasgeospatial.com

A Certified MBE/DBE/SBE Firm

8. ALONG SAID NEW LINE, NORTH $11^0$ 21' 00" EAST A DISTANCE OF 111.157 FEET TO A POINT IN THE SOUTHERLY RIGHT OF WAY OF LEHIGH AVENUE (60 FEET WIDE, LEGALLY OPEN ON CITY PLAN), THENCE;

9. EASTERLY ALONG SAID RIGHT OF WAY LINE, SOUTH $78^0$ 39' 00" EAST A DISTANCE OF 15.455 FEET TO A POINT, THENCE;

10. LEAVING SAID RIGHT OF WAY, SOUTH $11^0$ 21' 00" WEST A DISTANCE OF 250.000 FEET TO A POINT, THENCE;

11. SOUTH $78^0$ 39' 00" EAST A DISTANCE OF 150.000 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF NORTH BROAD STREET, (113 FEET WIDE, LEGALLY OPEN ON CITY PLAN), THENCE;

12. SOUTH $11^0$ 21' 00" WEST A DISTANCE OF 100.000 FEET TO THE POINT AND PLACE OF BEGINNING..

 CONTAINING 33000.6 SQUARE FEET OR 0.75759 ACRES OF LAND,

SUBJECT TO AND TOGETHER WITH ANY AND ALL EASEMENTS AND RESTRICTIONS OF RECORD. SUBJECT TO EASEMENTS SHOWN ON THE AFOREMENTIONED PLAN.

Boundary ▪ Topographic ▪ ALTA ▪ Subdivisions ▪ As-Built ▪ Right-of-Way ▪ Existing Conditions ▪ Property

STARBUCKS

Case ID: 260404329

STARBUCKS

**EXHIBIT B**

**LEGAL DESCRIPTION OF ADJACENT PROPERTY**

**[SEE ATTACHED]**

STARBUCKS

Case ID: 260404329



Reviewed and Approved as per
Sub-Division Plan Requirements
Adopted by the Board of Surveyors

Surveyor & Regulator    District    Date

9⁴ᴸ    8/24/21

Shaheed A. Smith Geospatial, LLC
1432 Easton Road, Suite 5F
Warrington, PA 18976
Office  215-343-5989
www.sasgeospatial.com

A Certified MBE/DBE/SBE Firm

**SURVEYOR'S  DESCRIPTION OF PROPOSED PARCEL NEW LOT 2**
**16ᵀᴴ WARD, PHILADELPHIA,**
**CITY AND COUNTY OF PHILADELPHIA, PA**

**ALL THAT CERTAIN** TRACT OR PARCEL OF LAND SITUATE IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, PA, AS DESCRIBED IN A PLAN ENTITLED "LOT LINE ADJUSTMENT", PREPARED BY SHAHEED A. SMITH GEOSPATIAL, LLC, FOR KIMLEY-HORN AND ASSOCIATES, INC., DATED 02/26/21, MORE PARTICULARLY DESCRIBED AS FOLLOWS AND TO WIT:

**BEGINNING** AT A POINT IN THE SOUTHERLY RIGHT OF WAY LINE OF LEHIGH AVENUE (80 FEET WIDE, LEGALLY OPEN ON CITY PLAN), MEASURED EASTERLY A DISTANCE OF 150.000 FEET FROM THE INTERSECTION OF THE EASTERLY RIGHT OF WAY LINE OF 15ᵀᴴ STREET, (50 FEET WIDE, LEGALLY OPEN ON CITY PLAN) AND THE SOUTHERLY LINE OF LEHIGH AVENUE, THENCE;

1. FROM SAID POINT OF BEGINNING, EASTERLY ALONG THE RIGHT OF WAY LINE OF LEHIGH AVENUE, SOUTH 78° 39' 00" EAST A DISTANCE OF 80.212 FEET TO A POINT, THENCE;

2. ALONG A NEW LINE OF LOT 2, SOUTH 11° 21' 00" WEST A DISTANCE OF 111.157 FEET TO A POINT, THENCE;

3. STILL ALONG NEW LOT LINE OF LOT 2, NORTH 78° 39' 00" WEST, A DISTANCE OF 80.212 FEET TO A POINT; THENCE;

4. NORTH 11° 21' 00" EAST, A DISTANCE OF 111.157 FEET TO THE POINT AND PLACE OF BEGINNING.

CONTAINING 8916.1 SQUARE FEET OR 0.20468 ACRES OF LAND,

SUBJECT TO AND TOGETHER WITH ANY AND ALL EASEMENTS AND RESTRICTIONS OF RECORD. SUBJECT TO EASEMENTS SHOWN ON THE AFOREMENTIONED PLAN.

Boundary ▪ Topographic ▪ ALTA ▪ Subdivisions ▪ As-Built ▪ Right-of-Way ▪ Existing Conditions ▪ Property

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)          B-2

STARBUCKS

Case ID: 260404329



Shaheed A. Smith Geospatial, LLC
1432 Easton Road, Suite 5F
Warrington, PA 18976
Office  215-343-5989
www.sasgeospatial.com

A Certified MBE/DBE/SBE Firm

Reviewed and Approved as per
Sub-Division Plan Requirements
Adopted by the Board of Surveyors

Surveyor & Regulator    9th District    2/24/21 Date

Shaheed A Smith, PLS
PA Lic. No. SU 075289
July 20, 2021

Boundary • Topographic • ALTA • Subdivisions • As-Built • Right-of-Way • Existing Conditions • Property

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    B-3

STARBUCKS

Case ID: 260404329

STARBUCKS

**EXHIBIT C**

**SITE PLAN OF PROPERTY AND ADJACENT PROPERTY**

**[SEE ATTACHED]**

STARBUCKS

Case ID: 260404329

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)          C-2

STARBUCKS

Case ID: 260404329

**EXHIBIT D**

**MEMORANDUM OF LEASE**

This **MEMORANDUM OF LEASE** is made by and between Philadelphia-Suburban Development Corporation, a Pennsylvania corporation ("Landlord") having its principal place of business at _____, and Starbucks Corporation, a Washington corporation having an office at 2401 Utah Avenue South, Seattle, Washington 98134 ("Tenant").

**WITNESSETH:**

The parties hereto entered into a ground lease of real property as more fully described below (the "Lease").

1.    The Lease covers property 2628-32 N. Broad Street, Philadelphia, PA 19132, consisting of _____ square feet (the "Property"), as legally described on Exhibit A, together with all improvements, easement rights and appurtenances thereto, as defined in the Lease (the "Leased Premises") Landlord owns property adjacent to the Property described on Exhibit B (the "Adjacent Property"). Exhibits A and B are attached hereto and incorporated herein by this reference. The Property and Adjacent Property are described on Exhibit C, attached and hereby incorporated.

2.    The Lease provides for the rental of the Leased Premises by the Tenant for a term of twenty (20) years ("Initial Term").

3.    The Lease grants to Tenant the right to extend the Initial Term for up to three (3) consecutive ten (10)-year period(s) ("Extension Term(s)") for a total Term of fifty (50) years, inclusive of any extensions and renewals.

4.    Tenant may use and occupy the Leased Premises for any lawful use, including without limitation the sale of beer and wine.

5.    Tenant shall have the right to use any and all appurtenances and easements benefiting the Leased Premises and the Adjacent Property and parking to support its intended use of the Leased Premises.

6.    The Lease grants to Tenant both an option to purchase and right of first refusal as set forth in the Lease.

7.    This Memorandum shall not, under any circumstances, be deemed to modify or change any provisions of the Lease, the provisions of which shall in all instances prevail. The Lease is binding upon and benefits the parties, their heirs, personal representatives, successors and assigns. All capitalized terms used in this Memorandum of Lease and not defined herein shall have the same meanings ascribed to them in the Lease.

8.    Landlord and any Landlord Affiliate shall not use or allow any other person or entity (except Tenant) to use any portion of the Leased Premises or the Adjacent Property for or in support of the sale of (a) freshly ground and whole coffee beans; (b) espresso, espresso-based and coffee-based drinks; (c) tea or tea-based drinks; (d) gourmet brand-identified brewed coffee; and/or (e) blended beverages, including without limitation, those containing any of the following: ice, coffee, espresso, tea, milk, cream, juice and/or fruit. For purposes of this Lease, "gourmet" shall be defined as (a) beverages made using Arabica beans or (b) sourced from a gourmet coffee brand such as Coffee Bean & Tea Leaf, Intelligentsia, Peets, Caribou or other coffee purveyor. For purposes of this Lease "brand identified" shall mean beverages advertised or marketed within the applicable retail space using a brand name. If Landlord or an offending party contests

STARBUCKS

Case ID: 260404329

Tenant's claim of such exclusive sales violation, Tenant shall be entitled, with Landlord's full assistance, to audit the alleged offender's sales records for a full accounting of any such violations in order to make a proper determination.

Full service, sit-down restaurants with a wait staff and table service serving a complete dinner menu may sell, in conjunction with a sale of a meal, blended beverages containing juice.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Lease this _____ day of _____, 20____.

LANDLORD:

PHILADELPHIA-SUBURBAN DEVELOPMENT CORPORATION
a _____

By: _____
Name: _____
Title: _____

## ACKNOWLEDGEMENT OF LANDLORD

STATE OF _____  )
        ) SS.:
COUNTY OF _____  )

On the _____ day of _____, in the year 20___, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this Memorandum of Lease and acknowledged to me that he/she executed the same in his/her capacity as _____ _____of _____, and that by his/her signature executed the instrument on behalf of said _____.

_____
Notary Public for the State of _____
My commission expires _____

(Starbucks Rev. Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)     D-2

STARBUCKS

Case ID: 260404329

**TENANT:**

STARBUCKS CORPORATION
a Washington corporation

By: _____
Name: _____
Title: _____


## ACKNOWLEDGEMENT OF STARBUCKS CORPORATION

STATE OF WASHINGTON    )
                              ) SS.:
COUNTY OF KING            )

On the _____ day of _____, in the year 20_____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity as _____ of Starbucks Corporation, and that by his/her signature executed this Memorandum of Lease on behalf of Starbucks Corporation.

_____
Notary Public for the State of _____
My commission expires _____

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)

D-3

STARBUCKS

Case ID: 260404329

**Exhibit A to Memorandum of Lease**
**Legal Description of the Leased Premises**

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    D-4

STARBUCKS

Case ID: 260404329

STARBUCKS

**Exhibit B to Memorandum of Lease**
**Legal Description of the Adjacent Property**

STARBUCKS
Case ID: 260404329

STARBUCKS

**Exhibit C to Memorandum of Lease**
**Site Plan of Property and Adjacent Property**

(Starbucks Rev. Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    D-6

STARBUCKS

Case ID: 260404329

**EXHIBIT E**

**DELIVERY OF POSSESSION**

Project Name: _____ Store #: _____

Date Possession Tendered: _____

Tenant: Starbucks Corporation

Landlord: _____

Premises Address: _____

Square Footage: _____

Landlord and Tenant acknowledge and agree that the Leased Premises were tendered to Tenant on the Possession Date noted above.

☐    Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punch list items.

☐    Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

☐    Tenant hereby refuses possession of the Premises because the items of Landlord's Work indicated below are not complete.

**Incomplete items of Landlord's Work:** _____
_____
_____
_____
_____

[Attach additional pages if needed]

From and after the date hereof, all notices should be delivered to Tenant at the address set forth in <u>Section 25</u> of the Lease.

**Landlord:**                                      **Tenant:**

_____        _____
Print Name:_____        Print Name: _____
Title:_____        Title: Construction Manager
Date: _____        Date: _____

(Starbucks Rev. Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    E-1

STARBUCKS

Case ID: 260404329

**EXHIBIT F**

**DATE CERTIFICATE**

Date

Attn: Name
Landlord Name
Address
City, State, Zip

**Re:    Starbucks Coffee at** _____
         City, State
         **Starbucks Store #**_____

Dear Name:

Please confirm the following list of dates pursuant to the Ground Lease by and between
_____ and Starbucks Corporation for the above referenced location:

| | |
|---|---|
| Possession Date: | __/__/____ |
| Permit Date: | __/__/____ [if referenced in the Lease] |
| Commencement Date: | __/__/____ |
| Starbucks Store Opening Date: | __/__/____ |
| Rent Commencement Date: | __/__/____ |
| Expiration Date: | __/__/____ |

Pursuant to <u>Section</u> _____ of the Lease, the Base Rent schedule shall be as set forth below:

| | | | |
|---|---|---|---|
| __/__/____ - __/__/____ | $_____ | Pro-rated: $_____ ) ____ days x __ day(s) |
| __/__/____ - __/__/____ | $_____ | Per month |
| __/__/____ - __/__/____ | $_____ | Per month |

[If applicable:]

| | | | |
|---|---|---|---|
| **Option 1** | __/__/____ - __/__/____ | $_____ | Per month |
| **Option 2** | __/__/____ - __/__/____ | $_____ | Per month |
| **Option 3** | __/__/____ - __/__/____ | $_____ | Per month |
| **Option 4** | __/__/____ - __/__/____ | $_____ | Per month |

**Please have both copies of this letter signed and dated by the Landlord and return one (1) of the originals in the envelope provided.  <u>If you have any questions regarding the above information please contact Name at (phone number)</u>.**

Agreed to this _____day of _____ 20___, by and between:

Landlord:                                          Starbucks Corporation:

By: _____      By:_____
     Signature                                          Name
                                                        Title
     _____
     printed name and title

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                F-1

STARBUCKS

Case ID: 260404329

**EXHIBIT G**

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

_____
_____
_____
_____

Attn: _____

_____

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made and entered into as of this _____ day of _____, 20____ (the date of full execution by all parties hereto shall be the "Effective Date"), by and among _____ _____, a _____ ("Mortgagee"), Starbucks Corporation, a Washington corporation ("Tenant") and _____, a _____ _____ ("Landlord").

RECITALS

A.    Mortgagee is the holder of a certain note (the "Note") and mortgagee under a mortgage dated _____ (the "Mortgage"), in which Landlord is named as the mortgagor, which Mortgage was recorded on _____, in the Official Records of _____ County, State of _____, as Document No. _____.    The Mortgage covers certain real property (the "Property") all as more particularly described in Exhibit A attached hereto and made a part hereof and which property is commonly known as _____ _____, in the City of _____, County of _____, State of _____ _____.

B.    Landlord is the owner in fee simple of the Property and is the current obligor under the Note.

C.    By a ground lease dated _____, [(the "Lease") [If there are documents affecting or modifying the Lease and listed below, then delete the definition here]] Landlord leased to Tenant those certain premises as legally described on Exhibit B (the "Premises") which constitutes or forms a portion of the Property covered by the Mortgage and commonly known as _____ _____, all as more particularly described in said Lease.  The Building and other improvements constructed on the Premises by Tenant shall not be encumbered by the lien of the Mortgage during the term of the Lease. [Other documents affecting or amending the lease include the following: [List all documents with date references: any type of legal document that would modify or exercise rights in the Lease (i.e. amendments, letter agreements, square footage certificates, rent/term commencement agreements), assignments, subleases, letters regarding change in landlord, letters regarding change in landlord notice address and fully executed SNDAs] The lease, as amended by the foregoing documents, shall be referred to herein as the "Lease".]

D.    The Lease [is or may become (subject to this Agreement)] subordinate in priority to the lien of the Mortgage. [Drafter's note:  If form is used for a mortgage that will follow execution of the ground lease, then please add Paragraph 9 below.]

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    G-1

STARBUCKS
Case ID: 260404329

E.      Tenant wishes to obtain from Mortgagee certain assurances that Tenant's possession of the Premises will not be disturbed by reason of the enforcement of the Mortgage covering the Premises or a foreclosure of the lien thereunder.

F.      Mortgagee is willing to provide such assurances to Tenant upon and subject to the terms and conditions of this Agreement.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the above, the reciprocal promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do mutually agree as follows:

1.      **Ratification**.  The Lease now **[is or shall become upon the mutual execution of this Agreement]** subject and subordinate in all respects to the lien of the Mortgage and all renewals, modifications and extensions thereof, subject to the terms and conditions of this Agreement.  Mortgagee acknowledges receipt of a copy of the Lease and hereby approves the same.  Landlord has satisfied all terms and provisions of the Mortgage to date, is not in any respect in default in performance thereof, nor is there now any fact or condition known to Lender or Landlord which, with notice or lapse of time or both, would become a default.  Tenant hereby affirms that the Lease is in full force and effect and that the Lease has not been modified or amended.

2.      **Landlord's Default**.  From and after the date Tenant receives a fully executed copy of this Agreement, Tenant will not seek to terminate the Lease by reason of any act or omission that constitutes (or would over time constitute) a default of Landlord until Tenant shall have given written notice of such act or omission to Mortgagee (at Mortgagee's last address furnished to Tenant) and until a period of thirty (30) days shall have elapsed, Mortgagee shall have the right, but not the obligation, to remedy such act or omission, provided however that if the act or omission does not involve the payment of money from Landlord to Tenant and (i) is of such a nature that it could not be reasonably remedied within the thirty (30) day period aforesaid, or (ii) the nature of the act or omission or the requirements of local law require Mortgagee to appoint a receiver or to foreclose on or commence legal proceedings to recover possession of the Property in order to effect such remedy and such legal proceedings and consequent remedy cannot reasonably be achieved within said thirty (30) days, then Mortgagee shall have such further time as is reasonable under the circumstances to effect such remedy (not to exceed forty five (45) days after the expiration of the thirty (30) day period aforesaid) provided that Mortgagee shall notify Tenant, within ten (10) days after receipt of Tenant's notice, of Mortgagee's intention to effect such remedy and provided further that Mortgagee institutes immediate legal proceedings to appoint a receiver for the Property or to foreclose on or recover possession of the Property within said thirty (30) day period and thereafter prosecutes said proceedings and remedy with due diligence and continuity to completion.  Notwithstanding the foregoing, Mortgagee shall have no rights under this Paragraph 2 if Mortgagee is an entity that controls, is controlled by, or is under common control with Landlord.

3.      **Non-Disturbance and Attornment**.  So long as Tenant is not in default under the Lease (beyond any period given Tenant to cure such default) as would entitle Landlord to terminate the Lease or would cause, without any further action of Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder, Mortgagee will not disturb the peaceful and quiet possession or right of possession of the Premises by Tenant nor shall the Lease or its appurtenances be extinguished by reason of any Foreclosure (as hereinafter defined) or otherwise, nor join Tenant as a party in any action or proceeding brought pursuant to the Mortgage.

In the event that Mortgagee or its successors or assigns, as defined in Paragraph 7 hereof ("Successor Landlord") acquires the interest of Landlord or comes into the possession of or acquires title to the Premises (the "Succession") by reason of the foreclosure (judicial or non-judicial) or enforcement of the Mortgage (including a private power of sale) or the Note or obligations secured thereby or by a conveyance in lieu thereof or other conveyance or as a result of any other means (any or all of the foregoing hereinafter referred to as a "Foreclosure"), then the Lease and all appurtenances thereto shall remain in

(Starbucks Rev. Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)              G-2

STARBUCKS

Case ID: 260404329

full force and effect and Tenant shall be bound to Successor Landlord under all of the provisions of the Lease for the balance of the term thereof (including any extensions or renewals thereof which may be effected in accordance with any options contained in the Lease) with the same force and effect as if Successor Landlord was Landlord under the Lease, and Tenant shall attorn to Successor Landlord as its landlord, such attornment to be effective and self-operative, without the execution of any further instruments on the part of either of the parties hereto, immediately upon the Succession; and further, in such event, Successor Landlord shall be bound to Tenant under all of the provisions of the Lease, and Tenant shall, from and after such Succession, have the same remedies against Successor Landlord for the breach of any agreement contained in the Lease that Tenant might have had under the Lease against Landlord thereunder, provided, however, that if Successor Landlord is not an entity that controls, is controlled by, or is under common control with Landlord, then Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord) unless Tenant shall have given notice (pursuant to Paragraph 2 hereof) of such act or omission to the party who was the then holder of the Mortgage (whether or not such holder elected to cure or remedy such act or omission); or

(b)    subject to any offsets (except those expressly permitted under the Lease) or defenses which Tenant might have against any prior landlord (including Landlord) unless Tenant shall have given notice (pursuant to Paragraph 2 hereof) of the state of facts or circumstances under which such offset or defense arose to the party who was the then holder of the Mortgage (whether or not such holder elected to cure or remedy such condition); or

(c)    bound by any rent or additional rent which Tenant might have paid to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease; or

(d)    bound by any security deposit which Tenant may have paid to any prior landlord (including Landlord), unless such deposit is available to the party who was the holder of the Mortgage at the time of a Foreclosure.

Tenant shall be under no obligation to pay rent to Mortgagee or Successor Landlord until Tenant receives written notice from Mortgagee or Successor Landlord stating that Mortgagee or Successor Landlord is entitled to receive the rents under the Lease directly from Tenant. Landlord, by its execution hereof, hereby authorizes Tenant to accept such direction from Mortgagee or Successor Landlord and to pay the rents directly to Mortgagee or Successor Landlord and waives all claims against Tenant for any sums so paid at Mortgagee's or Successor Landlord's direction. Tenant may conclusively rely upon any written notice Tenant receives from Mortgagee or Successor Landlord notwithstanding any claims by Landlord contesting the validity of any term or condition of such notice, including any default claimed by Mortgagee or Successor Landlord, and Tenant shall have no duty to inquire into the validity or appropriateness of any such notice.

4.    **Notices of Default/Tenant's Right to Cure**. Mortgagee hereby agrees to give to Tenant a copy of each notice of a failure on the part of the mortgagor or obligor under the Mortgage or Note to perform or observe any of the covenants, conditions or agreements of such Mortgage or Note at the same time as whenever any such notice shall be given to the said mortgagor or obligor, such copy to be sent as provided in Paragraph 6 herein. Further, Mortgagee shall accept the cure by Tenant of any default, which cure shall be made within ten (10) days in the case of monetary defaults of Landlord and within thirty (30) days in the case of non-monetary defaults following Tenant's receipt of such notice provided however that (i) if the failure of performance does not involve the payment of money from Landlord to Tenant, and (ii) is of such a nature that it could not be reasonably remedied within the thirty (30) day period aforesaid, then Tenant shall have such further time as is reasonable under the circumstances to effect such remedy provided that Tenant shall notify Mortgagee, within ten (10) days after receipt of Mortgagee's notice, of Tenant's intention to effect such remedy and provided further that Tenant institutes steps to effect such remedy within said thirty (30) day period and thereafter prosecutes said remedy with due diligence and continuity to completion. Mortgagee agrees that it will accept such performance by Tenant of any covenant, condition or agreement to be performed by mortgagor or obligor under the Mortgage or Note with the same force and effect as though performed by such mortgagor or obligor. The provisions of this Paragraph 4 are

intended to confer additional rights upon Tenant and shall not be construed as obligating Tenant to cure any default of any such mortgagor or obligor.

### 5.    Agreement to Release Proceeds or Awards.

(a)    Casualty. In the event of a casualty at the Premises, Mortgagee shall release its interest in any insurance proceeds applicable to the improvements installed by Tenant. Mortgagee acknowledges that it has no interest and waives any interest in Tenant's personal property, furnishings, machinery, trade fixtures, equipment, signs, safety systems (such as, without limitation, fire and security monitoring and alarm systems), building and other improvements installed at or about the Premises, or any insurance proceeds are payable with respect thereto under either Landlord's or Tenant's policies.

(b)    Eminent Domain. In the event of a public taking or act of eminent domain, Mortgagee shall release its interest in that portion of the award to which Tenant is entitled pursuant to the Lease, as well as its interest in the award applicable to the improvements installed by Tenant.

### 6.    Notices. Whenever a provision is made under this Agreement for any notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice or declaration to the other party, in order to be effective such notice or declaration shall be in writing and served either personally (provided that proof of delivery thereof can be produced) or sent by United States mail, certified, postage prepaid, or by pre-paid nationally recognized overnight courier service (provided that proof of delivery thereof can be produced), addressed at the addresses set forth below or at such address as either party may advise the others from time to time.

To Mortgagee:                          _____
                                       _____
                                       _____

To Tenant at:                          Starbucks Corporation
                                       Attn:  Financial Lease Admin. RE-3
                                       RE: Starbucks Coffee Company Store #_____-____

by mail at:                            P.O. Box 35126
                                       Seattle, WA  98124-5126

by overnight delivery to:              2401 Utah Avenue South, Suite 800
                                       Seattle, WA  98134
                                       Phone: (206) 318-4440
                                       Email: FinancialLeaseAdmi@Starbucks.com

To Landlord:                           _____
                                       _____
                                       _____

Mortgagee and Landlord shall send a duplicate copy of any notice given hereunder to the attention of the Law and Corporate Affairs Department at the same address, Mailstop S-LA1. No notice to Tenant shall be effective unless it is addressed to the attention of Property Management Department and as otherwise set forth above. No notice delivered to the Premises shall be effective. Any party may change the address by written notice to the other parties clearly stating such party's intent to change the address for all purposes of this Agreement, which new address shall be effective one (1) month after receipt. Notice shall be deemed given when received or when receipt is refused, provided that such notice was sent pursuant to the requirements of this Paragraph 6.

### 7.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective personal representatives, heirs, successors and assigns it being understood that the obligations herein of Mortgagee shall extend to it in its capacity as mortgagee under

STARBUCKS

Case ID: 260404329

the Mortgage and to its successors and assigns, including anyone who shall have succeeded to its interest or to Landlord's interest in the Premises or acquired possession thereof by Foreclosure or otherwise.

8.    **Miscellaneous**.

8.1.    Authority.  Each party hereby represents and warrants that this Agreement has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

8.2.    Severability.  The invalidity of any provision of this Agreement, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

8.3.    Interpretation.  Paragraph and section headings are included for convenience of reference only and shall not be used to interpret, change or modify the meaning of this Agreement.  This Agreement shall be interpreted in accordance with the fair meaning of its words and the parties certify they either have been or have had the opportunity to be represented by their own counsel and that they are familiar with the provisions of this Agreement, which provisions have been fully negotiated, and agree that the provisions hereof are not to be construed either for or against either party as the drafting party.

8.4.    Amendments.  This Agreement may be modified only in writing, signed by the parties in interest, at the time of the modification.  Landlord and Mortgagee specifically acknowledge that Tenant's employees at the Premises do not have authority to modify this Agreement or to waive Tenant's rights hereunder.

8.5.    Waivers.  No waiver of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach of the same or any other provision.  A party's consent to or approval of any act shall not be deemed to render unnecessary obtaining such party's consent to or approval of any subsequent act.  No waiver shall be effective unless it is in writing, executed on behalf of the party by the person to whom notices are to be addressed.

8.6.    Cumulative Remedies.   Except where otherwise expressly provided in this Agreement, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

8.7.    Choice of Law.  This Agreement shall be governed by the laws of the state where the Premises are located.

8.8.    Attorneys' Fees.  If any party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, proceeding, trial or appeal, shall be entitled to its reasonable attorneys' fees to be paid by the losing party as fixed by the court.

8.9.    Consents.  Whenever the right of approval or consent is given to a party pursuant to this Agreement, that party shall not unreasonably withhold, condition or delay its consent unless this Agreement expressly provides otherwise.

8.10.    Waiver of Jury Trial.  With respect to any litigation arising out of or in connection with this Agreement, each party hereby expressly waives the right to a trial by jury.

8.11.    No Other Mortgage.  Landlord represents and warrants to Tenant that, as of the date hereof, no lender, other than Mortgagee, has a security interest in the Property.

8.12.    Tenant's Property.  Mortgagee hereby acknowledges and agrees that it shall not have any security interest in Tenant's improvements, personal property or trade fixtures at any time placed or installed on the Premises, including Tenant's Building.

[9.     **Effectiveness of Agreement**. **If, within thirty (30) days of Tenant's execution of this Agreement, Tenant has not received a fully executed original of this Agreement at the notice address listed above, this Agreement shall be null and void.]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

**[FORM OF SIGNATURES AND ACKNOWLEDGEMENTS SHOULD BE CONFIRMED FOR RECORDING]**

**MORTGAGEE**

a _____

By: _____
Name: _____
Its: _____

Date: _____

**TENANT**

Starbucks Corporation
a Washington corporation

By: _____
Name: _____
Its: _____

Date: _____

**LANDLORD**

a _____

By: _____
Name: _____
Its: _____

Date: _____

## ACKNOWLEDGEMENT OF MORTGAGEE

STATE OF _____          )
                                 ) SS.:
COUNTY OF _____            )

On the _ day of _____, in the year 20___, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this Subordination, Non-Disturbance and Attornment Agreement and acknowledged to me that he/she executed the same in his/her capacity as _____ of _____ _____, and that by his/her signature executed the instrument on behalf of said _____ _____.

_____
Notary Public for the State of _____
Commission expires:_____

## ACKNOWLEDGEMENT OF STARBUCKS CORPORATION

STATE OF WASHINGTON          )
                             ) SS.:
COUNTY OF KING               )

On the _____ day of _____, in the year 20_____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity as _____ _____ of Starbucks Corporation, and that by his/her signature executed this Subordination, Non-Disturbance and Attornment Agreement on behalf of Starbucks Corporation.

_____
Notary Public for the State of _____
Commission expires:_____

Case ID: 260404329

## ACKNOWLEDGEMENT OF LANDLORD

STATE OF _____        )
                            ) SS.:
COUNTY OF _____        )

       On the _____ day of _____, in the year 20___, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this Subordination, Non-Disturbance and Attornment Agreement and acknowledged to me that he/she executed the same in his/her capacity as _____ of _____ _____, and that by his/her signature executed the instrument on behalf of said _____ _____.'

                                            _____

                                            Notary Public for the State of _____
                                            Commission expires:_____

STARBUCKS

Case ID: 260404329

STARBUCKS

**Exhibit A to SNDA**
**Legal Description of the Property**

STARBUCKS

Case ID: 260404329

STARBUCKS

**Exhibit B to SNDA**
**Legal Description of the Premises**

Case ID: 260404329

**EXHIBIT H**

**LANDLORD'S WORK LETTER**

**(SEE ATTACHED)**

STARBUCKS

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

## LANDLORD WORKLETTER

## EXHIBIT C-1
## TENANT'S CONSTRUCTION REQUIREMENTS

1.      Landlord Construction

Tenant has provided Landlord with Tenant's Requirements for Landlord Workletter, which is a package of information that includes Tenant's standards, specifications and other details or documents pertaining to Landlord's Work (defined below) in the leased premises (the "Tenant's Requirements"). Additionally, Landlord will be required to coordinate certain aspects of the work with Tenant and/or Tenant's Construction Documents as defined in this Workletter.

Landlord will provide the Tenant with a copy of Landlord's construction schedule, including the name, phone number and address of Landlord's contractor and project manager, and copies of all Tenant and governmentally approved Landlord's Plans (as defined in the Lease, or, if not defined in the Lease, "Landlord's Plans" will mean the Tenant and governmentally approved plans for Landlord's configuration of the leased premises and any other portions of the building and the shopping center of which such leased premises are a part, coordination of Landlord's Work, Tenant's drive-through facility, if any, and the parking area, if any), and copies of all changes to such Plans as shall have been approved by Tenant.  The foregoing shall be provided to Tenant by the delivery date for such items as set forth in the Lease (or, if no such delivery date is set forth in the Lease, at least ninety (90) days prior to the Scheduled Delivery Date as defined in the Lease, or, if the Scheduled Delivery Date is not defined in the Lease, the date set forth in Landlord's construction schedule for completion of all Landlord's Work, which date shall be referred to herein as the "Scheduled Delivery Date".  The construction schedule must include completion dates for key construction milestones, which milestones shall include completion of access/egress, completion of Tenant parking field, installation of permanent utility services, and a Certificate of Occupancy for the building and the shopping center of which the leased premises are a part, all of which must occur prior to the Scheduled Delivery Date.

The Tenant's Requirements, together with the provisions of the Lease governing Landlord's Work, this Landlord's Workletter, and the Landlord's Plans, are referred to herein, collectively, as the "Landlord's Work Documents."

If not otherwise defined or expressly described in the Lease, "Landlord's Work" shall mean all items described in the Landlord's Work Documents and any work necessary to bring the leased premises and the building and the shopping center of which the leased premises are a part, in each case, into the condition required under the Landlord's Work Documents; together with obtaining, at Landlord's sole cost, all approvals to finalize a master sign program (if required or necessary) acceptable to Tenant by the date that Landlord delivers Landlord's Plans to Tenant; together with, if applicable to the leased premises, obtaining, at Landlord's sole cost, all permits and/or government approvals for the construction and operation of Tenant's drive-through facility.

STARBUCKS

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

 STARBUCKS COFFEE COMPANY                    Landlord Work Letter

Landlord's Work shall be completed in compliance with the Landlord's Work Documents, standard construction practices, and all applicable Federal, State and local laws, rules, codes and regulations. Landlord shall provide Tenant with a weekly construction status report with digital progress photos. During construction of all Landlord's Work, Tenant's project manager, or its designated representative, may enter upon the leased premises and the building and the shopping center of which the leased premises are a part to inspect progress, take progress photos, and to determine if Landlord's Work is being completed in accordance with the description of Landlord's Work and the Landlord's Work Documents. Upon the completion of Landlord's Work, Landlord shall provide Tenant with completed as-builts for the leased premises.

2.    Parties Obligations upon Delivery and Possession

Landlord shall notify Tenant in writing at least ten (10) days (if not otherwise set forth in the Lease) prior to the date that Landlord anticipates that the leased premises will be ready for Tenant's occupancy and Tenant shall arrange promptly to inspect the leased premises to determine whether Landlord's Work has been completed in accordance with the Landlord's Work Documents. At the time of Tenant's inspection, Landlord shall demonstrate that all of Landlord's Work and all mechanical systems of the leased premises are in good working order; provided, however, that if electrical service is not connected at the time of Tenant's inspection, then, notwithstanding anything to the contrary in any other Landlord's Work Documents, Tenant's inspection shall not be deemed complete and Landlord shall not be deemed to have satisfied all conditions to the delivery of the leased premises until such electrical service is completed and Landlord shall have demonstrated that all of Landlord's Work that requires completed electrical service is in good working order, including, without limitation, HVAC, the Drive Thru Window, if applicable, and rooftop fan.

Upon completion of Tenant's inspections, Tenant shall deliver to Landlord a written punch list of all incomplete or faulty items of construction or mechanical installation, and any necessary mechanical adjustments and finish work needed to bring the leased premises and the building and the shopping center of which the leased premises are a part into the condition required by the Landlord's Work Documents. Except as expressly provided to the contrary in the Lease, Landlord shall repair all punch list items as a condition to Tenant's acceptance of the leased premises, or if Tenant chooses to accept delivery of the leased premises prior to completion, within fourteen (14) days of the date Tenant delivers the punchlist to Landlord, unless another date is specified in the Lease. Upon Tenant's acceptance of delivery of possession of the Premises, Landlord and Tenant shall execute the delivery of possession form in accordance with the Lease or a written acknowledgement of delivery and acceptance if a delivery of possession form is not a part of the Lease.

If on the Scheduled Delivery Date, leased premises and the building of which the leased premises are a part are not in the condition required by the Landlord's Work Documents, and/or if Landlord fails to repair all punch list items at the time and in the manner described in the preceding paragraph, and if, in either case, Tenant elects to accept possession of the leased premises, then, in addition to any remedy provided in the Lease and without limitation thereof, and except as expressly provided to the contrary in the Lease, Tenant is hereby authorized to complete all or

LL Initials _____ Date September 8, 2021          Tenant Initials _____ Date 12.2.2020

*Version Date: May, 2015*          *LL Workletter - Pre-Fab Drive Thru Ground Lease FINAL LL Workletter -*
*Pre-Fab Drive Thru - Original.docx*

Page **2** of **7**

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

 STARBUCKS COFFEE COMPANY                    Landlord Work Letter

any portion of the outstanding Landlord's Work and/or punchlist items necessary to bring the leased premises into the required condition and Landlord shall reimburse Tenant for the actual cost of such work plus an administrative surcharge of fifteen percent (15%) of the amount otherwise due Tenant, to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums. Landlord agrees that the Tenant's and its contractor's determination of the scope of all work that is necessary to bring the leased premises into the required condition is deemed appropriate and the cost thereof plus the surcharge referred to above shall be final and binding on Landlord. If Landlord does not reimburse Tenant as required by this Landlord Workletter then in addition to any remedy provided in the Lease and without limitation thereof, Tenant may offset such sum against the monthly base rent and all other charges payable by Tenant under the Lease until such sum has been fully recouped. Nothing herein shall limit or impair any of Tenant's rights and remedies set forth in the Lease or Landlord's obligations thereunder, including, without limitation, requirements for the condition of the leased premises and the building and the shopping center of which the leased premises are a part and Landlord's obligation to construct and complete all Landlord's Work.

3. Incorporation With Lease

This Landlord Workletter is attached to and forms a part of the Lease and is intended by the Landlord and Tenant to be interpreted in all respects in a manner that is consistent with the terms, conditions and provisions of such Lease. Notwithstanding the foregoing, the express terms, conditions and provisions of the Lease (including, without limitation, those terms, conditions and provisions of the Lease, if any, governing delivery dates and the rights and obligations of the parties in the event that on the Scheduled Delivery Date, the premises are not delivered to Tenant in the required condition) shall control in the event of any conflict or inconsistency between the express terms, conditions and provisions of the Lease and this Landlord Workletter.

LL Initials ___ Date September 8, 2021          Tenant Initials _RF_ Date _12.2.2020_

*Version Date: May, 2015*          *LL Workletter - Pre-Fab Drive Thru Ground Lease FINALLL Workletter*
*Pre-Fob Drive Thru—Original.docx*

Page **3** of **7**

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

STARBUCKS COFFEE COMPANY                                    Landlord Work Letter

## EXHIBIT C-2

## DESCRIPTION OF LANDLORD WORK
## NEW AND/OR EXISTING CONSTRUCTION

| GROUND LEASE - PRE-FAB DT COMPONENTS | |
|---|---|
| **Scope Category** | **Details** |
| Bldg Domestic Water Distribution | Furnish and install one domestic water (DW) service sized per Starbucks Plumbing Guidelines to a separate meter. |
| | If the flow rate or pressure is not sufficient, Landlord shall engineer, furnish and install a booster pump in a location agreed upon with the Tenant. |
| | If permanent utility service is not available at the Scheduled Delivery Date as defined in the lease, temporary service must be provided by Landlord. Permanent water service must be provided by no later than two (2) weeks into Tenant's construction in the space. |
| Bldg Electrical Distribution | If permanent electrical service is not available at the Scheduled Delivery Date as defined in the lease, temporary service must be provided by Landlord. Permanent Electrical service must be provided by no later than two (2) weeks into Tenant's construction in the space. |
| Bldg Exterior and Site Lighting | ~~Furnish and install pole lights in the parking lot and at site ingress and egress to provide a minimum lighting level of 1.5 foot candles at grade.~~ |
| | ~~Any parking lot lighting dedicated to Tenant occupancy shall require conduit and wire stub-up to within five feet (5') of the building pad at the rear service door for integration with Tenants lighting control system.~~ |
| | ~~Furnish and install exterior lighting fixtures to provide even illumination, with no dark areas, and light levels per Starbucks Electrical Design Guidelines.~~ |
| | ~~Any exterior building lighting dedicated to Tenant occupancy shall require control within Tenants space.~~ |
| Bldg Gas Distribution | Furnish and install one gas line per Starbucks Plumbing Design Guidelines to a separate meter. |
| Bldg Selective Demolition | ~~Tenant shall identify any real and personal property items to remain and be protected prior to demolition.~~ |
| | Demolish, remove and legally discard all site and building improvements that impede placement and operation of Tenant's business, including but not limited to, hazardous substances, sidewalks, paving, site storm drains, landscaping, partitions, ceilings, floor coverings (including adhesive and grout), building foundations, encroachments, signs, electrical conduit, plumbing, rooftop equipment, and other existing fixtures and equipment, per Tenant's Outline Specifications. Restore all impacted areas and surfaces to a condition ready to receive tenant's construction and scope. Interior spaces shall be left in a "broom clean" condition. |
| Drivethru Electrical Distribution | ~~Furnish and install a 1 and 1/2 inch conduit with pull string from Tenant's Electrical Panel stubbed-up to a location designated by Tenant and/or Tenant's Site Electrical Drawings, for its' Drive-Thru electrical sub-panel (aka Digital Control Box)~~ |

LL Initials _____ Date September 8, 2021          Tenant Initials _RF_ Date 12.2.2020

*Version Date: May, 2015*          *LL Workletter - Pre-Fab Drive Thru Ground Lease FINAL LL Workletter -*
~~*Pre Fab Drive Thru - Original.docx*~~

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)          H-5          STARBUCKS

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

 STARBUCKS COFFEE COMPANY                     Landlord Work Letter

## GROUND LEASE - PRE-FAB DT COMPONENTS

| | |
|---|---|
| | Furnish and install all underground electrical conduits for Tenants Drive-Thru signage and ordering components, labeled with pull strings, per Tenant's Electrical Guidelines. Conduits shall be run from Tenant's drive-thru sub-panel (aka Digital Control Box) and stubbed-up to locations identified by Tenant and/or per Tenant's Site Electrical Drawings. |
| DriveThru Component Footings | Furnish and install concrete footings and anchor bolts for the following items:

1) Pre-Menu Board
2) Order Menu Board
3) Order Confirmation System (OCS) or Speaker Post, if jurisdictionally required.
4) Directional Signage
5) Clearance Bar
6) Tenant's Monument Sign and/or Pylon Sign
7) Tenant's drive-thru electrical sub-panel (aka digital control box), as applicable
8) Protection and Illumination bollards

Landlord shall coordinate this work with Tenant and Tenant's Signage vendor. Tenant and Tenant's signage vendor will provide footing locations and anchor bolt patterns to Landlord. Landlord is expected to provide permitted drawings of the footings to Tenant's signage vendor. |
| Drivethru Paving | Provide concrete (preferred) or asphalt drive-thru lane per Starbucks Drive Thru Global Standards and Guidelines. If using concrete, complete in accordance with Starbucks Outline Specifications. |
| | Install two (2) Tenant-provided detector loop conduits. One conduit at the order point and one conduit at the drive-thru window prior to installation of the drive lane surface, per Starbucks Drive Thru Global Standards and Guidelines and per Starbucks Vendor (HME) Detector Loop cut sheets. |
| Site Irrigation Systems | Furnish and install an irrigation system that is designed to maximize delivery of water to planted areas and minimize run-off per Tenant's Plumbing Design Guidelines. |
| | The irrigation system shall include a backflow prevention device, a time clock or moisture sensor based controller and is separately metered. Controls and valves must be accessible by Tenant on any Tenant-dedicated system. |
| | If a permanent irrigation system is NOT required due to landscape type then a temporary system can be installed until plants are established. |
| | Cover drip irrigation systems with two inches (2") of mulch. |
| | Landscaping controls shall be set to run at optimal times of the day to minimize evaporation loss and business disruption. Broadcast systems should not be run during Tenant's normal business hours. |
| Site Landscaping | Provide Landscaping with drought-tolerant and/or native vegetation as appropriate for the specific region per Tenant's Drive Thru Guidelines. |
| | Design should minimize rain and irrigation run-off. Conserve and utilize any existing plants/soil/material as appropriate. |
| | Provide a mixture of trees, shrubs and ground cover to retain soil moisture and mitigate solar heat gain without blocking visual access to prominent store windows, entrance, Tenant signage, and directional signage. |
| | Provide twelve inches (12') of amended topsoil to planting areas to ensure optimum plant health. |
| | Provide a minimum of two inches (2") of mulch over planting beds to hide drip irrigation system, retain soil moisture and minimize weed growth. |

LL Initials _____  Date September 8, 2021              Tenant Initials __RF__  Date __12.2.2020__

Version Date:  May, 2015                    *LL Workletter - Pre-Fab Drive Thru Ground Lease FINAL LL Workletter*
*Pre-Fab Drive Thru - Original.docx*

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)              H-6

STARBUCKS

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

 STARBUCKS COFFEE COMPANY                    Landlord Work Letter

| GROUND LEASE - PRE-FAB DT COMPONENTS | |
|---|---|
| | ~~Stake trees for the first year until established. Remove stakes after one year to ensure proper root development.~~ |
| | ~~All planters should have proper drainage and automated irrigation as necessary.~~ |
| Site Patio | ~~Provide a minimum of 250 SF of outdoor seating area adjacent to Tenant's space designated as occupiable and accessible. Patio surface must be broom finished and sealed in accordance with Tenant's Outline Specifications.~~ |
| | If required by the local jurisdiction, Landlord shall also obtain an outdoor seating permit. |
| | ~~Provide a hose bib adjacent to the patio area per Tenant's Plumbing Design Guidelines.~~ |
| | ~~Provide adequate separation and barriers from vehicular traffic per Tenant's Drive Thru Design Guidelines, including but not limited to, a railing to enclose the patio seating area as approved by Tenant, and wheel stops at all parking spaces adjacent to the sidewalk and patio.~~ |
| | ~~Provide lighting to the exterior patio per Tenant's Electrical Design Guidelines.~~ |
| Site Paving and Striping | ~~Landlord shall construct all paving on the premises outside the building area per jurisdictionally approved Civil Engineering plans.~~ |
| | ~~Landlord shall provide parking lot striping including accessible stalls, pedestrian access markings, and wheel stops at all parking spaces adjacent to Tenants sidewalk and/or patio.~~ |
| | ~~In locations where parking lots and striping already exist, Landlord shall reconfigure parking lot traffic flow as necessary to accommodate Tenant access.~~ |
| Site Preparation | Landlord to provide a site and building pad prepared to the specifications of a Geotechnical Report. |
| | The Geotechnical Report is to describe the subsurface conditions observed at the borings drilled for this site, analyze the test data, and provide recommendations including but not limited to subsurface soil conditions, earthwork, seismic considerations, pavements, groundwater conditions, foundation design and construction and floor slab design and construction. |
| | ~~Grading and Temporary Erosion and Sedimentation Control shall be provided per jurisdictionally approved Civil Engineering plans.~~ |
| Site Primary Utilities | ~~Design, permit and install distribution from the service point to a separate meter to a location designated by Tenant and in accordance with Starbucks MEP (Mechanical, Electrical and Plumbing) Guidelines and Outline Specifications for Gas, Water and Electrical service.~~ |
| | ~~Design, permit and install distribution from the service point to a location designated by Tenant and in accordance with Starbucks MEP Guidelines and Outline Specifications for Data and Telephone service.~~ |
| Site Sidewalk and Curbs | ~~Landlord shall provide and install all curbs and sidewalks including site perimeter curbs and sidewalks. Sidewalks are to slope away from all points of building entry.~~ |
| | ~~All curbs and gutters are to be formed concrete. Extruded asphalt or extruded concrete curbs and gutters may not be used.~~ |
| | ~~Sidewalks and curbs shall be provided per jurisdictionally approved engineering plans.~~ |
| | ~~Landlord shall furnish and install a bike rack for the premises. Location to be coordinated with Tenant.~~ |
| Site Storm Water | ~~Provide a new or relocate existing storm water system to accommodate Tenant's building configuration and site circulation.~~ |
| | ~~Location of storm water detention/retention ponds, if required, shall be coordinated with Tenant.~~ |

LL Initials ____ Date September 8, 2021          Tenant Initials _RF_ Date 12.2.2020

Version Date: May, 2015
~~Pre-Fab Drive Thru - Original.docx~~                    LL Workletter - Pre-Fab Drive Thru Ground Lease FINAL~~LL Workletter - ~~

Page 6 of 7

Case ID: 260404329

DocuSign Envelope ID: 268B00B8-F494-4DF6-8A05-C406EDBE159C

 STARBUCKS COFFEE COMPANY

Landlord Work Letter

| GROUND LEASE - PRE-FAB DT COMPONENTS | |
|---|---|
| Site Telephone and Data Systems | ~~Landlord to initiate installation of telephone facilities with Local Exchange Carrier (LEC) or telephone service provider.~~ |
| | Provide one conduit pathway for telephone wiring and one conduit for broadband cabling from demarcation point to Tenant's space / 5ft. within Tenant's building. ~~Terminate conduit in Tenant's space at the ceiling above the Manager's Workstation in the Back of House, or as otherwise designated by Tenant.~~ |
| | Utilize minimum 2" conduit, or size per requirements of the local service providers. Provide labeled, end to end pull strings in all conduits. Refer to Tenant's Outline Specifications. |
| Site Trash Enclosure | ~~Provide a trash enclosure sized at least to 18' x 9' to accommodate a 4 cubic yard trash container and a 4 cubic yard recycling container and a container for composting service. Provide enough clearance in the enclosure for the waste removal vehicles to safely pick-up and replace containers to limit damage to the enclosure.~~ |
| | ~~The trash enclosure shall be physically located on the site no greater than 300 feet from the entrance to Tenant's premises in a location depicted on the site plan and mutually agreed upon by Tenant and Landlord. The pathway to the enclosure and the enclosure itself shall be well lit. The enclosure shall be sited to provide proper access and clearance for waste removal vehicles including a 90 degree turning radius.~~ |
| | ~~Provide a hose bib accessible to the trash enclosure per Tenants Plumbing Design Guidelines.~~ |
| | ~~If Tenant is required to share trash removal or recycling containers with other tenants, such shared container shall be adequately sized and serviced to handle Tenant's trash, recycling and composting requirements, equivalent to a 4 cubic yard trash container, 4 cubic yard recycling container and a container for composting service.~~ |

Landlord: _(signature)_

Print Name: Mark Nicolotti

Title: President

Date: 11-24-2020

Tenant: _Rahel Fikre_

Print Name: Rahel Fikre

Title: Store Development Manager

Date: 12.2.2020

LL Initials _(initials)_ Date September 8, 2021

Tenant Initials _____ Date _____

*Version Date: May, 2015*
*Pre-Fab Drive Thru - Original.docx*

~~LL Workletter - Pre-Fob Drive Thru Ground Leose FINALLL Workletter~~

Page **7** of **7**

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)

H-8

STARBUCKS

Case ID: 260404329

**EXHIBIT I**

**TENANT'S DRIVE THROUGH FACILITY**

**[SEE ATTACHED]**

Case ID: 260404329



(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                I-2

STARBUCKS

Case ID: 260404329

**EXHIBIT J**

**FORM W-9**

.

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    J-1

STARBUCKS

Case ID: 260404329

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification**<br><br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | Give Form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type. See Specific Instructions on page 3.*

---

**Part I  Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| | | – | | | | | | |

---

**Part II  Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign<br>Here | Signature of<br>U.S. person ▶ | Date ▶ |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X                    Form **W-9** (Rev. 10-2018)

---

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    J-2

**STARBUCKS**

Case ID: 260404329

Form W-9 (Rev. 10-2018)                                                                                                    Page **2**

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

Note: If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

Foreign person. If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

What is backup withholding? Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships,* earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

Failure to furnish TIN. If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Civil penalty for false information with respect to withholding. If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                                    J-3

STARBUCKS

Case ID: 260404329

Form W-9 (Rev. 10-2018)

Page **3**

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; do not leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

Note: ITIN applicant: Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)

J-4

**STARBUCKS**

Case ID: 260404329

Form W-9 (Rev. 10-2018)                                                                                                           Page **4**

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

Note: You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

### Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

Note: See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note: Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code*, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

(Starbucks Rev.  Nov. 2012)
Location:  Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                    J-5                                    STARBUCKS

Case ID: 260404329

Form W-9 (Rev. 10-2018)                                                                                          Page **5**

1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

4. Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i) (A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships*, earlier.

*Note: The grantor also must provide a Form W-9 to trustee of trust.

Note: If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

Case ID: 260404329

Form W-9 (Rev. 10-2018)                                                                                               Page **6**

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

(Starbucks Rev. Nov. 2012)
Location: Philadelphia, PA (N. Broad & Lehigh Ave.)
8200328 v7 (49470.05226.000)                                    J-7

STARBUCKS

Case ID: 260404329

# Exhibit C

Case ID: 260404329



101 Eisenhower Parkway, Suite 412
Roseland, NJ 07068
(973) 287-0966

535 Fifth Avenue, 4th Floor
New York, NY 10017
(646) 374-0255

September 12, 2022

**VIA FEDERAL EXPRESS**

Starbucks Corporation
Attn: Financial Lease Admin. RE-3
RE: Starbucks Coffee Company Store #68730
2401 Utah Avenue South, Suite 800
Seattle, WA 98134
Phone: (206) 318-4440
Email: FinancialLeaseAdmi@Starbucks.com

Starbucks Corporation
Law and Corporate Affairs Department
Mailstop S-LA1
RE: Starbucks Coffee Company Store #68730
2401 Utah Avenue South, Suite 800
Seattle, WA 98134

**RE:    Ground Lease dated October 27, 2021 by and between Philadelphia Suburban Development Corporation, as Landlord, and Starbucks Corporation, as Tenant for lease of certain premises at 2628-32 N. Broad Street, Philadelphia, PA**

Dear Tenant:

This letter constitutes Landlord's notice under Section 4.1 of the Lease that the Premises will be delivered to Tenant within 180 days of the date hereof (*i.e.* by March 11, 2023). Landlord's team will be in touch with more specific dates as the building pad and related Landlord's Work nears completion. At that point Landlord would like to schedule an inspection, tender delivery of the Premises to Tenant, and arrange for payment of the $150,000 Initial Allowance Installment contemplated in Section 4.4 of the Lease.

Thank you.

Richard J. Slavin, Esq.

cc (via email only):

       Mark Nicoletti, Philadelphia Suburban Development Corporation (mn@psdc.com)
       Joseph Ferrier, Philadelphia Suburban Development Corporation (jferrier@psdc.com)
       Lori Peruto, Esq., Philadelphia Suburban Development Corporation (lperuto@psdc.com)
       Leocadie Ahmes, Starbucks Corporation (lahmes@starbucks.com)
       Gida Avila, Starbucks Corporation (giavila@starbucks.com)
       Andrew Coffman, Starbucks Corporation (ancoffma@starbucks.com)

Case ID: 260404329

# Exhibit D

Case ID: 260404329

| | |
|---|---|
| **From:** | Slavin, Richard J. <rslavin@hodgsonruss.com> |
| **Sent:** | Friday, April 19, 2024 1:00 PM |
| **To:** | jgibbs@starbucks.com |
| **Cc:** | Lori Peruto; Joe Ferrier |
| **Subject:** | FW: Starbucks Store #68730 |
| **Attachments:** | DATE CERTIFICATE(25188671.1).docx |

Hi Joe: Following up on our call on April 10 where March 5, 2024 was agreed to be the Rent Commencement Date. Attached is the rent commencement letter at Exhibit F to the Lease reflecting the agreed dates. I believe you were reviewing Exhibit E internally. Are there any further construction items to discuss at this time?
Thank you.
Rich
**Richard J. Slavin**
Hodgson Russ LLP
646.218.7533

**From:** Lori Peruto
**Sent:** Monday, April 8, 2024 8:02 PM
**To:** Joseph Gibbs
**Cc:** Slavin, Richard J. ; Joe Ferrier
**Subject:** Re: Starbucks Store #68730

**External Email - Use Caution**

Hi Joe,
Following up on my email below.
Are you available at 9 on Wednesday?
Sent from my iPhone
Lori N. Peruto,Esq.
C-215-740-7800

> On Apr 5, 2024, at 12:59 PM, Lori Peruto <lperuto@psdc.com> wrote:
>
> Hi Joe,
> As per our call Wednesday, we are available for another call to discuss lease/rent commencement at 9:00 on Wednesday April 10th.
> Please let us know if you are still available at that time.
> Thanks
> Lori Nicoletti Peruto, Esquire
> General Counsel
> Philadelphia Suburban Development Corporation
> 100 Ross Road
> Suite 200
> King of Prussia, PA 19406
> Direct Dial – 610-265-0215
> Office-610-265-6700
> Cell-215-740-7800

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you*

Case ID: 260404329

*are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

2

Case ID: 260404329

# Exhibit E

Case ID: 260404329

**DATE CERTIFICATE**

_____ __, 2024

Philadelphia-Suburban Development Corporation
100 Ross Road, Suite 200
King of Prussia, PA  19406
Attn.:  Joseph Ferrier

**Re:    Starbucks Coffee at 2628-32 N. Broad Street**
**Philadelphia, Pennsylvania**
**Starbucks Store # 68730**

Dear Mr. Ferrier:

Please confirm the following list of dates pursuant to the Ground Lease by and between Philadelphia-Suburban Development and Starbucks Corporation for the above referenced location:

~~Possession Date:~~                          ~~__/__/____~~
~~Permit Date:~~                              ~~__/__/____ [if referenced in the Lease]~~
Commencement Date:          3/11/2023
~~Starbucks Store Opening Date:~~  ~~__/__/____~~
Rent Commencement Date:     3/5/2024
Expiration Date:            3/31/2044 (unless extended pursuant to Section 2.5 of the Lease)

Pursuant to Section 3.1 of the Lease, the Base Rent schedule shall be as set forth on Exhibit A attached hereto and made a part hereof.

**Please have both copies of this letter signed and dated by the Landlord and return one (1) of the originals in the envelope provided.  If you have any questions regarding the above information please contact Joseph Gibbs, Store Development Manager at (202) 380 7796).**

Agreed to this _____day of _____ 2024, by and between:

Landlord:      Philadelphia-Suburban Development          Starbucks Corporation:


By:   _____          By:_____
      Signature                                       Name
                                                      Title
      _____
      Joseph Ferrier, Co-CEO

Case ID: 260404329

Re:    **Starbucks Coffee at 2628-32 N. Broad Street**
       **Philadelphia, Pennsylvania**
       **Starbucks Store # <u>68730</u>**

## <u>RENT SCHEDULE</u>

| Initial Term | | | |
|---|---|---|---|
| **Lease Years** | **Dates** | **Monthly Installment** | **Lease Year Annual  Rent** |
| 1 – 5 | 3/5/2024 – 3/31/2029 | $12,500.00 | $150,000.00 |
| 6 – 10 | 4/1/2029 – 3/31/2034 | $13,500.00 | $162,000.00 |
| 11 – 15 | 4/1/2034 – 3/31/2039 | $12,083.33 | $145,000.00 |
| 16 – 20 | 4/1/2039 – 3/31/2044 | $13,310.00 | $159,720.00 |
| **Extension Term(s)** | | | |
| **Lease Years** | **Dates** | **Monthly Installment** | **Lease Year Annual  Rent** |
| **Option 1** | | | |
| 21 – 25 | 4/1/2044 – 3/31/2049 | $14,641.00 | $175,692.00 |
| 26 – 30 | 4/1/2049 – 3/31/2054 | $16,105.10 | $193,261.20 |
| **Option 2** | | | |
| 31 – 35 | 4/1/2054 – 3/31/2059 | $17,715.61 | $212,587.32 |
| 36 – 40 | 4/1/2059 – 3/31/2064 | $19,487.17 | $233,846.05 |
| **Option 3** | | | |
| 41 – 45 | 4/1/2064 – 3/31/2069 | $21,435.88 | $257,230.66 |
| 46 – 50 | 4/1/2069 – 3/31/2074 | $23,579.47 | $282,953.72 |

25188671v1

Case ID: 260404329

# Exhibit F

Case ID: 260404329



An official website of the City of Philadelphia government  Here's how you know

# Property History
Permits, licenses, violations & appeals by address

**COMMERCIAL BUILDING PERMIT**                                    **ISSUED** 02/04/2025

# CP-2023-003383

**L&I District: NORTH**
**OPA Account #: 882146450**
2628 N BROAD ST
Philadelphia, PA 19132-4015

| | |
|---|---|
| **L&I district** | NORTH |
| **Permit number** | CP-2023-003383 |
| **Permit type** | Commercial Building Permit (Building) |
| **Type of work** | New Construction |
| | FOR THE CONSTRUCTION OF A DETACHED STRUCTURE WITH DRIVE THROUGH. FOR USE AS EATING AND DRINKING ESTABLISHMENTS - TAKE OUT RESTAURANT TO INCLUDE TWENTY-FIVE (25) ACCESSORY SURFACE PARKING SPACES WITH ONE (1) VAN ACCESSIBLE SPACE. AS PER APPROVED PLANS. *******************SEPARATE PERMITS REQUIRED FOR ANY OTHER WORK. ************************************* |
| **Permit status** | Amendment Applicant Revisions |
| **Date issued** | Feb 04, 2025 |
| **Zoning documents** | No zoning documents |
| **Contractor** | BENCHMARK CONSTRUCTION GROUP INC |
| | BENCHMARK CONSTRUCTION GROUP INC 1603 CECIL B MOORE AVE PHILADELPHIA, PA 19121 USA |

Case ID: 260404329



An official website of the City of Philadelphia government  Here's how you know

# Property History
Permits, licenses, violations & appeals by address

An official website of the City of Philadelphia government  Here's how you know

Case ID: 260404329

FILED
01 MAY 2026 10:57 am

Civil Administration

M. RIVERA

**TUCKER LAW GROUP, LLC**
Joe H. Tucker, Jr., Esquire (56617)
Julian C. Williams, Esquire (324771)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 875-0609
jtucker@tlgattorneys.com
jcwilliams@tlgattorneys.com

**ATTORNEYS FOR PLAINTIFF,
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION**

---

PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION,

                    Plaintiff,

        v.

STARBUCKS CORPORATION,

                    Defendant

:
:
:
:
:
:
:
:
:
:
:
:
:

**PHILADELPHIA COUNTY
COURT OF COMMON PLEAS**

**APRIL TERM, 2026**

**NO.: 04329**

---

## NOTICE OF MANAGEMENT PROGRAM DISPUTE

The above-captioned matter was designated as a Jury Program case at filing. This action is properly within the Commerce Program because it is a dispute between business enterprises arising from a commercial lease and related claims. A copy of the Complaint is attached hereto as Exhibit A.

Plaintiff respectfully requests that this matter be reassigned to the Commerce Program.

Case ID: 260404329
Control No.: 26050092

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: May 1, 2026

*/s/ Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,*
*Philadelphia Suburban Development*
*Corporation*

2

Case ID: 260404329
Control No.: 26050092

# EXHIBIT "A"

Case ID: 260404329
Control No.: 26050092

**TUCKER LAW GROUP**
Joe H. Tucker, Jr., Esquire (56617)
Julian C. Williams, Esquire (324771)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 875-0609



*Filed and Attested by the*
*Office of Judicial Records*
*29 APR 2026 03:26 pm*
*L. BREWINGTON*

ATTORNEYS FOR PLAINTIFF
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

| | |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> STARBUCKS CORPORATION, <br><br> Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA <br><br> _____ Term, 2026 <br><br> CASE NO.: <br><br> **JURY TRIAL DEMANDED** |

**NOTICE TO DEFEND**

Case ID: 260404329
Control No.: 26050092

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney, and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo Angie Y. Lugo partir dela fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus o objectiones a las demandas en contra de su persona.  Sea a visado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sim previo a viso o notification.  Ademas, la corte puede cumpla con todas las provisiones de esta demanda.  Usted puede perer dinero o sus propiedades u otros derechos imporatantes para usted. |
| *You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help*. | *Lleva esta demanda a un abogado immediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servico.  Vaya en personal o llame por telefono Angie Y. Lugo la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistensia legal*. |
| Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>1101 Market Street-11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333 | Asociacion de Licenciados de Filadelphia<br>Servicio de Referencia e Informacion Legal<br>1101 Market Street-11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333 |

Case ID: 260404329
Control No.: 26050092

## CIVIL ACTION COMPLAINT

Plaintiff Philadelphia Suburban Development Corporation ("PSDC"), by and through the undersigned counsel, hereby files this Complaint against Defendant Starbucks Corporation ("Starbucks"), and in support thereof alleges as follows:

## INTRODUCTION

1.      PSDC brings this action against Starbucks for breach of a commercial lease (the "Lease") and fraud concerning a property located at 2628-32 N. Broad Street, Philadelphia, Pennsylvania 19132 (the "Property").  The Property sits at the intersection of Broad Street and Lehigh Avenue in North Philadelphia—a historically underserved, predominantly Black community.

2.      In April 2018, two Black men were arrested at a Starbucks in Philadelphia. They had been sitting at a table, waiting for a business associate.  They had not ordered anything.  A Starbucks employee called the police.  The arrest was recorded, the video spread, and the nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

3.      Starbucks's CEO traveled to Philadelphia to apologize personally, calling the arrests "reprehensible."  The company closed more than 8,000 stores for racial bias training.  Starbucks publicly committed to investing in underserved communities—particularly in Philadelphia, the city it had embarrassed.

4.      Starbucks announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development in underserved neighborhoods.  Philadelphia was one of twelve cities targeted for investment.  Starbucks

Case ID: 260404329
Control No.: 26050092

committed to opening "Community Stores" in these neighborhoods—stores designed to partner with local nonprofits and create economic opportunity.

5.    PSDC—a Pennsylvania developer with fifty years of experience in Philadelphia focused on community development and social service—partnered with Starbucks to bring a Community Store to North Philadelphia.

6.    Starbucks's commitment was not limited to press releases.  Starbucks representatives actively participated in community meetings, including meetings of the Broad and Ridge Opportunities for Communities ("BROC"), making direct promises to North Philadelphia residents and community organizations about its plans to open and operate a Community Store.  The Community trusted and believed Starbucks would fulfill its promise.

7.    On October 27, 2021, PSDC and Starbucks executed the Lease.

8.    PSDC invested millions preparing the site, demolishing existing structures, performing construction work, and coordinating with local nonprofits.

9.    Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.

10.    PSDC's investment and concessions were premised on Starbucks's commitment to perform.

11.    The Starbucks store would catalyze broader community investment. PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community."  Economist Kevin C. Gillen, PhD estimates that the project would

Case ID: 260404329
Control No.: 26050092

generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.

12.    PSDC partnered with Starbucks in reliance on those commitments and promises, assuming substantial financial risk on the understanding that Starbucks would perform.

13.    Starbucks did not keep its promises.

14.    In fact, Starbucks delayed obtaining its building permits—its responsibility under the Lease—and then used those delays as a pretext to terminate.

15.    When its own conduct caused the project to become more expensive, Starbucks used that increased cost as further justification to exit.

16.    On November 19, 2025, Starbucks claimed it was "unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

17.    Starbucks's termination right had expired.  Its delays were self-created.  Its conduct over four years demonstrates bad faith.

18.    Starbucks betrayed the North Philadelphia community.

19.    PSDC brings this action to recover damages and to obtain a declaration that Starbucks's purported termination is invalid.

## **PARTIES**

20.    Plaintiff Philadelphia Suburban Development Corporation is a Pennsylvania corporation with its principal place of business at 100 Ross Road, Suite 200, King of Prussia, Pennsylvania 19406.

21.    Defendant Starbucks Corporation is a Washington corporation with its principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks is registered to do business in Pennsylvania and regularly conducts business in Philadelphia County.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 42 Pa. C.S. § 931.  The amount in controversy exceeds the jurisdictional limit of the Philadelphia Municipal Court.

23.    This Court has personal jurisdiction over Starbucks because Starbucks is registered to do business in Pennsylvania, regularly conducts business in Philadelphia County, and entered into the Lease at issue in this action in Philadelphia County.

24.    Venue is proper in Philadelphia County pursuant to Pa.R.Civ.P. 1006 because the Property at issue is located in Philadelphia County and a substantial part of the events giving rise to this action occurred in Philadelphia County.

## FACTUAL BACKGROUND

### A.  The 2018 Starbucks Philadelphia Incident and Its Aftermath.

25.    On April 12, 2018, Rashon Nelson and Donte Robinson were arrested at a Starbucks in Philadelphia's Rittenhouse Square.  They had been sitting at a table waiting for a business associate.  They had not ordered anything.  A Starbucks employee called the police.

26.    The arrest was recorded.  The video spread.  The nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

Case ID: 260404329
Control No.: 26050092

27.    Starbucks's CEO, Kevin Johnson, traveled to Philadelphia to apologize, calling the arrests "reprehensible."

28.    Starbucks settled with Nelson and Robinson.  The City of Philadelphia settled for a symbolic $1 each, plus $200,000 for a program supporting young entrepreneurs in underserved communities.

29.    Starbucks closed more than 8,000 stores for an afternoon of racial bias training.

30.    In the wake of the incident, Starbucks publicly committed to investing in underserved communities.  The company announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development. Philadelphia was one of twelve cities targeted for investment.

31.    Starbucks committed to opening "Community Stores" in underserved neighborhoods—stores designed to partner with local nonprofits, hire from the community, and create economic opportunity.

32.    Bringing a Community Store to Philadelphia was a centerpiece of Starbucks's public response to the 2018 crisis.

33.    Unfortunately, Starbuck's public response was performative as it had no intention of following through on its promises.  Instead, Starbucks wanted to wait for the public furor to subside before it would renege.

**B. PSDC's History and Mission.**

34.    PSDC is a Pennsylvania developer with fifty years of experience in Philadelphia.  Its mission centers on community-oriented development—working with tenants, nonprofits, and community organizations to ensure development benefits residents rather than displacing them.

35.    PSDC has partnered with organizations across North Philadelphia to coordinate development that serves the community.

**C. Starbucks's Direct Commitments to North Philadelphia.**

36.    Starbucks's commitment to North Philadelphia went beyond public announcements.  Starbucks representatives actively participated in community meetings and meetings of BROC—a community organization coordinating development along the Broad and Ridge corridor in North Philadelphia.

37.    At those meetings, Starbucks made direct promises to community residents and organizations to open a Community Store and invest in the neighborhood.  Those promises were specific, repeated, and relied upon.

38.    PSDC also relied on those promises.

39.    The Starbucks store would catalyze broader community investment. PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community."  Economist Kevin C. Gillen, PhD estimates that the project would generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.  PSDC's development vision for the Broad and Lehigh site, and Starbucks's role as anchor tenant and community partner, is set forth in the presentation attached hereto as Exhibit A.

40.    Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader $1 billion development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.  PSDC invested

millions with a modest expected return, premised on Starbucks's presence catalyzing broader community investment.

### D. The Lease.

41.     On October 27, 2021, PSDC and Starbucks executed the Lease for the Property.  A true and correct copy is attached hereto as Exhibit B.

42.     Under Section 2.2, PSDC agreed to lease the Property to Starbucks for twenty years, with three ten-year extension options—a potential fifty-year term.

43.     Under Section 3.1, Base Rent was $12,500 per month for Years 1-5, with scheduled increases thereafter.

44.     Under Section 4.1, PSDC agreed to complete certain work on the Property ("Landlord's Work"), including offsite improvements and obtaining permits and approvals required to operate the Premises.

45.     Under Section 4.4, PSDC agreed to provide Starbucks a $300,000 Tenant Improvement Allowance.

46.     Under Section 17, Starbucks had termination rights during a defined "Feasibility Period."   Section 17.2 provided that if Starbucks could not obtain its "Governmental Approvals"—building permits and certificate of occupancy—on satisfactory terms prior to expiration of the Feasibility Period, Starbucks could terminate the Lease.

47.     The Feasibility Period expired on February 24, 2022, nearly three years before Starbucks sent its November 2025 termination letter.

### E. PSDC Performs Its Obligations.

48.     PSDC fulfilled all its obligations under the Lease.

Case ID: 260404329
Control No.: 26050092

49.    PSDC invested millions preparing the Property, including demolition, site work, and construction.

50.    PSDC obtained all required zoning and platting approvals.

51.    PSDC coordinated with local nonprofits to integrate the Starbucks store into broader community development efforts.

52.    On September 12, 2022, PSDC sent Starbucks a letter, notifying Starbucks that the Premises would be delivered within 180 days.  A true and correct copy is attached hereto as Exhibit C.

53.    PSDC completed Landlord's Work and tendered timely delivery of the Premises.

**F.  <u>Starbucks Delays and Then Uses Its Own Delays as a Pretext.</u>**

54.    Starbucks failed to perform its obligations under the Lease.

55.    Obtaining Governmental Approvals—building permits and certificate of occupancy—was Starbucks's responsibility under Section 17.

56.    Starbucks failed to diligently pursue those approvals.  It delayed submitting permit applications.  It delayed responding to City inquiries.  It delayed taking the steps necessary to obtain its permits.  At every stage, Starbucks created the very delays it later cited as grounds for termination.

57.    Starbucks's conduct also drove up project costs.  Starbucks cannot invoke cost increases of its own making as justification to terminate.

58.    By April 2024—more than two years after the Feasibility Period had expired—the parties were in discussions regarding the Commencement Date and Rent Commencement Date.  On April 10, 2024, PSDC and Starbucks agreed by telephone

Case ID: 260404329
Control No.: 26050092

that the Rent Commencement Date would be March 5, 2024.  A true and correct copy of the email chain confirming that agreement is attached hereto as Exhibit D.

59.    PSDC prepared a Date Certificate reflecting those agreed terms, including a Commencement Date of March 11, 2023, and a Rent Commencement Date of March 5, 2024.  A true and correct copy is attached hereto as Exhibit E.  Starbucks never executed the Date Certificate.  Starbucks never paid rent.  Starbucks never opened.

60.    In fact, Starbucks obtained Commercial Building Permit No. CP-2023-003383 on February 4, 2025—nine months before it sent its termination letter.  The permit authorized new construction of a detached drive-through structure for use as a restaurant at 2628 N. Broad Street.  A true and correct copy is attached hereto as Exhibit F.  Starbucks's claim that it was "unable" to obtain Governmental Approvals was false: it had already obtained them.

### G. Starbucks's Purported Termination.

61.    On November 19, 2025, Starbucks sent a letter purporting to terminate the Lease.  A true and correct copy is attached hereto as Exhibit G.

62.    Starbucks claimed it was exercising its "option to terminate the Lease effective immediately" under Section 17.2 because it "has been unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

63.    Starbuck's purported termination was wrongful for four independent reasons.

64.    First, Starbucks's termination right had expired.  Section 17.2 permitted termination only during the Feasibility Period, which ended on February 24, 2022, nearly three years before Starbucks invoked it.

Case ID: 260404329
Control No.: 26050092

65.     Second, Starbucks caused the delays it relied upon.  It delayed permit applications, delayed responding to the City, and delayed at every step—then pointed to those delays as grounds to walk away.  A party may not create the condition that triggers its own termination right.

66.     Third, Starbucks acted in bad faith throughout.  Starbucks made promises to PSDC and to the North Philadelphia community, negotiated lease terms, agreed to a Rent Commencement Date, and watched PSDC invest millions.  Then Starbucks walked away, abandoning its obligations.

67.     Fourth, Starbucks's claimed inability to obtain Governmental Approvals is directly contradicted by the record.  Starbucks obtained its commercial building permit on February 4, 2025.  Nine months later it claimed inability.  That claim was false.

68.     Starbucks's purported termination is invalid.  The Lease remains in effect.

## H. Damages.

69.     As a result of Starbucks's breach, PSDC has suffered substantial damages, including but not limited to:

a.   Costs incurred in performing Landlord's Work, including demolition, site work, and construction;

b.   Costs to relocate an existing tenant to make way for Starbucks;

c.   Zoning and platting approval costs;

d.   Broker commissions;

e.   The value of the land and the present value of the completed building as a capital asset;

f.   Lost rent and lost profits during the base twenty-year term;

Case ID: 260404329
Control No.: 26050092

g.  Lost lease value attributable to the three ten-year extension options; and

h.  Attorneys' fees and costs.

70.  PSDC reserves the right to prove the full extent of its damages at trial.

71.  Under Section 23.14 of the Lease, the prevailing party is entitled to reasonable attorneys' fees.

## COUNT I
## BREACH OF CONTRACT

72.  PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

73.  The Lease is a valid and enforceable contract.

74.  PSDC performed all its obligations under the Lease.

75.  Starbucks breached the Lease by:

a.  Failing to pay rent;

b.  Failing to execute the Date Certificate;

c.  Failing to diligently pursue its Governmental Approvals;

d.  Purporting to terminate after its termination right had expired; and

e.  Repudiating its obligations.

76.  As a direct result of Starbucks's breach, PSDC has suffered substantial damages in an amount to be determined at trial.

77.  PSDC is entitled to attorneys' fees as the prevailing party under Section 23.14.

Case ID: 260404329
Control No.: 26050092

## COUNT II
## FRAUD

78.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

79.    Starbucks made material misrepresentations to PSDC and the North Philadelphia community, including:

    a.    Starbucks publicly and directly represented to PSDC and to community members at BROC meetings and community gatherings that it was committed to opening a Community Store in North Philadelphia and investing in the neighborhood.

    b.    In October 2021, Starbucks executed the Lease, representing by that act its commitment to lease the property for twenty years, pay rent, and operate a Community Store; and

    c.    In April 2024, Starbucks agreed to and confirmed a Rent Commencement Date of March 5, 2024, representing its intent to honor its obligations under the Lease.

80.    Those representations were false.  Starbucks executed the Lease and made representations to PSDC and the community while failing to take the steps necessary to perform—delaying permit applications, failing to respond to City inquiries, and allowing the project to stall.  Starbucks obtained a commercial building permit in February 2025, demonstrating that performance was achievable, then claimed inability nine months later.  That pattern of conduct demonstrates that Starbucks's representations were knowingly false when made or were made with reckless disregard for their truth. Starbucks did not intend to fulfill its obligations.

Case ID: 260404329
Control No.: 26050092

81.     Starbucks made those representations intending that PSDC would rely on them and invest millions in the Property.

82.     PSDC justifiably relied on those representations by investing millions in the Property, obtaining zoning and platting approvals, coordinating with local nonprofits, accepting below-market rent, and assuming substantial financial risk.

83.     As a direct result of Starbucks's fraudulent misrepresentations, PSDC has suffered substantial damages in an amount to be determined at trial.  Because PSDC's claims sound in fraud, PSDC is entitled to recover all losses proximately caused by Starbucks's misrepresentations—including damages beyond the benefit of the bargain.

84.     Starbucks made public commitments to a historically underserved community in response to a national social injustice.  It induced PSDC to invest millions in reliance on those commitments.  It then walked away—abandoning its contractual obligations and the community it had promised to serve.  That conduct warrants punitive damages.

## COUNT III
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

85.     PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

86.     Every contract governed by Pennsylvania law contains an implied covenant of good faith and fair dealing.  That covenant requires each party to exercise its contractual discretion honestly and in a manner consistent with the reasonable expectations of the other party.

Case ID: 260404329
Control No.: 26050092

87.     Starbucks exercised its discretion under the Lease, including its discretion in pursuing Governmental Approvals, managing the construction timeline, and ultimately invoking Section 17.2 in bad faith and in a manner that frustrated PSDC's reasonable contractual expectations.  Specifically, Starbucks breached the implied covenant by:

a.   Deliberately creating delays and then invoking them as a pretext to terminate;

b.   Causing the project to become more expensive through its own conduct and then using those increased costs as a basis to exit;

c.   Entering into and negotiating the Lease and allowing PSDC to invest millions while Starbucks delayed and failed to perform its obligations;

d.   Obtaining a commercial building permit in February 2025 and then falsely claiming inability to obtain Governmental Approvals nine months later; and

e.   Invoking a termination right that had expired years earlier.

88.     As a direct result of Starbucks's breach of the implied covenant, PSDC has suffered substantial damages in an amount to be determined at trial.

## COUNT IV
### DECLARATORY JUDGMENT

89.     PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

90.     An actual controversy exists between the parties regarding the validity of Starbucks's purported termination of the Lease.  PSDC is entitled to declaratory relief pursuant to the Declaratory Judgment Act, 42 Pa. C.S. § 7531 *et seq*.

91.     PSDC is entitled to a declaration that:

Case ID: 260404329
Control No.: 26050092

a.    Starbucks's purported termination is invalid and of no legal effect;

b.    The Lease remains in full force and effect; and

c.    Starbucks owes rent and is obligated to perform under the Lease.

## COUNT V
## PROMISSORY ESTOPPEL
## (Alleged in the Alternative)

92.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

93.    This Count is pleaded in the alternative pursuant to Pa.R.Civ.P. 1020(c).

94.    Starbucks made clear and definite promises: to lease the Property for fifty years, to pay rent, to operate a Community Store, and to perform its obligations under the Lease.  Starbucks also made direct and repeated promises to North Philadelphia residents and organizations at BROC meetings and community gatherings about its commitment to the neighborhood.

95.    Starbucks made those promises with knowledge that PSDC and the community would rely on them.

96.    PSDC reasonably relied on those promises by investing millions in the Property, obtaining approvals, coordinating with nonprofits, accepting below-market rent, and taking on substantial financial risk.

97.    PSDC suffered substantial detriment as a result of that reliance.

98.    Injustice can be avoided only by enforcement of Starbucks's promises.

99.    PSDC is entitled to damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community.

Case ID: 260404329
Control No.: 26050092

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Philadelphia Suburban Development Corporation respectfully requests that this Court enter judgment in its favor and against Defendant Starbucks Corporation as follows:

A. On Count I, compensatory damages in an amount to be determined at trial, including lost rent, lost profits, and the value of PSDC's investments in the Property;

B. On Count II, all damages proximately caused by Starbucks's misrepresentations, including damages beyond the benefit of the bargain, plus punitive damages;

C. On Count III, compensatory damages in an amount to be determined at trial;

D. On Count IV, a declaration pursuant to 42 Pa. C.S. § 7531 *et seq.* that Starbucks's purported termination is invalid and of no legal effect, that the Lease remains in full force and effect, and that Starbucks owes rent and is obligated to perform;

E. On Count V, in the alternative, damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community;

F. Attorneys' fees and costs pursuant to Section 23.14 of the Lease;

G. Pre-judgment and post-judgment interest; and

H. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

PSDC demands a trial by jury on all issues so triable.


Respectfully Submitted,

**TUCKER LAW GROUP, LLC.**


Dated: April 29, 2026          BY: /s/ *Joe H. Tucker, Jr.*
                                    Joe H. Tucker, Jr., Esquire
                                    Julian C. Williams, Esquire

                                    *Attorneys for Plaintiff,*
                                    *Philadelphia Suburban Development*
                                    *Corporation*

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania, Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**TUCKER LAW GROUP, LLC**

Date:  April 29, 2026

/s/ *Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,*
*Philadelphia Suburban Development*
*Corporation*

## VERIFICATION

I, **Mark R. Nicoletti, Sr.**, verify that I am the President and Co-CEO of the Philadelphia Suburban Development Corporation ("PSDC"), and as such I am authorized to take this Verification on behalf of Plaintiff, PSDC, that I have reviewed the foregoing *Complaint*, the factual averments in the *Complaint* are based upon information which has been gathered by counsel for PSDC in the preparation for the prosecution of this lawsuit.  The language of the *Complaint* is that of counsel and not of signer.  I verify that I have read the *Complaint,* and the statements therein are true and correct to the best of my knowledge, information and belief.  To the extent that the contents of the *Complaint* are that of counsel, signer has relied upon counsel in taking this Verification.  I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities.

Date: 4/24/2026

DocuSigned by:

Mark R. Nicoletti, Sr.

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| FOR COURT USE ONLY | |
|---|---|
| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 05/28/2026 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

**CONTROL NUMBER:**

26051876

**(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)**

April _____ Term, 2026
*Month*                 *Year*

No. _____ 04329

Name of Filing Party:

PHILADELPHIA SUBURBAN DEVELOPMENT

PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION VS S

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition         ☐ Response to Motion

Has another petition/motion been decided in this case?  ☐ Yes  ☐ No
Is another petition/motion pending?  ☐ Yes  ☐ No
*If the answer to either question is yes, you must identify the judge(s):*

_____

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOTION TO AMEND | MTAMD |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I.  CASE PROGRAM**

OTHER PROGRAM

Court Type: MAJOR JURY
Case Type: FRAUD

**II.  PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JOE H TUCKER JR
  THE TUCKER LAW GROUP, LLC TEN PENN
  CENTER 1801 MARKET STREET, SUITE 2500
  , PHILADELPHIA PA 19103
STARBUCKS CORPORATION
  2401 UTAH AVENUE SOUTH , SEATTLE WA
  98134

**III.  OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

| | May 7, 2026 | JOE H. TUCKER JR | |
|---|---|---|---|
| *(Attorney Signature/Unrepresented Party)* | *(Date)* | *(Print Name)* | *(Attorney I.D. No.)* |

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2605018408
08-MAY-26 11:27:27

**FILED**
07 MAY 2026 04:55 pm
Civil Administration
A. MALONIS

| | |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> STARBUCKS CORPORATION, <br><br> Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA <br><br> APRIL TERM, 2026 <br><br> CASE NO.: 04329 <br><br> **JURY TRIAL DEMANDED** |

## ORDER

**AND NOW**, this _____ day of _____, 2026, upon

consideration of Plaintiff's Motion for Leave to File Amended Complaint, it is hereby

**ORDERED** that the Motion is **GRANTED**.  Plaintiff shall file the Amended Complaint,

in the form attached as Exhibit A to the Motion, within five (5) days of the date of this

Order.


BY THE COURT:


_____
                                                                    **J.**


Case ID: 260404329
Control No.: 26051876

**TUCKER LAW GROUP, LLC**
Joe H. Tucker, Jr., Esquire (56617)
Julian C. Williams, Esquire (324771)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 875-0609

ATTORNEYS FOR PLAINTIFF,
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

| | |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> STARBUCKS CORPORATION, <br><br> Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA <br><br> APRIL TERM, 2026 <br><br> CASE NO.: 04329 <br><br> **JURY TRIAL DEMANDED** |

### PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Plaintiff Philadelphia Suburban Development Corporation, by and through counsel, respectfully moves this Honorable Court for leave to file an Amended Complaint pursuant to Pa.R.Civ.P. 1033, and in support states as follows:

1. Plaintiff filed the original Complaint in this action on April 29, 2026.

2. Defendant Starbucks Corporation has not been served, has not entered an appearance, and has not filed any responsive pleading.

3. Plaintiff seeks to file an Amended Complaint to correct page-numbering issues.

4. The proposed amendment is non-substantive.  It does not add or remove parties, claims, or factual allegations.  It corrects pagination only.

1

Case ID: 260404329
Control No.: 26051876

5. Pa.R.Civ.P. 1033(a) authorizes amendment by leave of court. Pennsylvania courts liberally permit amendment except where surprise or prejudice would result. *Capobianchi v. BIC Corp.*, 446 Pa. Super. 130, 136 (1995); *Burger v. Borough of Ingram*, 697 A.2d 1037, 1041 (Pa. Cmwlth. 1997).

6. No surprise or prejudice can result. Defendant has not been served or appeared, and the amendment corrects formatting only.

7. A clean copy of the proposed Amended Complaint is attached as **Exhibit A**. A comparison copy identifying the page-numbering corrections is attached as **Exhibit B**.

**WHEREFORE**, Plaintiff Philadelphia Suburban Development Corporation respectfully requests that this Honorable Court grant leave to file the Amended Complaint in the form attached as **Exhibit A**, and enter the proposed Order attached hereto.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: May 7, 2026

*/s/ Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,*
*Philadelphia Suburban Development*
*Corporation*

2

## CERTIFICATE OF SERVICE

I, Joe H. Tucker, Jr., Esquire hereby certify that the foregoing Plaintiff's Motion for Leave to File Amended Complaint is filed prior to original process on Defendant. No appearance has been entered.  The Motion will be served on Defendant or its counsel of record contemporaneously with service of the Amended Complaint following the Court's grant of leave.


Date: May 7, 2026                                  /s/ *Joe H. Tucker, Jr.*
                                                   Joe H. Tucker, Jr., Esquire

# EXHIBIT "A"

Case ID: 260404329
Control No.: 26051876

**TUCKER LAW GROUP, LLC**
Joe H. Tucker, Jr., Esquire (56617)
Julian C. Williams, Esquire (324771)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 875-0609

ATTORNEYS FOR PLAINTIFF,
PHILADELPHIA SUBURBAN
DEVELOPMENT CORPORATION

| | |
|---|---|
| PHILADELPHIA SUBURBAN DEVELOPMENT CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>STARBUCKS CORPORATION,<br><br>        Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA<br><br>APRIL TERM, 2026<br><br>CASE NO.: 04329<br><br>**JURY TRIAL DEMANDED** |

<u>**NOTICE TO DEFEND**</u>

Case ID: 260404329
Control No.: 26051876

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney, and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>1101 Market Street-11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo Angie Y. Lugo partir dela fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus o objectiones a las demandas en contra de su persona. Sea a visado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sim previo a viso o notification. Ademas, la corte puede cumpla con todas las provisiones de esta demanda. Usted puede perer dinero o sus propiedades u otros derechos imporatantes para usted.<br><br>*Lleva esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servico. Vaya en personal o llame por telefono Angie Y. Lugo la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistensia legal.*<br><br>Asociacion de Licenciados de Filadelphia<br>Servicio de Referencia e Informacion Legal<br>1101 Market Street-11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333 |

Case ID: 260404329
Control No.: 26051876

## FIRST AMENDED COMPLAINT

Plaintiff Philadelphia Suburban Development Corporation ("PSDC"), by and through the undersigned counsel, hereby files this First Amended Complaint against Defendant Starbucks Corporation ("Starbucks"), and in support thereof alleges as follows:

## INTRODUCTION

1.     PSDC brings this action against Starbucks for breach of a commercial lease (the "Lease") and fraud concerning a property located at 2628-32 N. Broad Street, Philadelphia, Pennsylvania 19132 (the "Property").  The Property sits at the intersection of Broad Street and Lehigh Avenue in North Philadelphia—a historically underserved, predominantly Black community.

2.     In April 2018, two Black men were arrested at a Starbucks in Philadelphia. They had been sitting at a table, waiting for a business associate.  They had not ordered anything.  A Starbucks employee called the police.  The arrest was recorded, the video spread, and the nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

3.     Starbucks's CEO traveled to Philadelphia to apologize personally, calling the arrests "reprehensible."  The company closed more than 8,000 stores for racial bias training.  Starbucks publicly committed to investing in underserved communities—particularly in Philadelphia, the city it had embarrassed.

4.     Starbucks announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development in underserved neighborhoods.  Philadelphia was one of twelve cities targeted for investment.  Starbucks

1

Case ID: 260404329
Control No.: 26051876

committed to opening "Community Stores" in these neighborhoods—stores designed to partner with local nonprofits and create economic opportunity.

5.    PSDC—a Pennsylvania developer with fifty years of experience in Philadelphia focused on community development and social service—partnered with Starbucks to bring a Community Store to North Philadelphia.

6.    Starbucks's commitment was not limited to press releases. Starbucks representatives actively participated in community meetings, including meetings of the Broad and Ridge Opportunities for Communities ("BROC"), making direct promises to North Philadelphia residents and community organizations about its plans to open and operate a Community Store. The Community trusted and believed Starbucks would fulfill its promise.

7.    On October 27, 2021, PSDC and Starbucks executed the Lease.

8.    PSDC invested millions preparing the site, demolishing existing structures, performing construction work, and coordinating with local nonprofits.

9.    Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.

10.    PSDC's investment and concessions were premised on Starbucks's commitment to perform.

11.    The Starbucks store would catalyze broader community investment. PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community." Economist Kevin C. Gillen, PhD estimates that the project would

2

Case ID: 260404329
Control No.: 26051876

generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.

12.    PSDC partnered with Starbucks in reliance on those commitments and promises, assuming substantial financial risk on the understanding that Starbucks would perform.

13.    Starbucks did not keep its promises.

14.    In fact, Starbucks delayed obtaining its building permits—its responsibility under the Lease—and then used those delays as a pretext to terminate.

15.    When its own conduct caused the project to become more expensive, Starbucks used that increased cost as further justification to exit.

16.    On November 19, 2025, Starbucks claimed it was "unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

17.    Starbucks's termination right had expired.  Its delays were self-created.  Its conduct over four years demonstrates bad faith.

18.    Starbucks betrayed the North Philadelphia community.

19.    PSDC brings this action to recover damages and to obtain a declaration that Starbucks's purported termination is invalid.

## PARTIES

20.    Plaintiff Philadelphia Suburban Development Corporation is a Pennsylvania corporation with its principal place of business at 100 Ross Road, Suite 200, King of Prussia, Pennsylvania 19406.

3

Case ID: 260404329
Control No.: 26051876

21.    Defendant Starbucks Corporation is a Washington corporation with its principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks is registered to do business in Pennsylvania and regularly conducts business in Philadelphia County.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 42 Pa. C.S. § 931.  The amount in controversy exceeds the jurisdictional limit of the Philadelphia Municipal Court.

23.    This Court has personal jurisdiction over Starbucks because Starbucks is registered to do business in Pennsylvania, regularly conducts business in Philadelphia County, and entered into the Lease at issue in this action in Philadelphia County.

24.    Venue is proper in Philadelphia County pursuant to Pa.R.Civ.P. 1006 because the Property at issue is located in Philadelphia County and a substantial part of the events giving rise to this action occurred in Philadelphia County.

## FACTUAL BACKGROUND

### A. The 2018 Starbucks Philadelphia Incident and Its Aftermath.

25.    On April 12, 2018, Rashon Nelson and Donte Robinson were arrested at a Starbucks in Philadelphia's Rittenhouse Square.  They had been sitting at a table waiting for a business associate.  They had not ordered anything.  A Starbucks employee called the police.

26.    The arrest was recorded.  The video spread.  The nation watched two Black men led away in handcuffs for doing nothing wrong—other than being Black in a Starbucks.

4

Case ID: 260404329
Control No.: 26051876

27. Starbucks's CEO, Kevin Johnson, traveled to Philadelphia to apologize, calling the arrests "reprehensible."

28. Starbucks settled with Nelson and Robinson. The City of Philadelphia settled for a symbolic $1 each, plus $200,000 for a program supporting young entrepreneurs in underserved communities.

29. Starbucks closed more than 8,000 stores for an afternoon of racial bias training.

30. In the wake of the incident, Starbucks publicly committed to investing in underserved communities. The company announced a $100 million "Community Resilience Fund" to support Black-owned businesses and community development. Philadelphia was one of twelve cities targeted for investment.

31. Starbucks committed to opening "Community Stores" in underserved neighborhoods—stores designed to partner with local nonprofits, hire from the community, and create economic opportunity.

32. Bringing a Community Store to Philadelphia was a centerpiece of Starbucks's public response to the 2018 crisis.

33. Unfortunately, Starbuck's public response was performative as it had no intention of following through on its promises. Instead, Starbucks wanted to wait for the public furor to subside before it would renege.

**B. PSDC's History and Mission.**

34. PSDC is a Pennsylvania developer with fifty years of experience in Philadelphia. Its mission centers on community-oriented development—working with tenants, nonprofits, and community organizations to ensure development benefits residents rather than displacing them.

5

Case ID: 260404329
Control No.: 26051876

35.     PSDC has partnered with organizations across North Philadelphia to coordinate development that serves the community.

## C. Starbucks's Direct Commitments to North Philadelphia.

36.     Starbucks's commitment to North Philadelphia went beyond public announcements.  Starbucks representatives actively participated in community meetings and meetings of BROC—a community organization coordinating development along the Broad and Ridge corridor in North Philadelphia.

37.     At those meetings, Starbucks made direct promises to community residents and organizations to open a Community Store and invest in the neighborhood.  Those promises were specific, repeated, and relied upon.

38.     PSDC also relied on those promises.

39.     The Starbucks store would catalyze broader community investment.  PSDC's development vision for the Broad and Lehigh site represented a "$1B transformational investment in North Philadelphia to benefit the people living and working in the community."  Economist Kevin C. Gillen, PhD estimates that the project would generate $4.4 billion in total economic stimulus, create over 9,570 construction jobs, 571 permanent jobs, and 2,535 jobs for minorities, and increase local tax revenue by 951% over twelve years.  The Starbucks Community Store was central to that vision.  PSDC's development vision for the Broad and Lehigh site, and Starbucks's role as anchor tenant and community partner, is set forth in the presentation attached hereto as Exhibit A.

40.     Because Starbucks was intended to serve as an anchor and stabilizer at Broad and Lehigh, anchoring the broader $1 billion development, PSDC accepted a lower rent than it would have charged under a standard hard-term lease.  PSDC invested

Case ID: 260404329
Control No.: 26051876

millions with a modest expected return, premised on Starbucks's presence catalyzing broader community investment.

### D. The Lease.

41.    On October 27, 2021, PSDC and Starbucks executed the Lease for the Property.  A true and correct copy is attached hereto as Exhibit B.

42.    Under Section 2.2, PSDC agreed to lease the Property to Starbucks for twenty years, with three ten-year extension options—a potential fifty-year term.

43.    Under Section 3.1, Base Rent was $12,500 per month for Years 1-5, with scheduled increases thereafter.

44.    Under Section 4.1, PSDC agreed to complete certain work on the Property ("Landlord's Work"), including offsite improvements and obtaining permits and approvals required to operate the Premises.

45.    Under Section 4.4, PSDC agreed to provide Starbucks a $300,000 Tenant Improvement Allowance.

46.    Under Section 17, Starbucks had termination rights during a defined "Feasibility Period."   Section 17.2 provided that if Starbucks could not obtain its "Governmental Approvals"—building permits and certificate of occupancy—on satisfactory terms prior to expiration of the Feasibility Period, Starbucks could terminate the Lease.

47.    The Feasibility Period expired on February 24, 2022, nearly three years before Starbucks sent its November 2025 termination letter.

### E. PSDC Performs Its Obligations.

48.    PSDC fulfilled all its obligations under the Lease.

7

Case ID: 260404329
Control No.: 26051876

49. PSDC invested millions preparing the Property, including demolition, site work, and construction.

50. PSDC obtained all required zoning and platting approvals.

51. PSDC coordinated with local nonprofits to integrate the Starbucks store into broader community development efforts.

52. On September 12, 2022, PSDC sent Starbucks a letter, notifying Starbucks that the Premises would be delivered within 180 days. A true and correct copy is attached hereto as Exhibit C.

53. PSDC completed Landlord's Work and tendered timely delivery of the Premises.

**F. Starbucks Delays and Then Uses Its Own Delays as a Pretext.**

54. Starbucks failed to perform its obligations under the Lease.

55. Obtaining Governmental Approvals—building permits and certificate of occupancy—was Starbucks's responsibility under Section 17.

56. Starbucks failed to diligently pursue those approvals. It delayed submitting permit applications. It delayed responding to City inquiries. It delayed taking the steps necessary to obtain its permits. At every stage, Starbucks created the very delays it later cited as grounds for termination.

57. Starbucks's conduct also drove up project costs. Starbucks cannot invoke cost increases of its own making as justification to terminate.

58. By April 2024—more than two years after the Feasibility Period had expired—the parties were in discussions regarding the Commencement Date and Rent Commencement Date. On April 10, 2024, PSDC and Starbucks agreed by telephone

8

Case ID: 260404329
Control No.: 26051876

that the Rent Commencement Date would be March 5, 2024.  A true and correct copy of the email chain confirming that agreement is attached hereto as Exhibit D.

59.    PSDC prepared a Date Certificate reflecting those agreed terms, including a Commencement Date of March 11, 2023, and a Rent Commencement Date of March 5, 2024.  A true and correct copy is attached hereto as Exhibit E.  Starbucks never executed the Date Certificate.  Starbucks never paid rent.  Starbucks never opened.

60.    In fact, Starbucks obtained Commercial Building Permit No. CP-2023-003383 on February 4, 2025—nine months before it sent its termination letter.  The permit authorized new construction of a detached drive-through structure for use as a restaurant at 2628 N. Broad Street.  A true and correct copy is attached hereto as Exhibit F.  Starbucks's claim that it was "unable" to obtain Governmental Approvals was false: it had already obtained them.

### G. Starbucks's Purported Termination.

61.    On November 19, 2025, Starbucks sent a letter purporting to terminate the Lease.  A true and correct copy is attached hereto as Exhibit G.

62.    Starbucks claimed it was exercising its "option to terminate the Lease effective immediately" under Section 17.2 because it "has been unable to obtain its Governmental Approvals on terms satisfactory to Tenant."

63.    Starbuck's purported termination was wrongful for four independent reasons.

64.    First, Starbucks's termination right had expired.  Section 17.2 permitted termination only during the Feasibility Period, which ended on February 24, 2022, nearly three years before Starbucks invoked it.

9

Case ID: 260404329
Control No.: 26051876

65.     Second, Starbucks caused the delays it relied upon.  It delayed permit applications, delayed responding to the City, and delayed at every step—then pointed to those delays as grounds to walk away.  A party may not create the condition that triggers its own termination right.

66.     Third, Starbucks acted in bad faith throughout.  Starbucks made promises to PSDC and to the North Philadelphia community, negotiated lease terms, agreed to a Rent Commencement Date, and watched PSDC invest millions.  Then Starbucks walked away, abandoning its obligations.

67.     Fourth, Starbucks's claimed inability to obtain Governmental Approvals is directly contradicted by the record.  Starbucks obtained its commercial building permit on February 4, 2025.  Nine months later it claimed inability.  That claim was false.

68.     Starbucks's purported termination is invalid.  The Lease remains in effect.

## H. **Damages.**

69.     As a result of Starbucks's breach, PSDC has suffered substantial damages, including but not limited to:

    a.   Costs incurred in performing Landlord's Work, including demolition, site work, and construction;

    b.   Costs to relocate an existing tenant to make way for Starbucks;

    c.   Zoning and platting approval costs;

    d.   Broker commissions;

    e.   The value of the land and the present value of the completed building as a capital asset;

    f.   Lost rent and lost profits during the base twenty-year term;

Case ID: 260404329
Control No.: 26051876

g.   Lost lease value attributable to the three ten-year extension options; and

h.   Attorneys' fees and costs.

70.   PSDC reserves the right to prove the full extent of its damages at trial.

71.   Under Section 23.14 of the Lease, the prevailing party is entitled to reasonable attorneys' fees.

## COUNT I
## BREACH OF CONTRACT

72.   PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

73.   The Lease is a valid and enforceable contract.

74.   PSDC performed all its obligations under the Lease.

75.   Starbucks breached the Lease by:

a.   Failing to pay rent;

b.   Failing to execute the Date Certificate;

c.   Failing to diligently pursue its Governmental Approvals;

d.   Purporting to terminate after its termination right had expired; and

e.   Repudiating its obligations.

76.   As a direct result of Starbucks's breach, PSDC has suffered substantial damages in an amount to be determined at trial.

77.   PSDC is entitled to attorneys' fees as the prevailing party under Section 23.14.

11

Case ID: 260404329
Control No.: 26051876

## COUNT II
## FRAUD

78.     PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

79.     Starbucks made material misrepresentations to PSDC and the North Philadelphia community, including:

    a.   Starbucks publicly and directly represented to PSDC and to community members at BROC meetings and community gatherings that it was committed to opening a Community Store in North Philadelphia and investing in the neighborhood.

    b.   In October 2021, Starbucks executed the Lease, representing by that act its commitment to lease the property for twenty years, pay rent, and operate a Community Store; and

    c.   In April 2024, Starbucks agreed to and confirmed a Rent Commencement Date of March 5, 2024, representing its intent to honor its obligations under the Lease.

80.     Those representations were false.  Starbucks executed the Lease and made representations to PSDC and the community while failing to take the steps necessary to perform—delaying permit applications, failing to respond to City inquiries, and allowing the project to stall.  Starbucks obtained a commercial building permit in February 2025, demonstrating that performance was achievable, then claimed inability nine months later.  That pattern of conduct demonstrates that Starbucks's representations were knowingly false when made or were made with reckless disregard for their truth. Starbucks did not intend to fulfill its obligations.

12

Case ID: 260404329
Control No.: 26051876

81.    Starbucks made those representations intending that PSDC would rely on them and invest millions in the Property.

82.    PSDC justifiably relied on those representations by investing millions in the Property, obtaining zoning and platting approvals, coordinating with local nonprofits, accepting below-market rent, and assuming substantial financial risk.

83.    As a direct result of Starbucks's fraudulent misrepresentations, PSDC has suffered substantial damages in an amount to be determined at trial.  Because PSDC's claims sound in fraud, PSDC is entitled to recover all losses proximately caused by Starbucks's misrepresentations—including damages beyond the benefit of the bargain.

84.    Starbucks made public commitments to a historically underserved community in response to a national social injustice.  It induced PSDC to invest millions in reliance on those commitments.  It then walked away—abandoning its contractual obligations and the community it had promised to serve.  That conduct warrants punitive damages.

## COUNT III
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

85.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

86.    Every contract governed by Pennsylvania law contains an implied covenant of good faith and fair dealing.  That covenant requires each party to exercise its contractual discretion honestly and in a manner consistent with the reasonable expectations of the other party.

13

Case ID: 260404329
Control No.: 26051876

87.     Starbucks exercised its discretion under the Lease, including its discretion in pursuing Governmental Approvals, managing the construction timeline, and ultimately invoking Section 17.2 in bad faith and in a manner that frustrated PSDC's reasonable contractual expectations.  Specifically, Starbucks breached the implied covenant by:

a.     Deliberately creating delays and then invoking them as a pretext to terminate;

b.     Causing the project to become more expensive through its own conduct and then using those increased costs as a basis to exit;

c.     Entering into and negotiating the Lease and allowing PSDC to invest millions while Starbucks delayed and failed to perform its obligations;

d.     Obtaining a commercial building permit in February 2025 and then falsely claiming inability to obtain Governmental Approvals nine months later; and

e.     Invoking a termination right that had expired years earlier.

88.     As a direct result of Starbucks's breach of the implied covenant, PSDC has suffered substantial damages in an amount to be determined at trial.

## COUNT IV
## DECLARATORY JUDGMENT

89.     PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

90.     An actual controversy exists between the parties regarding the validity of Starbucks's purported termination of the Lease.  PSDC is entitled to declaratory relief pursuant to the Declaratory Judgment Act, 42 Pa. C.S. § 7531 *et seq*.

91.     PSDC is entitled to a declaration that:

14

Case ID: 260404329
Control No.: 26051876

a.    Starbucks's purported termination is invalid and of no legal effect;

b.    The Lease remains in full force and effect; and

c.    Starbucks owes rent and is obligated to perform under the Lease.

## COUNT V
## PROMISSORY ESTOPPEL
## (Alleged in the Alternative)

92.    PSDC incorporates by reference the allegations set forth in Paragraphs 1 through 71 above as if more fully set forth herein.

93.    This Count is pleaded in the alternative pursuant to Pa.R.Civ.P. 1020(c).

94.    Starbucks made clear and definite promises: to lease the Property for fifty years, to pay rent, to operate a Community Store, and to perform its obligations under the Lease.  Starbucks also made direct and repeated promises to North Philadelphia residents and organizations at BROC meetings and community gatherings about its commitment to the neighborhood.

95.    Starbucks made those promises with knowledge that PSDC and the community would rely on them.

96.    PSDC reasonably relied on those promises by investing millions in the Property, obtaining approvals, coordinating with nonprofits, accepting below-market rent, and taking on substantial financial risk.

97.    PSDC suffered substantial detriment as a result of that reliance.

98.    Injustice can be avoided only by enforcement of Starbucks's promises.

99.    PSDC is entitled to damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community.

15

Case ID: 260404329
Control No.: 26051876

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Philadelphia Suburban Development Corporation respectfully requests that this Court enter judgment in its favor and against Defendant Starbucks Corporation as follows:

A. On Count I, compensatory damages in an amount to be determined at trial, including lost rent, lost profits, and the value of PSDC's investments in the Property;

B. On Count II, all damages proximately caused by Starbucks's misrepresentations, including damages beyond the benefit of the bargain, plus punitive damages;

C. On Count III, compensatory damages in an amount to be determined at trial;

D. On Count IV, a declaration pursuant to 42 Pa. C.S. § 7531 *et seq.* that Starbucks's purported termination is invalid and of no legal effect, that the Lease remains in full force and effect, and that Starbucks owes rent and is obligated to perform;

E. On Count V, in the alternative, damages in an amount to be determined at trial, and to such equitable relief as may be necessary to prevent injustice, including an order directing that Starbucks fulfill its commitments to the North Philadelphia community;

F. Attorneys' fees and costs pursuant to Section 23.14 of the Lease;

G. Pre-judgment and post-judgment interest; and

H. Such other and further relief as the Court deems just and proper.

16

Case ID: 260404329
Control No.: 26051876

## JURY DEMAND

PSDC demands a trial by jury on all issues so triable.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: May 5, 2026

*/s/ Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,
Philadelphia Suburban Development
Corporation*

17

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania, Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**TUCKER LAW GROUP, LLC**

Date:  May 5, 2026

/s/ *Joe H. Tucker, Jr.*
Joe H. Tucker, Jr., Esquire
Julian C. Williams, Esquire

*Attorneys for Plaintiff,*
*Philadelphia Suburban Development*
*Corporation*

Case ID: 260404329
Control No.: 26051876

## VERIFICATION

I, **Mark R. Nicoletti, Sr.**, verify that I am the President and Co-CEO of the Philadelphia Suburban Development Corporation ("PSDC"), and as such I am authorized to take this Verification on behalf of Plaintiff, PSDC, that I have reviewed the foregoing *First Amended Complaint*, the factual averments in the *First Amended Complaint* are based upon information which has been gathered by counsel for PSDC in the preparation for the prosecution of this lawsuit. The language of the *First Amended Complaint* is that of counsel and not of signer. I verify that I have read the *First Amended Complaint,* and the statements therein are true and correct to the best of my knowledge, information and belief. To the extent that the contents of the *First Amended Complaint* are that of counsel, signer has relied upon counsel in taking this Verification. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities.

Date: 5/5/2026  _____

DocuSigned by:

_____
9A1E248401824BB...
Mark R. Nicoletti, Sr.

RECEIVED

MAY 1 3 2026

ROOM 521

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

PHILADELPHIA SUBURBAN                    :        April Term 2026
DEVELOPMENT CORPORATION,                 :
                                         :        No. 4329
                      Plaintiff,         :
                                         :
         v.                              :
                                         :        Control No.  26050092
                                         :
STARBUCKS CORPORATION,                   :
                                         :
                      Defendant.         :

DOCKETED

MAY 1 3 2026

R. POSTELL
COMMERCE PROGRAM

### ORDER

**AND NOW**, this 13th day of May 2026, upon consideration of the Notice of Management Program Dispute filed by Plaintiff and there being no opposition, the Complaint and the Court Docket, it is hereby **ORDERED and DECREED** that the Notice of Program Management Dispute is **GRANTED** and this matter shall be transferred to the Commerce Program for all purposes. This matter shall be placed in a "waiting to list Case Management Conference" status.

BY THE COURT:

PAULA A. PATRICK, S. J.

ORDER-Philadelphia Suburban Development Corporation Vs S [RCP]

26040432900009